UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

| | | |
|---|---|---|
| **APRIL MILLER, ET AL.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs,** | : | **0:15-CV-00044-DLB** |
| | : | |
| **v.** | : | **DISTRICT JUDGE** |
| | : | **DAVID L. BUNNING** |
| **KIM DAVIS, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

---

## DEFENDANT KIM DAVIS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Roger K. Gannam
Jonathan D. Christman
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
Tel: (800) 671-1776
Fax: (407) 875-0770
rgannam@lc.org
jchristman@lc.org

A.C. Donahue
DONAHUE LAW GROUP, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
Tel: (606) 677-2741
Fax: (606) 678-2977
ACDonahue@DonahueLawGroup.com

*Attorneys for Defendant Kim Davis*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................... 1

RELEVANT BACKGROUND ..................................................................................... 3

    A.  Kentucky Marriage Licensing Scheme ....................................................... 3

    B.  Kentucky's Recognition Of Same-Sex "Marriages" Following *Obergefell* ...................... 4

    C.  Davis' Sincerely Held Religious Beliefs About Marriage ............................ 6

    D.  Blevins' Willingness To Issue Same-Sex "Marriage" Licenses ................... 7

    E.  Plaintiffs' Ability To Obtain Kentucky Marriage Licenses .......................... 7

STANDARD OF REVIEW ........................................................................................... 8

ARGUMENT ................................................................................................................. 8

    A.  Davis Will Suffer Substantial And Irreparable Harm If She Is Forced To Authorize Same-Sex "Marriages" ...................................................... 8

        1.  Requiring Davis To Authorize Same-Sex "Marriages" Violates The Kentucky Religious Freedom Restoration Act ........................... 9

            a.  Davis' inability to authorize same-sex "marriage" licenses is motivated by her sincerely-held religious beliefs ........................... 10

            b.  Forcing Davis to authorize same-sex "marriages" substantially burdens her religious freedom ............................ 11

            c.  There is no compelling governmental interest in violating Davis' religious freedom and other less restrictive means are available ........................ 12

        2.  Requiring Davis To Authorize Same-Sex "Marriages" Violates Her Fundamental Right Rights Of Religious Freedom And Conscience Protected By The United States And Kentucky Constitutions ........................ 14

        3.  Requiring Davis To Affix Her Name And Approval To Same-Sex "Marriage" Licenses Violates The Compelled-Speech Doctrine ........................ 17

4. Requiring Davis To Affirm A Definition Of Marriage Contrary To Her Religious Belief Violates The Religious Test Clause ................................................................ 20

5. Plaintiffs' Assertion That Public Officials Like County Clerks Have No Fundamental Rights Is Meritless ..................................................................... 22

6. Providing Religious Accommodation Will Not Engender Statewide "Chaos" In The Issuance Of Kentucky Marriage Licenses ................................................. 25

B. Plaintiffs Have Failed To Demonstrate That They Would Suffer Irreparable Harm Absent An Injunction Against Davis Because Kentucky Marriage Licenses Are Readily Available .................................................................................................... 29

C. Plaintiffs Have Failed To Demonstrate A Strong Likelihood Of Success On The Merits Of Their Claims Because They Are Not Absolutely Prevented From Marrying Whom They Want ................................................................................................... 31

D. The Public Interest Weighs In Favor Of Denying Plaintiffs' Motion For Preliminary Injunction ................................................................................................... 34

E. To The Extent This Court Concludes Plaintiffs Are Entitled To Any Preliminary Injunctive Relief, The Injunction Should Be Directed Exclusively At The Rowan County Judge/Executive ................................................................................... 37

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

## Cases

### *State*

*Jones v. Hallahan*,
501 S.W.2d 588 (Ky. App. 1973) ............................................................................23

### *Federal*

*Borough of Duryea, Pa. v. Guarnieri*,
131 S.Ct. 2488 (2011) ............................................................................................23

*Bourke v. Beshear*,
996 F. Supp. 2d 542 (W.D. Ky. 2014) ....................................................................24

*Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd County, Ky.*,
258 F. Supp. 2d 667 (E.D. Ky. 2003) ......................................................................8

*Burwell v. Hobby Lobby Stores, Inc.*,
134 S.Ct. 2751 (2014) ......................................................................10, 12, 13, 28

*Cantwell v. Connecticut*,
310 U.S. 296 (1940) ................................................................................................9

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ....................................................................................15, 16, 17

*Connection Distributing Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ..................................................................................8

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*,
483 U.S. 327 (1987) ..............................................................................................29

*Curto v. City of Harper Woods*,
954 F.2d 1237 (6th Cir. 1992) ................................................................................31

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
70 F.3d 1474 (6th Cir. 1995) ..................................................................................34

*DeBoer v. Snyder*,
772 F.3d 388 (6th Cir. 2014) ............................................................................23, 24

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................8

*Employment Div., Dep't of Human Resources of Oregon v. Smith*,
     494 U.S. 872 (1990)..............................................................................15

*Eyler v. Babcox*,
     582 F. Supp. 981 (N.D. Ill. 1983) .....................................................34

*Garcetti v. Ceballos*,
     547 U.S. 410 (2006).............................................................................23

*Girouard v. United States*,
     328 U.S. 61 (1946)................................................................21, 22, 28

*G. & V. Lounge, Inc. v. Michigan Liquor Control Comm'n*,
     23 F.3d 1071 (6th Cir. 1994) ..............................................................34

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
     480 U.S. 136 (1987).............................................................................29

*Imagine Medispa, LLC v. Transformations, Inc.*,
     999 F. Supp. 2d 862 (S.D. W.Va. 2014) ............................................34

*Johanns v. Livestock Marketing Ass'n*,
     544 U.S. 550 (2005).............................................................................18

*Kruer ex rel. S.K. v. Gonzales*,
     No. 05-120, 2005 WL 1529987 (E.D. Ky. June 28, 2005)....................8

*Lane v. Franks*,
     134 S.Ct. 2369 (2014)..........................................................................23

*Loving v. Virginia*,
     388 U.S. 1 (1968).................................................................................32

*Montgomery v. Carr*,
     101 F.3d 1117 (6th Cir. 1996) ............................................................31

*Newsom v. Norris*,
     888 F.2d 371 (6th Cir. 1989) ................................................................9

*Obergefell v. Hodges*,
     135 S. Ct. 2584 (2015)............................................................... *passim*

*Palmer v. Braun*,
     155 F. Supp. 2d 1327 (M.D. Fla. 2001)..............................................34

*Pleasant Grove City, Utah v. Summum*,
     555 U.S. 460 (2009).............................................................................19

*Prater v. City of Burnside, Ky.*,
   289 F.3d 417 (6th Cir. 2002) ...........................................................................14

*Riley v. Nat'l Federation of Blind of N.C., Inc.*,
   487 U.S. 781 (1988)...............................................................................17, 18

*Salmon v. Old Nat'l Bank*,
   No. 08-116, 2010 WL 716232 (W.D. Ky. Feb. 24, 2010).......................................34

*San Francisco Veteran Police Officers Ass'n v. City & County of San Francisco*,
   18 F. Supp. 3d 997 (N.D. Cal. 2014)................................................................34

*Sch. Dist. Of Abington, Twp., Pa. v. Schempp*,
   374 U.S. 203 (1963)....................................................................................20

*Sherbert v. Verner*,
   374 U.S. 398 (1963)...............................................................................15, 17

*Slater v. Douglas County*,
   743 F. Supp. 2d 1188 (D. Or. 2010) ...............................................................26

*Stormans, Inc. v. Selecky*,
   844 F. Supp. 2d 1172 (W.D. Wash. 2012)..........................................................27

*Summe v. Kenton County Clerk's Office*,
   604 F.3d 257 (6th Cir. 2010) .........................................................................39

*Suster v. Marshall*,
   149 F.3d 523 (6th Cir. 1998) ...........................................................................8

*Thomas v. Review Bd. of Indiana Employment Security Div.*,
   450 U.S. 707 (1981)....................................................................................10

*Torcaso v. Watkins*,
   367 U.S. 488 (1961).....................................................................................22

*Turner v. Safley*,
   482 U.S. 78 (1987).......................................................................................32

*United States v. Windsor*,
   133 S.Ct. 2675 (2013)..................................................................................33

*Vaughn v. Lawrenceburg Power Sys.*,
   269 F.3d 703 (6th Cir. 2001) .........................................................................31

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   135 S.Ct. 2239 (2015)..................................................................................19

5

*Wallace v. Jaffree*,
  472 U.S. 38 (1985)..................................................................................14

*West Va. State Bd. of Ed. v. Barnette*,
  319 U.S. 624 (1943).........................................................................18, 19

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972)..................................................................................15

*Wooley v. Maynard*,
  430 U.S. 705 (1976).........................................................................18, 19

*Zablocki v. Redhail*,
  434 U.S. 374 (1978).........................................................................31, 32

## Constitutional Provisions

### *State*

KY. CONST. Preamble ....................................................................................34

KY. CONST. § 1 ...................................................................................14, 17

KY. CONST. § 5 ..........................................................................14, 15, 34

KY. CONST. § 8 ..........................................................................................17

KY. CONST. § 99 .........................................................................................20

KY. CONST. § 100 .......................................................................................20

KY. CONST. § 228 .......................................................................................23

KY. CONST. § 233A..............................................................................4, 23

### *Federal*

U.S. CONST. amend I ........................................................................... *passim*

U.S. CONST. Art. VI................................................................................20

## Statutes

### *State*

Kentucky Religious Freedom Restoration Act, 2013 Kentucky Laws Ch. 111 (HB 279) ..............9

KY. REV. STAT. § 67.725 .........................................................................38, 39

KY. REV. STAT. § 150.195 ................................................................................13

KY. REV. STAT. § 171.130 ..................................................................................3

KY. REV. STAT. § 402.005 ............................................................................4, 23

KY. REV. STAT. § 402.050 ................................................................................33

KY. REV. STAT. § 402.080 ..................................................................2, 8, 29, 33

KY. REV. STAT. § 402.100 ........................................................................ *passim*

KY. REV. STAT. § 402.110 ..........................................................................2, 3, 11

KY. REV. STAT. § 402.240 ........................................................................ *passim*

KY. REV. STAT. § 446.010 ..................................................................................9

KY. REV. STAT. § 446.030 ..................................................................................9

KY. REV. STAT. § 446.090 ..................................................................................9

KY. REV. STAT. § 446.140 ..................................................................................9

KY. REV. STAT. § 446.350 ........................................................................ *passim*

MD. CODE ANN., FAM. LAW § 2-401(a) ...........................................................33

MICH. COMP. LAWS § 551.101 ........................................................................33

MICH. COMP. LAWS § 551.103a ......................................................................33

MINN. STAT. § 517.07 ......................................................................................33

MINN. STAT. § 517.08(a) ..................................................................................33

OHIO REV. CODE ANN. § 3101.05(a) ...............................................................33

TENN. CODE ANN. § 36-3-103 ........................................................................33

<u>*Federal*</u>

18 U.S.C. § 3597 ..............................................................................................27

42 U.S.C. § 2000bb-1 ......................................................................................10

Defendant Kim Davis ("Davis"), by and through her undersigned counsel, respectfully submits this Response in Opposition to Plaintiffs' Motion for Preliminary Injunction.

## I.   <u>INTRODUCTION</u>

This case is not about whom a person may marry under Kentucky law. No state-wide ban is preventing any Plaintiff from marrying whom they want to marry. This case is also not about whether Plaintiffs can obtain a Kentucky marriage license. They can. Such licenses, including same-sex "marriage" ("SSM") licenses, are readily available across Kentucky, and Plaintiffs can obtain a license from any one of more than 100 counties (including counties surrounding Rowan County, and the counties where multiple Court hearings attended by Plaintiffs have been held). This case is also not about whether Kentucky will recognize SSM. The Kentucky Governor has declared Kentucky will. Instead, this case is about forcing an individual county clerk (Davis) to authorize and personally approve SSM in violation of her fundamental religious liberty and speech rights. The United States and Kentucky Constitutions, as well as the Kentucky Religious Freedom Restoration Act, protect her conscience from such authoritarian invasion and intolerant coercion.

Plaintiffs' request for immediate and extraordinary injunctive relief in the form of Kentucky marriage licenses authorized by Davis is a thinly-veiled attempt at deeming her religious conscience meaningless and punishing her for even asserting a religious objection to authorizing SSM. In fact, these Plaintiffs sought licenses from Davis only after learning of her religious objections to SSM, and they refuse to obtain a license elsewhere. But if a SSM license is issued with Davis' name, authorization, and approval, no one can unring that bell. That searing act of validation would forever echo in her conscience.

Plaintiffs' rush to induce irreversible and substantial harm to the religious conscience of Davis ignores numerous alternative options presently available to them (if, what they really wanted

1

was a Kentucky marriage license) and also short-circuits the political process in Kentucky (and elsewhere) that is reacting and responding to the implications of the majority opinion of the United States Supreme Court in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015). Irrespective of what "five lawyers" opined in *Obergefell* about SSM, *id.* at 2612, 2624 (Roberts, C.J., dissenting), they did not overrule or overwrite the First Amendment and other critical religious liberty protections. There is no constitutional right to have a particular person authorize a SSM license and affix their imprimatur to that permanent public record, especially if that person holds deep religious convictions prohibiting her from participating in and approving of SSM. If Davis' religious objection cannot be accommodated under the circumstances of this case, then elected officials have no real religious freedom when they take public office. But contrary to Plaintiffs' insatiable demands, such individual rights and freedoms so fundamental to liberty are neither surrendered at the entry door of public service nor waived upon taking an oath of office. To suggest otherwise creates a religious (or anti-religious) test for holding office – which the United States and Kentucky Constitutions expressly forbid. Plaintiffs' injunction motion must be denied.

## II.    RELEVANT BACKGROUND

### A.    Kentucky Marriage Licensing Scheme.

Kentucky has a body of legislation that governs the issuance of marriage licenses. Under Kentucky marriage law, individuals may obtain a marriage license from the county clerk in any of Kentucky's 120 counties, **irrespective of their county of residence**. KY. REV. STAT. § 402.080.[1] Pursuant to Kentucky's marriage licensing scheme, "[e]ach county clerk shall use the form proscribed by the Department for Libraries and Archives [KDLA] when issuing a marriage license." KY. REV. STAT. § 402.100. Kentucky marriage law further requires that "[t]he form of

---

[1]       Chapter 402 provisions from Kentucky marriage law are collectively attached hereto as Exhibit "D."

marriage licensed prescribed in KRS 402.100 shall be uniform throughout this state." KY. REV. STAT. § 402.110. The designer of the mandatory license form (KDLA) is an executive branch department "headed by a commissioner whose title shall be state librarian who shall be appointed by and serve at the pleasure of the Governor." KY. REV. STAT. § 171.130. County clerks have no discretion in the composition of this prescribed form. Hr'g Tr. (7/20/15), Davis Direct, at 37:17-20, 38:9-17, 39:9-12, 75:18-19; *id.*, Davis Cross, 57:8-23.[2]

Under Kentucky marriage law, the specific form required by the KDLA "shall consist of" a "marriage license" that includes an "authorization statement of the county clerk issuing the license" and "[t]he date and place the license is issued, and the signature of the county clerk or deputy clerk issuing the license." KY. REV. STAT. § 402.100(1). This form "shall" also include a "marriage certificate" that includes "[a] signed statement by the county clerk or a deputy county clerk of the county in which the marriage license was issued that the marriage license was recorded." KY. REV. STAT. § 402.100(2). Upon solemnization, the form is to be returned to the county clerk's office and "shall provide" certain "information as recorded on the license authorizing the marriage," including the "***the name of the county clerk under whose authority the license was issued***, and the county in which the license was issued." KY. REV. STAT. § 402.100(3) (emphasis added). Thus, any county clerk must include their name and signature **four** times on any marriage licenses the clerk signs. *See* Ex. 2, KDLA-Approved Marriage Form Pre-*Obergefell*; Ex. 3, KDLA-Approved Marriage Form Post-*Obergefell*.[3] But even on licenses that the county clerk does not sign, the form requires the clerk to put provide their name **no less than two times** for each and every marriage license issued in the clerk's county. *See* Exs. 2-3. In other words, no

---

[2]     The July 13, 2015 and July 20, 2015 hearing transcripts, *see* D.E. 21 and 26, are attached hereto as Exhibits "A" and "B," respectively.

[3]     Copies of Davis Exhibits 1 through 5 admitted during the July 20, 2015 injunction hearing, *see* D.E. 25, are collectively attached hereto as Exhibit "C" for the Court's convenience.

marriage license is issued by a county clerk without their authorization and without their imprimatur. Hr'g Tr. (7/20/15), Davis Direct, at 37:10-16, 38:9-17, 40:11-41:23, 50:20-21, 77:9-78:3. The KDLA-approved form uses the word "marriage" at six places. *See* Exs. 2 & 3.

Kentucky marriage law also provides an alternative procedure for the issuance of marriage licenses "[i]n the absence of the county clerk, or during a vacancy in the office." KY. REV. STAT. § 402.240. According to this option, the county judge/executive for each county "may issue the license" instead of the county clerk "and, in so doing, he shall perform the duties and incur all the responsibilities of the clerk. The county judge/executive shall return a memorandum thereof to the clerk, and the memorandum shall be recorded as if the license had been issued by the clerk." *Id.*

**B.      Kentucky's Recognition Of Same-Sex "Marriages" Following *Obergefell*.**

Kentucky also has democratically-enacted law regarding the definition of marriage. *See* KY. CONST. § 233A; KY. REV. STAT. § 402.005. But on June 26, 2015, a majority of the Supreme Court held that laws from four states (including Kentucky) that defined marriage as the union of a man and a woman were "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Obergefell v. Hodges*, 135 S.Ct. 2584, 2605 (2015). Almost immediately, Kentucky Governor Steven L. Beshear ("Gov. Beshear") informed all county clerks that "[e]ffective today, Kentucky will recognize as valid all same sex marriages performed in other states and in Kentucky." Ex. 4, Ltr. from Gov. Steven L. Beshear to Kentucky County Clerks, dated June 26, 2015 ("Beshear Letter"); Hr'g Tr. (7/20/15), Davis Direct, at 44:3-17, and Davis Cross, at 59:9-11. Gov. Beshear stated that "Kentucky . . . must license and recognize the marriages of same-sex couples," and further instructed that "[n]ow that same-sex couples are entitled to the issuance of a marriage license, the [KDLA] will be sending a gender-

neutral form to you today, along with instructions for its use." Ex. 4, Beshear Letter.[4] The KDLA subsequently provided this new marriage form to county clerks, including Davis. *Id.*, Davis Direct, at 39:21-40:2. The form retained all of the references to "marriage," as well as the name, signature and authorization requirements of the county clerk. *Id.* at 40:11-42:7; *see also* Exs. 2-3.

Following Gov. Beshear's decree, county clerks across Kentucky began issuing SSM licenses. *See*, *e.g.*, Hr'g Tr. (7/20/15), Davis Direct, at 54:9-19.[5] According to Gov. Beshear, "government officials in Kentucky . . . must recognize same-sex marriages as valid and allow them to take place,"[6] and "[s]ame-sex couples are now being married in Kentucky and such marriages from other states are now being recognized under Kentucky law."[7] In these same pronouncements, Gov. Beshear stated that the "overwhelming majority of county clerks" are "iss[uing] marriage licenses regardless of gender" and only "two or three" county clerks (of 120) were "refusing" to issue such licenses due to their "personal beliefs" and "personal feelings." *See* Exs. I, J. In subsequent announcements, Gov. Beshear has maintained that county clerks must issue marriage licenses, including SSM licenses, despite their "own personal beliefs."[8] For Gov. Beshear, the only options available to county clerks who oppose SSM are (1) issue the licenses against their "personal convictions," or (2) resign. Hr'g Tr. (7/20/15), Davis Direct, at 47:5-12.[9]

---

[4]      *See also* Ex. F, Press Release, Gov. Beshear's Statement on Supreme Court Ruling on Same-Sex Marriage, dated June 26, 2015.

[5]      *See* Ex. G, Boyd Judge-exec officiates county's first same-sex marriage, The Independent, July 9, 2015; Ex. H, Kenton County witnesses first same-sex marriage, Cincinnati Inquirer, June 29, 2015.

[6]      *See* Ex. I, Press Release, Gov. Beshear Statement on Today's Meeting with Casey County Clerk, dated July 9, 2015.

[7]      *See* Ex. J, Press Release, Gov. Beshear: No special session needed, dated July 7, 2015.

[8]      *See* Ex. K, Gov. Beshear Tells County Clerks to Fulfill Their Duties or Resign, WMKY.com, dated July 21, 2015.

[9]      Notably, Gov. Beshear did not provide the same ultimatum to Kentucky Attorney General Jack Conway ("Atty. Gen. Conway") when he refused to defend Kentucky marriage law. According to Atty. Gen. Conway in his tearful statement at the time, "There are those who believe it's my mandatory duty, regardless of my personal opinion, to continue to defend this case…I can only say that I am doing what I think is right. In the final analysis, I had to make a decision that I could be proud of – for me now." *See* Ex. L, Read and watch Jack Conway's statement on same-sex marriage, WKYT.com, dated Mar. 4, 2014. Gov. Beshear did not force Atty. Gen. Conway to abandon his conscience

### C.   **Davis' Sincerely Held Religious Beliefs About Marriage.**

Davis serves as the elected county clerk for Rowan County, Kentucky. Hr'g Tr. (7/20/15),

Davis Direct, at 24:2-5. Before taking office as the county clerk in January 2015, she worked at

the Rowan County Clerk's Office as a deputy clerk for nearly thirty years. *Id.* at 24:6-12. Davis is

a professing Apostolic Christian who attends church "[e]very time the doors are open," attends

weekly Bible study and worship services, and leads a weekly Bible study with women at a local

jail. *Id.* at 29:8-30:6; *see also id.*, Blevins Cross, at 20:1-2 (describing Davis as "very religious").

As a Christian, Davis possesses a sincerely held religious belief that "[m]arriage is a union

between one man and one woman," only. *Id.*, Davis Direct, at 31:7-14, 32:4-7. As county clerk,

she authorizes the "marriage" licenses issued from her office. *Id.* at 37:10-16, 38:9-17, 40:11-14,

41:4-7, 41:16-23, 50:20-21, 77:9-12, 77:21-78:3. But Davis cannot authorize the marriage of same-

sex couples because it violates her religious beliefs and convictions. *Id.* at 42:17-20 ("Because if I

say that I authorize that, I'm saying I agree with it, and I can't."); *id.* at 43:2-5; *id.*, Davis Cross,

at 62:10-12 ("[M]y religious beliefs can't condone issuing and being a party to the issuance of

same-sex marriage licenses."); *see also id.*, Blevins Cross, at 17:3-6 ("[Davis] did tell me early on,

before the decision was made, that if it was to allow same-sex marriage that she could not do that

in her moral judgment. She just could not do it."). Moreover, her name appears on every marriage

license issued from the Rowan County clerk's office, and she cannot have her name on a SSM

license because her name equates to approval. *Id.*, Davis Direct, at 38:9-17, 40:24-41:3, 41:24-

42:1; *id.*, Davis Cross, 61:15-19, 67:5-7; *id.*, Davis Redirect, 75:16-19, 80:16-18.

On June 27, 2015, following the *Obergefell* decision, Davis discontinued issuing **any**

marriage licenses. *Id.*, Davis Direct, at 33:13-24. This was not a "spur-of-the-moment decision"

---

and instead hired "other counsel" to represent Kentucky in defending its own Constitution and laws. *See* Ex. M, Press Release, Gov. Beshear: State to Pursue Appeal in Same Sex Marriage Case, dated Mar. 4, 2014.

reached by Davis; to the contrary, it was something that she "had prayed and fasted over weekly" in the weeks and months leading up to the *Obergefell* decision and she "sought God on it." *Id.* at 34:14-18. In fact, before the *Obergefell* decision, Davis wrote Kentucky legislators pleading with them to "get a bill on the floor to help protect clerks" who had a religious objection to SSM. *Id.* at 34:2-14, 35:8-36:3; *see also* Ex. 1, Ltr. From K. Davis to Ky. Sen. Robertson, dated Jan. 23, 2015. Her views about marriage have not changed. *Id.* at 36:1-3, 43:14-16. To ensure that all individuals and couples were treated the same, Davis suspended the issuance of all marriage licenses in Rowan County. *Id.* at 43:6-9; *id.*, Davis Cross, at 62:13-14, 67:7, 70:17-20; *see also id.*, Blevins Cross, 20:5-6, 21:3-5. Even though one of her deputy clerks (and perhaps two) is (or are) willing to issue a SSM license, she instructed all deputy clerks to stop issuing marriage licenses because licenses are issued with her authority (not the deputy clerk's) and every license requires her name to appear on the license (even if signed by a deputy clerk). *Id.*, Davis Direct, at 38:25-39:4, 48:19-49:18; *id.*, Davis Cross, at 61:15-19, 62:4-12; *id.*, Davis Redirect, 81:1-2.

### D.   Blevins' Willingness To Issue Same-Sex "Marriage" Licenses.

Walter Blevins ("Blevins") is the Rowan County Judge/Executive, the highest elected official in the county. Hr'g Tr. (7/20/15), Blevins Direct, at 6:16-7:6, 7:19-21. Blevins admitted that he had the authority to issue marriage licenses in the absence of the county clerk, even though he was unaware of any county judge/executive using this procedure. *Id.*, at 8:9-13, 9:15-16, and Blevins Cross, at 15:24-25. Blevins testified that he would raise no religious objection to issuing SSM licenses if he had authority to issue marriage licenses. *Id.*, Blevins Direct, at 14:16-18.

### E.   Plaintiffs' Ability To Obtain Kentucky Marriage Licenses.

Rowan County is bordered by 7 counties, and the clerk's offices in these counties are within 30-45 minutes from Rowan County clerk's office. Hr'g Tr. (7/20/15), Davis Direct, at 53:5-10, 53:17-22. More than ten other clerks' offices are within a one hour drive of the Rowan County

office, and these counties are issuing marriage licenses. *Id.* at 53:11-15, 54:3-8. Marriage licenses, including SSM licenses, are also being issued in the two counties where hearings were held in this matter. *Id.* at 54:9-19. As Kentucky residents, Plaintiffs are not required to obtain a marriage license in Rowan County. KY. REV. STAT. § 402.080. Yet Plaintiffs admitted that they have not even attempted to obtain a license in any county other than Rowan County.[10]

## III.  STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy." *Kruer ex rel. S.K. v. Gonzales*, No. 05-120, 2005 WL 1529987, at *5 (E.D. Ky. June 28, 2005) (Bunning, J.). In considering preliminary injunctive relief, this Court evaluates "(1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm; (3) whether an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of such injunction." *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *see also Boyd County High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd County, Ky.*, 258 F. Supp. 2d 667, 679 (E.D. Ky. 2003) (Bunning, J.).

## IV.  LEGAL ARGUMENT

### A.  Davis Will Suffer Substantial And Irreparable Harm If She Is Forced To Authorize Same-Sex "Marriages."

As Plaintiffs admit, "it is well-settled that 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also* D.E. 2-1 at 8-9. In fact, the Sixth Circuit has expressly found that "[t]he Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values

---

[10]      Hr'g Tr. (7/13/15), Miller Direct, at 24:19-20, 28:23-25, and Miller Cross, at 31:2-4; *id.*, Fernandez Direct, at 34:7-10, 37:16-18; *id.*, Spartman Direct, at 41:17-18, 47:1-2, and Spartman Cross, at 48:1-6.

constitutes irreparable injury[.]" *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989). "'One reason for such stringent protection of First Amendment rights certainly is the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Id.* (citation omitted). Indeed, "[t]he fundamental law declares the interest of the United States that the free exercise of religion be not prohibited and that freedom to communicate information and opinion be not abridged." *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940).

### 1. Requiring Davis To Authorize Same-Sex "Marriages" Violates The Kentucky Religious Freedom Restoration Act.

Davis' inability to issue, authorize, and approve SSM licenses is protected by the Kentucky Religious Freedom Restoration Act, 2013 Kentucky Laws Ch. 111 (HB 279) (hereinafter, "Kentucky RFRA").[11] The Kentucky RFRA protects her right to act *or refuse to act* motivated by a sincerely held religious belief. The Kentucky RFRA was enacted by an overwhelming majority in 2013, *over Governor Beshear's veto*, and provides that:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest.

KY. REV. STAT. § 446.350. Thus, a person's religious freedom may not be substantially burdened unless (1) a compelling governmental interest is shown and (2) the least restrictive means were

---

[11]     The Kentucky RFRA is housed under Chapter 446 of Kentucky's statutes, which is entitled "Construction of Statutes," and includes such other generally applicable provisions as "Definitions for Statutes Generally," "Computation of Time," "Severability," "Titles, Headings, and Notes," KY. REV. STAT. §§ 446.010, 446.030, 446.090, 446.140. Even more specifically, the Kentucky RFRA (a copy of which is attached hereto as Exhibit "E") is included under a section of Chapter 446 reserved for "Rules of Codification." As such, Kentucky marriage law cannot be interpreted exclusive of the Kentucky RFRA. Therefore, Plaintiffs' attempt at using Kentucky marriage law and Gov. Beshear's directives, *see* D.E. 1, Compl., at ¶¶ 31-33; D.E. 2-1 at 6, and this Court action, to force Davis to issue and authorize a Kentucky marriage license necessarily incorporates consideration of the Kentucky RFRA.

used to further that interest. The Kentucky RFRA is similar to the Federal Religious Freedom Restoration Act ("Federal RFRA"), 42 U.S.C. § 2000bb-1(a) & (b), but the Kentucky RFRA goes even further in protecting religious liberties because it establishes a "clear and convincing" evidentiary standard, a heightened burden of proof.

a.    **Davis' inability to authorize same-sex "marriage" licenses is motivated by her sincerely-held religious beliefs.**

Davis holds sincerely-held religious beliefs on marriage. It is not for Plaintiffs, or, respectfully even this Court, to question the reasonableness or scriptural accuracy of that belief. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014) (citing *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 716 (1981)). Indeed, judges "are not arbiters of scriptural interpretation," and they are not tasked with determining who "more correctly" perceives their faith's commands. *Thomas*, 450 U.S. at 716. Instead, the "narrow function" of this Court is to determine whether the line of conscience drawn is an "honest conviction" that the matter at issue "was forbidden by [her] religion." *Id.*

In the case at bar, the undisputed evidence is that Davis' inability to issue SSM licenses is motivated by her sincerely-held religious beliefs about marriage. Hr'g Tr. (7/20/15), Davis Direct, at 31:13-16; *id.*, Davis Cross, at 62:10-17, 63:21-25. In her view, marriage is the sacred union of a man and a woman, only. *Id.*, Davis Direct, at 31:10-12, 32:4-7; *id.*, Davis Cross, at 69:10. Thus, she cannot license, authorize and approve a union that is not "marriage," according to her religious beliefs. *Id.*, Davis Direct, at 42:17-20; *id.*, Davis Cross, 62:10-12. As indicated above, the Kentucky RFRA protects a person's "right to act ***or refuse to act*** in a manner motivated by a sincerely held religious belief." Thus, the Kentucky RFRA is not solely directed at what a person may believe—but also how those beliefs translate to actions (or non-actions). Davis has unquestionably demonstrated an honest conviction against same-sex "marriage."

10

**b.    Forcing Davis to authorize same-sex "marriages" substantially burdens her religious freedom.**

Forcing Davis to authorize SSM licenses substantially burdens her religious freedom. As indicated above, Kentucky law requires that "each county clerk" use the same prescribed form to issue a marriage license. KY. REV. STAT. §§ 402.100, 402.110. As county clerk, Davis is provided this form by the KDLA, and she has no local discretion in the composition and requirements of that prescribed form. Hr'g Tr. (7/20/15), Davis Direct, at 37:17-20, 38:9-17, 39:9-12, and Davis Cross, 57:8-23. This form includes: (1) an "*authorization statement of the county clerk issuing the license*"; (2) "the *signature of the county clerk* or deputy clerk issuing the license"; (3) "*[a] signed statement by the county clerk* or a deputy county clerk of the county in which the marriage license was issued"; and (4) the "*the name of the county clerk under whose authority the license was issued*." KY. REV. STAT. § 402.100(1)-(3) (emphasis added).

Thus, as county clerk, Davis must include her name, signature, and approval four times on marriage licenses she signs. *See* Exs. 2-3. Even on licenses that she does not sign, the KDLA-approved form requires Davis to put her imprimatur no less than two times on each and every marriage license issued in her county. *Id*. Yet, as constructed, the "authorization" or permission to marry (even on licenses she does not personally sign) unmistakably comes from Davis herself. Hr'g Tr. (7/20/15), Davis Direct, at 37:10-16, 38:9-17, 40:11-14, 41:4-7, 41:16-23, 50:20-21, 77:9-12, 77:21-78:3. But she cannot sanction, endorse, and approve a union of two persons which, in her sincerely-held belief, is not marriage. *Id.* at 31:10-12, 32:4-7; 42:17-20, and Davis Cross, at 62:10-12 ("[M]y religious beliefs can't condone issuing and being a party to the issuance of same-sex marriage licenses."); *see also id.*, Blevins Cross, at 17:5-6 (confirming that "[Davis] just could not do it"). The marriage licenses Davis authorizes become permanent records stating the marriage was endorsed by her, which she cannot do. *See id.*, Davis Direct, at 42:19-20 ("Because if I say

11

that I authorize that, I'm saying I agree with it, and I can't."), and Davis Cross, 67:5-7 ("I could [not] put my name to a marriage license that was issued to a same-sex couple.").

Importantly, Davis is not claiming a substantial burden on her religious freedom if *someone else* authorizes and approves a SSM license. For example, Davis is not claiming that her religious freedom is substantially burdened if she must complete an opt-out form to be exempted from issuing SSM licenses. Davis is also not claiming that a SSM license authorized by the Rowan County Judge/Executive and devoid of her name and authority substantially burdens her religious freedom. Davis is also not claiming that her religious freedom is substantially burdened if the license were issued by someone else in Rowan County (*e.g.*, a deputy clerk), so long as that license is not issued under her name or on her authority. But as it stands now, and through no fault of her own, no marriage license in Rowan County is issued without Davis' authority and without her imprimatur. Davis is also not claiming that the mere act of recording substantially burdens her religious freedom. But county clerks are not mere scriveners for a marriage. Instead, county clerks actually authorize the marriage license. *See* KY. REV. STAT. § 402.100(1)-(3). Such participation in and approval of SSM substantially burdens her religious freedom.

### c.   There is no compelling governmental interest in violating Davis' religious freedom and other less restrictive means are available.

There is no compelling governmental interest in forcing Davis to violate her religious freedom, especially when SSM marriage licenses are readily available in nearby and surrounding county clerks' offices. Moreover, forcing Davis to sign, issue, and approve SSM licenses over and against her sincere religious objections also is not the least restrictive means of obtaining a Kentucky marriage license. "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 134 S. Ct. at 2780. No proof has been shown that Kentucky "lacks other means" of issuing SSM licenses "without imposing a substantial burden" on Davis' "exercise of religion."

*See id.* Not only that, the least restrictive means test may "require the Government to expend additional funds to accommodate citizens' religious beliefs." *Id.* at 2781. This is consistent with the Kentucky Legislative Research Commission's ("KYLRC") fiscal impact reports provided to Kentucky legislators prior to enacting the Kentucky RFRA. In those reports, the KYLRC noted that the least restrictive alternative required "may be minimal . . . or significant, for example, if it requires hiring additional staff or paying overtime for other staff to do a job that an employee declines to do because of religious beliefs."[12] Thus, even if proposed less restrictive alternatives require additional costs in administrating Kentucky marriage law, such costs are envisioned by the Kentucky RFRA to ensure that religious freedoms of persons like Davis are protected.

In this matter, several less restrictive means are available to accomplish the goal of providing Plaintiffs with Kentucky marriage licenses (if that is the "desired goal," *Hobby Lobby*, 134 S.Ct. at 2780) without substantially burdening Davis' religious freedom and conscience. First, Kentucky can provide an opt-out or exemption to county clerks who have a religious objection to issuing SSM licenses. Other states, such as North Carolina, have provided precisely this type of remedy to conscientious objectors to same-sex "marriage." *See*, *e.g.*, N.C. Gen. Stat. § 51-5.5. Indeed, Kentucky law itself already provides to county clerks an exemption from issuing fishing and hunting licenses, which any county clerk may claim simply by submitting a written memorandum. Ky. Rev. Stat. § 150.195. Thus, if Kentucky is able to accommodate personal beliefs and conscientious objection regarding something that is (to some) as trivial as fishing and hunting, surely Kentucky can and must provide similar accommodation for deeply held beliefs about the fundamental nature of marriage.

---

[12]    *See* Ex. N, Kentucky LRC, Local Mandate Fiscal Impact Estimates, Ky. House Bill 279 (2013 Reg. Sess.), dated Feb. 26, 2013 and Mar. 6, 2013.

Second, Kentucky can designate other persons who are able to authorize SSM licenses in a particular county in the event the county clerk in that county has a religious objection to issuing such licenses. Third, Kentucky can modify the prescribed KDLA-approved form to remove the personal authorization and approval that a county clerk must provide on the current form. Fourth, Kentucky can keep the issuance of marriage licenses at the state-level through an online or other state-wide licensing scheme that removes deputizing county clerks as state agents for authorizing and approving SSM. Fifth, in this particular situation, where the county judge/executive is willing to issue SSM licenses, Kentucky can instruct the KDLA to design a form "memorandum" to be used by the county judge/executive for the issuance of marriage licenses in light of Davis' absence based upon a religious conscience objection. All of these options, and certainly others as well, are available to avoid substantially burdening Davis' religious freedom.

### 2. Requiring Davis To Authorize Same-Sex "Marriage" Violates Her Fundamental Rights Of Religious Freedom And Conscience Protected By The United States And Kentucky Constitutions.

Davis is also protected by fundamental rights of religious freedom and conscience that are firmly enshrined in the United States and Kentucky Constitutions. The First Amendment of the United States Constitution requires that government must not "prohibit[] the free exercise" of religion, U.S. CONST. amend I, and ensures that a person may "express himself in accordance with the dictates of his own conscience." *Wallace v. Jaffree*, 472 U.S. 38, 49 (1985). Importantly, the Free Exercise Clause specifically "protects not only the right to hold a particular religious belief, but also the right to engage in conduct motivated by that belief." *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 427 (6th Cir. 2002). In a similar fashion, the Kentucky Constitution provides expansive constitutional protections for religious expression, liberties, and conscience. KY. CONST., § 1 (identifying the "inherent and inalienable rights" of persons, including the "right of worshipping Almighty God according to the dictates of their consciences"); *id.*, § 5 ("[T]he civil

14

rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the ***rights of conscience***.").

Most cases with free exercise claims are considered under the framework established by the Supreme Court in *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). According to this well-established framework, a neutral and generally applicable law does not violate the Free Exercise Clause "even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Smith*, 494 U.S. at 878-80. However, if the free exercise claim is combined with another constitutional right, as involved here, *see* Section IV.A.3 (free speech rights), *infra*, the standard of protection is at its constitutional zenith. *Smith*, 494 U.S. at 881. Thus, similar to the Kentucky RFRA analysis set forth above, a successful free exercise challenge can be made if the individual demonstrates that (1) a sincerely held religious belief (2) was burdened by a governmental action, and the government cannot show that it had (3) a compelling reason for burdening the religious belief and (4) it used the least restrictive means to achieve its interest. *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Sherbert v. Verner*, 374 U.S. 398 (1963). "Many laws will not meet the test." *Smith*, 494 U.S. at 888. In the case at bar, there is no compelling interest in withholding an exemption from Davis. Kentucky's marriage licensing scheme will not be thwarted in the least by accommodating an exemption for Davis, particularly where other alternatives for licensing are readily available both within and without Rowan County.

Moreover, by directing county clerks to disregard their religious beliefs in no uncertain terms, the Kentucky Governor is not applying Kentucky's marriage law in a neutral and generally applicable manner. A law or policy "burdening religious practice that is not neutral or not of

15

general application must undergo the most rigorous of scrutiny," and laws or policies that "target religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Gov. Beshear's policies and directives are specifically targeting county clerks like Davis who possesses certain religious beliefs about marriage. This targeting is demonstrated by the exemption Gov. Beshear granted to Atty. Gen. Conway when—after "pray[ing] over this decision"—he was unwilling to defend Kentucky's democratically-enacted marriage law pursuant to his own personal beliefs and feelings (his purported conscience) about "doing what I think is right" and "mak[ing] a decision that I could be proud of."

Gov. Beshear is picking and choosing the conscience-based exemptions to marriage that he deems acceptable—which is constitutionally unacceptable. For instance, when Atty. Gen. Conway refused to defend Kentucky marriage law, Gov. Beshear did not direct Conway that "Neither your oath nor the Supreme Court dictates what you must believe. But as elected officials, they do prescribe how we must act," but he did so direct county clerks like Davis. *See* Ex. 4, Beshear Letter. Gov. Beshear did not command Atty. Gen. Conway that "when you accepted this job and took that oath, it puts you on a different level," and "[y]ou have official duties now that the state law puts on you," but he did deliver this command to county clerks like Davis. *See* Ex. K. Gov. Beshear did not publicly proclaim that Atty. Gen. Conway was "refusing to perform [his] duties" and failing to "follow[] the law and carry[] out [his] duty," and should instead "comply with the law regardless of [his] personal beliefs," but he did make this proclamation (repeatedly) about county clerks like Davis *See* Exs. I, J. Gov. Beshear did not instruct Atty. Gen. Conway that "if you are at that point to where your personal convictions tell you that you simply cannot fulfill your duties that you were elected to do, than obviously the honorable course to take is to resign

16

and let someone else step-in who feels that they can fulfill these duties," but he did issue this instruction to county clerks like Davis. *See* Ex. K. Gov. Beshear did not ominously declare that "[t]he courts and voters will deal appropriately with" Atty. Gen. Conway, but he did so declare with the "two or three" county clerks who are not issuing marriage licenses.

In no uncertain terms, Gov. Beshear's policy has "as [its] object the suppression of religion," *Lukumi*, 508 U.S. at 542—even worse, a particular religious belief. Thus, although Atty Gen. Conway was given a pass for his conscience about marriage without any threats of repercussion, clerks like Davis are being repeatedly told by their Governor to abandon their religiously-informed beliefs or resign. In doing so, Kentucky is forcing clerks like Davis "to choose between following the precepts of her religion and forfeiting benefits [her job], on the one hand, and abandoning one of the precepts of her religion in order to accept work [keep her job], on the other hand." *Sherbert*, 374 U.S. at 404. There is no compelling reason, let alone an "interest of the highest order," *Lukumi*, 508 U.S. at 546, to impose this choice on Davis when no "substantial threat to public safety, peace or order" is at stake, *Sherbert*, 374 U.S. at 403-04. The Free Exercise Clause "commits government itself to religious tolerance," and this Court must not permit the Kentucky Governor to abdicate his "own high duty to the Constitution and to the rights it secures," *Lukumi*, 508 U.S. at 547, including the religious freedom of persons like Davis. Accordingly, Davis possesses a viable free exercise claim and defense that must be protected.

### 3.     Requiring Davis To Affix Her Name And Approval To Same-Sex "Marriage" Licenses Violates The Compelled-Speech Doctrine.

The United States and Kentucky Constitutions also protect the free speech rights of Davis. U.S. CONST. amend I (government may not "abridg[e] the freedom of speech"); KY. CONST., § 1 (persons have an inalienable right of "freely communicating their thoughts and opinions"); *id.*, § 8 ("[e]very person may freely and fully speak"). The Free Speech Clause of the First Amendment

protects "the decision of both what to say and what ***not*** to say." *Riley v. Nat'l Federation of Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988) (emphasis in original). Indeed, "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714 (1976) (citing *West Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 637 (1943)). In *Wooley*, a religious individual objected to carrying the New Hampshire state motto of "Live Free or Die" on his state-issued license plate. *Wooley*, 430 U.S. at 707, 715. In *Barnette*, religious individuals objected to a West Virginia statute requiring public school students to affirmatively salute the flag. *Barnette*, 319 U.S. at 636. In both cases, the objecting individuals prevailed because the State improperly "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Barnette*, 319 U.S. at 642; *Wooley*, 430 U.S. at 715.

This "compelled-speech" doctrine applies when "an individual is obliged personally to express a message he disagrees with, imposed by the government." *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005). In this matter, this Court is faced with a state measure that "forces an individual, as part of [her] daily life" to "be an instrument for fostering public adherence to an ideological point of view [she] finds unacceptable." *See Wooley*, 430 U.S. at 715. The single-page KDLA-approved form uses the word "marriage" at six different places on the document (not including the reference to "join[ing] together in the state of matrimony"), and twice designates Davis as the person authorizing the marriage license. Unlike other governmental licensing or registration schemes that Kentucky provides (*e.g.*, driver's licenses, fishing and hunting licenses, motor vehicle registration, voter registration), the issuance of a marriage license requires an individual person (the county clerk) to authorize a particular relationship between persons against her religious convictions. Thus, pursuant to the Governor's edicts and the

18

prescribed KDLA form, Davis is being told to validate and affirm in public a view and message that she finds "morally objectionable" and "repugnant to [her] moral and religious beliefs." *See Wooley*, 430 U.S. at 707. As it currently stands, her name and approval cannot be divorced from a SSM license. The principles enshrined in *Wooley* and *Barnette* therefore protect Davis from being coerced into placing her imprimatur on a union that, in her view, is not a marriage. To hold otherwise forces Davis to agree with a message and point of view she finds abhorrent and unconstitutionally "invades" her "intellect and spirit."

Further, this Court must reject any notion that the only speech involved in a marriage license is pure government speech outside the purview of the First Amendment. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). For instance, "[c]onstitutional and statutory provisions outside of the Free Speech Clause may limit government speech," *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S.Ct. 2239, 2246 (2015), such as the religion clauses of the First Amendment, "[a]nd the Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech," *id.* This constraint is fatal to any contention that Kentucky marriage licenses are pure government speech beyond First Amendment review.

Even if the KDLA-approved form is state-issued, state-designed, and identified with the state, the form still requires personal speech from a county clerk to validate, authorize and approve the marriage. The form itself identifies "Kim Davis" by name in several places and further designates her as the individual under whose "authority" the license was issued. KY. REV. STAT. § 402.100(3). Thus, even if the license entails government speech to a certain degree, it also necessarily implicates the private speech of Davis whose imprimatur and authority must be stamped on every license she issues. *See Wooley*, 430 U.S. 705 (engraved message on

19

standardized, state-issued license plates implicated driver's free speech rights). If Kentucky now wants to issue SSM licenses that is one thing. But if Kentucky also seeks to compel individuals like Davis to be an "instrument" of a message that she finds objectionable and repulsive, it is another thing altogether and violates her free speech rights.

### 4.    Requiring Davis To Affirm A Definition Of Marriage Contrary To Her Religious Belief Violates The Religious Test Clause.

In addition to First Amendment protections, Davis' religious conscience is further protected by the Religious Test Clause of the Constitution, which mandates that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." U.S. CONST. art. VI. Compelling all individuals who have any connection with the issuance of marriage licenses (*e.g.*, a county clerk like Davis) to authorize, approve, and participate in that act against their sincerely held religious beliefs about marriage, without providing accommodation, amounts to an improper religious test for holding (or maintaining) public office.

The Kentucky Constitution includes a limited number of requirements for county clerks to hold office, including age and Kentucky residency. KY. CONST. §§ 99, 100. None of the requirements pertain to religious belief or practice. This Court is being asked to add a newly minted qualification to the Kentucky Constitution's prescribed qualifications for county clerks: approval of same-sex "marriage." But at the time she took public office in January 2015 for a four-year term, Davis' religious beliefs and convictions about marriage undeniably conformed to the law of Kentucky. To require Davis to now participate in the issuance of SSM licenses is repugnant and antithetical to her religious convictions and conscience. However, government may not "oppos[e] or show[] hostility to religion, thus 'preferring those who believe in no religion over those who do believe.'" *Sch. Dist. Of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 225 (1963).

The case of *Girouard v. United States*, 328 U.S. 61 (1946), is instructive here. In *Girouard*, a Canadian native filed a petition for naturalization and stated in his application that "he understood the principles of the government of the United States, believed in its form of government, and was willing to take the oath of allegiance," that included swearing an oath "to support and defend the Constitution . . . So help me God," that was "in no material respect different from" the oath of office for public officials. 328 U.S. at 826, 828. But in answering the question on his application regarding whether he was willing to take-up arms in defense of his country, he stated that his religious beliefs prevented him from "combatant military duty." *Id.* He was willing to serve in the army, just not bearing arms. *Id.* The district court admitted him for citizenship, which the court of appeals reversed. The Supreme Court then reversed the court of appeals since "[o]ne may serve his country "faithfully and devotedly, though his religious scruples make it impossible for him to shoulder a rifle." *Id.* at 827. The fact that his role may be limited "by religious convictions" had no bearing "on his attachment to his country or on his willingness to support and defend it to his utmost." *Id.* at 827-28. In rejecting argument that the individual could not support and defend the Constitution, the Supreme Court concluded that "[i]t is hard to believe that one need forsake his religious scruples to become a citizen but not to sit in the high councils of state," implying thereby that persons need not forsake their "religious scruples" to "sit in the high councils of state." *Id.* at 828. As further evidence of the parallels to be drawn in this scenario, the religious conscience objection was acceptable in light of the historical back-up for the belief. *See id.* at 827-28. Finally, the importance of protecting religious liberty in this country cannot be overemphasized:

> The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual. The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. Throughout the ages men have suffered death rather than subordinate their allegiance to God to the

> authority of the State. Freedom of religion guaranteed by the First
> Amendment is the product of that struggle.

*Girouard*, 328 U.S. at 829. Like a non-combatant who cannot shoulder a rifle, a county clerk who cannot issue SSM licenses can still faithfully and devotedly serve this country, and their county.

In Plaintiffs' erroneous and unsupported view, religious persons like Davis, who became county clerk before *Obergefell*, must either participate without exception in the issuance of SSM marriage licenses (her conscience be damned) or resign since holding public office is her choice (her livelihood, qualifications for office, and commitment to public service be damned). Thus, she is told to cast aside her deep religious convictions after entering the door of public service, and those not yet serving in similar public roles are told to shed any such convictions before taking office. But the fact "that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution." *Torcaso v. Watkins*, 367 U.S. 488, 495-96 (1961). Indeed, the very idea that religious persons "need not apply" for these public positions that have historically been accessible to them constitutes an unmistakable religious litmus test that is "abhorrent to our tradition." *Girouard*, 328 U.S. at 829. Imposing on all public officials a mandate to participate in SSM, without any protection for religious conscience, would violate the First Amendment and Religious Test Clause. At a minimum, this Court must ensure that the United States and Kentucky Constitutions are accessible by Davis, a qualified and duly elected public servant of Kentucky – not to mention all religious persons aspiring to someday serve the public as elected or appointed officials.

**5.    Plaintiffs' Assertion That Public Officials Like County Clerks Have No Fundamental Rights Is Meritless.**

Plaintiffs would have this Court discard all of the foregoing rights, liberties and protections merely because Davis is an elected public official. If Plaintiffs have their way, a person's constitutional rights and liberties are immediately eviscerated the moment they take their oath of

22

office. Not only is this contention overly simplistic, it is untenable and should be easily dismissed by this Court. "Almost fifty years ago, this Court declared that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014). Indeed, the Supreme Court has "made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Although a citizen entering government service must "by necessity" accept "certain limitations on his or her freedom," *id.* at 417, such person's constitutional rights are not circumscribed in their entirety. Instead, there are "some rights and freedoms so fundamental to liberty" that a citizen is "'not deprived of [these] fundamental rights by virtue of working for the government.'" *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2493-94 (2011) (citation omitted). Fundamental rights are implicated in this case, as this Court already acknowledged. *See*, *e.g.*, Hr'g Tr. (7/13/15), at 84:3-4, 85:20-22, 98:19-22, 99:19-21, 103:15-18, 104:8-9.

Moreover, upon taking office as Rowan County clerk, Davis swore an oath to "support the Constitution of the United States and the Constitution of this Commonwealth" and "that I will faithfully execute, to the best of my ability, the office of [County Clerk] according to law. . . so help me God." KY. CONST. § 228. In so doing, she took an oath to support the United States and Kentucky Constitutions that, in their enumerated provisions, firmly protect her individual fundamental rights of conscience, religious liberty, and speech, as well as the fundamental conscience rights of others. Hr'g Tr. (7/20/15), Davis Direct, at 54:20-56:5. Not only that, Kentucky marriage law at the time she took office (not to mention during her multi-decade tenure as a deputy clerk) unequivocally comported with her sincerely held religious beliefs about marriage. *See id.*, Davis Redirect, at 71:23-72:1; *see also* KY. CONST. § 233A; KY. REV. STAT. § 402.005; *Jones v. Hallahan*, 501 S.W.2d 588 (Ky. App. 1973); *DeBoer v. Snyder*, 772 F.3d 388,

23

397, 421 (6th Cir. 2014) (reversing Kentucky federal district court opinion that Kentucky's statutes and constitutional amendment violated the United States Constitution).[13] Furthermore, her oath was expressly sworn "so help me God" thereby further incorporating her sincerely held religious beliefs. By its express terms, her oath does not require her to set aside her beliefs and, by holding to her religious conscience about marriage Davis is, in fact, supporting and upholding the United States and Kentucky Constitutions that she swore an oath to support.

The Kentucky Governor and Attorney General swore a similar oath. Yet, as indicated above, Atty. Gen. Conway in March 2014 refused to continue to defend Kentucky's Constitution and democratically-enacted marriage law. This led Gov. Beshear to issue a call for outside attorneys to represent Kentucky in its appeal, which cost Kentucky hundreds of thousands of dollars in legal fees.[14] Of course, the same Plaintiffs' Counsel in this matter (who was also representing the plaintiffs in *Bourke v. Beshear*) raised no concerns about recognizing public officials' conscience rights at that time and failed to leverage claims that a grave dereliction of duties had occurred when Atty. Gen. Conway tearfully remarked that "I am doing what I think is right."[15] In fact, this same Plaintiffs' Counsel declared that this refusal to defend Kentucky's marriage law gave him "15 minutes" of hope.[16] As such, contrary to Plaintiffs' suggestion, Plaintiffs' standard for conscience protections is not simply that public officials have no such rights

---

[13]     During the injunction hearing, Plaintiffs questioned Davis about the opinion in *Bourke v. Beshear*, 996 F. Supp. 2d 542 (W.D. Ky. 2014). Plaintiffs' reference to this opinion is a red herring. For one, this February 12, 2014 opinion was reversed by the Sixth Circuit on November 6, 2014, two days after Davis was elected and before she took office. Moreover, the *Bourke* opinion was not controlling on the Rowan County clerk because the clerk at that time was not a party to the *Bourke* case, and Rowan County is not even situated in the Western District of Kentucky.

[14]     *See* Ex. O, Ky. Pays $195K+ to defend gay-marriage ban, The Courier-Journal, dated May 20, 2015 (Kentucky paid at least $195,400 to private firm to defend Kentucky marriage law after Atty. Gen. Conway refused).

[15]     *See* Ex. P, Kentucky Gov. Steve Beshear to Appeal Federal Judge's Same-Sex Marriage Order, WFPL.com, dated Mar. 4, 2014 (quoting Plaintiffs' Counsel, Dan Canon).

[16]     *See* Ex. Q, Beshear to hire $125-an-hour lawyer for gay marriage appeal after Conway bows out, Wave3 News (quoting Plaintiffs' Counsel, Dan Canon).

24

whatsoever. Instead, Plaintiffs' self-serving standard is that conscience protections are in place for those whose conscience comports with Plaintiffs' views on marriage.

Finally, Plaintiffs cannot avoid the implications upon the religious and speech rights of Davis merely by seeking relief against Davis in her official capacity. The official capacity designation requires an individual person to occupy the office. Moreover, Plaintiffs sued Davis in her individual capacity seeking punitive damages from her personally. By suing her individually, Plaintiffs concede the relevancy of Davis in her individual capacity as the person occupying the office of Rowan County clerk. Further, the injunctive relief Plaintiffs seek against Davis in her official capacity (the issuance of a marriage license) necessarily implicates Davis in her individual capacity for all the reasons set forth above. Lastly, Davis in her official capacity has an obligation to comply with all constitutional norms, protections, and obligations that affect individual persons—including her own individual capacity. Therefore, Plaintiffs cannot claim that the individual conscience, religious, and speech protections afforded Davis are of no consequence.

6. **Providing Religious Accommodation Will Not Engender Statewide "Chaos" In The Issuance Of Kentucky Marriage Licenses.**

Contrary to Plaintiffs' counsel's suggestion, providing religious accommodation under the circumstances of this case will not engender statewide "chaos"[17] in the issuance of Kentucky marriage licenses. First, Plaintiffs' baseless contention evidences a patent disregard for general religious accommodation law applicable to state actors and employers. For example, Davis, in her official capacity, must not violate the Kentucky RFRA vis-à-vis her deputy clerks, in addition to her own person. Thus, in her role as a government official and employer, she may not substantially burden the religious freedom of her deputy clerks unless she demonstrates a compelling

---

[17]     *See* Ex. R, Do religious rights trump order to issue marriage licenses?, Cincinnati Inquirer, July 20, 2015 (quoting Plaintiffs' Counsel, Dan Canon).

government interest to be achieved and that the least restrictive means have been used to achieve that interest. KY. REV. STAT. § 446.350. Not only that, she must also ensure that other employees' individual rights of conscience, religious freedom, and free speech are protected under the United States and Kentucky Constitutions, and other religious accommodation law. Davis is aware that at least four of her six deputy clerks also have a religious objection to affixing their names to SSM licenses. Hr'g Tr. (7/20/15), Davis Direct, at 48:20-49:11. Thus, religious accommodation is already part of Davis' responsibilities as a government employer. *See also*, *e.g.*, *Slater v. Douglas County*, 743 F. Supp. 2d 1188, 1192-95 (D. Or. 2010) (denying summary judgment to county defendant that only proposed to reassign a county clerk employee who refused on religious grounds to issue same-sex domestic partnership registrations rather than accommodating her request).

Second, Plaintiffs' specious references to inter-racial marriage bans or prohibitions on divorcees obtaining marriage licenses is misleading, and completely unfounded. Neither Davis nor any of her deputy clerks have asked for religious accommodation from issuing licenses to inter-racial couples or to persons who were formerly divorced. Hr'g Tr. (7/20/15), Davis Cross, at 63:11-14, 64:11-15. To suggest otherwise is an obvious attempt to avoid the merits of the actual objection that Davis has asserted and also a malicious attempt at misrepresenting Davis and her sincerely held religious beliefs. Moreover, no actual evidence was presented that race-based (or other) accommodation requests have been made, are being considered, or will be made if Davis' particular religious objection is accommodated. Rather, as noted above, Davis has served in the Rowan County clerk's office for thirty years, and this is the first time she has raised a religious objection because this is the first time that she has been asked to authorize a marriage that is not a union between a man and a woman. Hr'g Tr. (7/20/15), Davis Direct, at 51:18-22. Not only that,

26

during that same period, she is unaware of any individual in the clerk's office raising any objection to the issuance of any marriage licenses, until now. *Id.* at 51:23-52:2. Also, only a limited number of county clerks across Kentucky have even asserted a similar religious objection as Davis to the issuance of SSM licenses. These undisputed facts are fatal to Plaintiffs' "sky is falling" rhetoric.

Third, religious accommodations are not provided for each and every whim or scruple raised by a public employee. Religious objections must be established. Merely stating a religious objection does not mean that "anyone can deny anybody a marriage license anytime they want to based on their own personal religious beliefs." *See* Ex. R (quoting Plaintiffs' Counsel). That is neither the statewide policy of Kentucky nor the facts of this case. Accommodating sincere religious beliefs and practices and ensuring that individual religious freedom is not substantially burdened promotes the religious pluralism and tolerance that have made this country distinctive. Plainly, this is not a situation where an accommodation of Davis' religious objections will swallow the general law on marriage and marriage licenses in Kentucky, because licenses are readily available in more than 100 offices spread across Kentucky.

Fourth, providing accommodation for religious conviction is not antithetical for public employees or inconsistent with governmental mandates. For example, federal and state employees who have a "moral or religious" conviction against capital punishment are provided an exemption from "be[ing] in attendance at" or "participat[ing] in any prosecution or execution" performed under the Federal Death Penalty Act. 18 U.S.C. § 3597(b). In a similar fashion, medical providers (and other persons) with conscience-based objections to governmental mandates and programs related to providing abortions, abortion-related drugs, and abortion-related insurance coverage may also be exempted from generally applicable requirements. *See*, *e.g.*, *Stormans, Inc. v. Selecky*, 844 F. Supp. 2d 1172, 1188-93 (W.D. Wash. 2012) (pharmacists with religious objection based

upon sincerely held beliefs against providing certain abortion-related drugs did not have to comply with government's mandate to carry those drugs); *Hobby Lobby*, 134 S. Ct. at 2759 (holding that government mandate to force closely held corporations to provide health insurance coverage for methods of contraception that violated the sincerely-held religious beliefs of the companies' owners was an unlawful burden on religious exercise). Moreover, persons can be naturalized as citizens with conscience-based non-combatant objections, *Girouard*, 328 U.S. at 827-28, or religious-based objections to certain vaccinations, 8 U.S.C. § 1182(g).

The foregoing examples illustrate that, in certain matters, the law already accounts for religious-based objections to generally applicable legal duties or mandates. In each of the foregoing areas (*i.e.*, abortion, capital punishment, non-combatant in wartime), there are well-established historical roots for the objection. For marriage, the nature of the objection is even more firmly established in history because the "meaning of marriage" as a union between one man and one woman "has persisted in every culture," "has formed the basis of human society for millennia," and has singularly "prevailed in the United States throughout our history." *Obergefell*, 135 S. Ct. at 2612-13 (Roberts, C.J., dissenting); *see also id.* at 2641 ("For millennia, marriage was inextricably linked to the one thing that only an opposite-sex couple can do: procreate.") (Alito, J., dissenting). In fact, the majority in *Obergefell* conceded that the institution of marriage as exclusively a union between a man and a woman "has existed for millennia and across civilizations" and this view "long has been held—and continues to be held—**in good faith by reasonable and sincere people here and throughout the world**." *Obergefell*, 135 S. Ct. at 2594 (Kennedy, J., majority) (emphasis added). Thus, although the traditional view of marriage was

discarded in *Obergefell*, that long-held view of marriage provides the historical underpinnings for a religious exemption and accommodation from the redefinition of marriage. [18]

**B.**      **Plaintiffs Have Failed To Demonstrate That They Would Suffer Irreparable Harm Absent An Injunction Against Davis Because Kentucky Marriage Licenses Are Readily Available.**

In stark contrast to the severe and irreversible harm facing Davis, Plaintiffs have failed to demonstrate any permanent, irreversible, and irrevocable damage if their request for preliminary injunctive relief against Davis is denied. Because marriage licenses are readily available throughout Kentucky, and have been for more than thirty days as of the date of this filing, Plaintiffs have failed to demonstrate that they will suffer any irreparable harm absent a preliminary injunction against Davis ordering her to personally sign, issue, approve, and authorize their proposed unions. Under Kentucky law, a marriage license "may be issued by *any* county clerk" so long as "the female" in the proposed union is "eighteen (18) years of age or over or a widow, and the license is issued on her application in person or by writing signed by her." KY. REV. STAT. § 402.080. Thus, under Kentucky law, individuals who reside in one Kentucky county *are not required* to obtain their marriage license in that county. In this matter, the testifying Plaintiffs (two females and one male) claimed to reside in Rowan County, but Kentucky law does not mandate that they may only obtain a marriage license in their home county.

The undisputed evidence in this case, to date, demonstrates that Kentucky marriage licenses, including SSM licenses, are being issued (or will be issued) to individuals in all but a few of Kentucky's 120 counties. *See* Exs. I, J, K; *see also* Ex. 4, Beshear Letter. But the testifying

---

[18]      Further, providing accommodation for Davis' religious objection does not violate the Establishment Clause. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) ("[G]overnment may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338 (1987) (there is "ample room for accommodation of religion under the Establishment Clause").

Plaintiffs uniformly admitted that they have not even tried to get a license in any Kentucky county other than Rowan County.[19] Yet Rowan County is bordered by seven other counties, all of whom are issuing marriage licenses. Hr'g Tr. (7/20/15), Davis Direct, at 53:5-15.

Plaintiffs' options for obtaining a marriage license are not limited to these neighboring counties. Indisputably, marriage licenses (including SSM licenses) are being issued in Boyd and Kenton Counties, where the July 13, 2015 and July 20, 2015 hearings were held in this matter (and attended by multiple Plaintiffs). Hr'g Tr. (7/20/15), Davis Direct, at 54:9-19; *see also* Exs. F, G. Thus, Plaintiffs are willing and able to drive approximately 60 miles to the Ashland federal courthouse (the distance from the Rowan County clerk's office) and more than 100 miles to the Covington federal courthouse for Court hearings, but they cannot drive to any of the dozens of nearby and surrounding counties issuing marriage licenses to obtain a Kentucky marriage license.[20] In fact, Plaintiffs openly conceded that they are aware that they can obtain a license in another Kentucky county, but they are intentionally choosing not to obtain a license in any other county.[21] For Plaintiffs, only a license signed, approved, and authorized by Davis (and Davis alone) will placate their desires. *See* D.E. 2-2. Apparently, their actual desire to be married is less important than having Davis participate in and approve their desired union. Such desire is not grounds for issuance of the immediate and extraordinary remedy of a preliminary injunction against Davis when Kentucky marriage licenses are readily available elsewhere.

---

[19]     *See* Hr'g Tr. (7/13/15), Miller Direct, at 28:23-25, and Miller Cross, at 31:2-4; *id.*, Fernandez Direct, at 37:16-18; *id.*, Spartman Direct, at 47:1-2, and Spartman Cross, at 48:1-6.

[20]     More than fifteen (15) Kentucky county clerk's offices are within 60 miles of the Rowan County clerk's office, and more than sixty (60) county clerk's offices are within 100 miles of the Rowan County clerk's office. *See* Ex. U, Map of Kentucky Counties.

[21]     *See* Hr'g Tr. (7/13/15), Miller Cross, at 31:10-11; *id.*, Fernandez Cross, at 38:10-17; *id.*, Spartman Direct, 46:23-25, and Spartman Cross, at 48:11-13.

**C.**   **Plaintiffs Have Failed To Demonstrate A Strong Likelihood Of Success On The Merits Of Their Claims Because They Are Not Absolutely Prevented From Marrying Whom They Want.**

Plaintiffs have also failed to demonstrate a strong likelihood of success on the merits of their own Fourteenth Amendment claims. In demanding a fundamental right to have a specific individual approve of and participate in their marriage, Plaintiffs overlook clear precedent that not every act, policy, rule, or regulation "which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). Heightened scrutiny only applies to restrictions on the right to marry that are "direct and substantial." Contrary to Plaintiffs' suggestion, "[m]erely placing a non-oppressive burden on the decision to marry . . . is not sufficient to trigger heightened constitutional scrutiny." *Montgomery v. Carr*, 101 F.3d 1117, 1125 (6th Cir. 1996). Instead, a "direct and substantial" burden requires an "absolute barrier" in which individuals are "absolutely or largely prevented from marrying" *who* they want to marry or "absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). The lack of marriage licenses from the Rowan County clerk's office "does not change the essential fact" that Plaintiffs are not barred "from getting married, nor did it prevent them from marrying a large portion of population even in [Rowan] County." *Vaughn*, 269 F.3d at 712. No proof has been submitted in this case to demonstrate any absolute barrier preventing any Plaintiff from marrying whom they want to marry. Thus, Davis' decision to stop issuing licenses should be evaluated under rational basis review, rather than heightened scrutiny.[22]

---

[22]      Under rational basis review, a policy "is invalid if it fails to advance a legitimate governmental interest or it is an unreasonable means of advancing a legitimate government interest." *Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992). "The means chosen need not be the best for achieving these stated ends, but need only be rational in view of those ends." *Montgomery*, 101 F.3d at 1130.

The right to marry cases relied upon by Plaintiffs also do not compel a different conclusion. Critically, the cases of *Loving v. Virginia*, 388 U.S. 1 (1968), *Zablocki*, 434 U.S. 374, *Turner v. Safley*, 482 U.S. 78 (1987), and *Obergefell*, 135 S.Ct. 2584, all involve state-wide bans affecting marriage. *See*, *e.g.*, *Loving*, 388 U.S. at 11-12 (striking down Virginia ban on inter-racial marriages); *Zablocki*, 434 U.S. at 379, 390-91 (striking down Wisconsin law that required any resident with child support obligations to satisfy such obligations before marrying and to obtain a court order permitting the marriage); *Turner*, 482 U.S. at 81-82, 99 (striking down Missouri prison regulation that represented a near "almost complete ban" on inmate marriage); *Obergefell*, 135 S.Ct. at 2593, 2599-2605 (redefining marriage to include same-sex couples, and striking down Kentucky, Tennessee, Michigan and Ohio marriage laws to the contrary). Some of the restrictions also came with criminal penalties attached for violating the terms of the restrictions (*e.g.*, *Loving* and *Zablocki*). Additionally, all of the marriage cases relied upon by Plaintiffs except *Loving* (which received strict scrutiny as a race-based classification) were evaluated under rational basis review. Furthermore, none of those cases also involved religious conscience and First Amendment objections that are present in the case at bar.

Moreover, despite Plaintiffs' constant refrain, this case is neither the same case as *Obergefell* nor controlled by it. Before *Obergefell*, Plaintiffs were "absolutely prevented" from obtaining a Kentucky marriage license if they wanted to marry a person of the same sex. No same-sex couple was able to obtain a Kentucky marriage license in any one of Kentucky's 120 counties. And even if Plaintiffs had gotten "married" in a different state, their "marriages" would not have been recognized in Kentucky. But now individuals desiring SSM licenses can obtain them because Kentucky is recognizing SSM and nearly all county clerks are issuing SSM licenses. Nevertheless, Plaintiffs are claiming a violation of the fundamental right to marry unless they (i) obtain a

marriage license in their home county and (ii) it is approved by a particular individual. Neither is a right mandated by *Obergefell*, and neither presents a direct and substantial burden on a fundamental right to marry.

State marriage laws differ across the county, and Kentucky marriage law is far less restrictive than other states. For instance, some states require prospective couples to obtain a license in the county where the ceremony will occur, *see*, *e.g.*, MD. CODE ANN., FAM. LAW § 2-401(a), whereas others permit residents to obtain their license in one county and hold their ceremony in another county, *see*, *e.g.*, KY. REV. STAT. §§ 402.050, 402.080, 402.100; MINN. STAT. § 517.07. Some states require prospective couples to obtain their license in their home county, *see*, *e.g.*, MICH. COMP. LAWS § 551.101; OHIO REV. CODE ANN. § 3101.05(a), whereas others allow residents to obtain a license in any county, *see* KY. REV. STAT. § 402.080; TENN. CODE ANN. § 36-3-103. Some states require prospective couples to wait to receive their license upon application, *see*, *e.g.*, MICH. COMP. LAWS § 551.103a (3 days); MINN. STAT. § 517.08(a) (5 days), whereas others (*e.g.*, Kentucky, Ohio, Tennessee) have no waiting period. Granting Plaintiffs' Motion for Preliminary Injunction converts every marriage-related law in all fifty states into a constitutional matter subject to injunction practice in federal courts, even though laws regarding "the definition and regulation of marriage" have "long been regarded as a virtually exclusive province of the States." *United States v. Windsor*, 133 S.Ct. 2675, 2689-91 (2013).

In the case at bar, Davis' inability to issue marriage licenses to Plaintiffs does not absolutely or largely prevent individual persons from marrying whom they want to marry under Kentucky law. By stopping the issuance of SSM licenses until appropriate accommodations are made, Davis is ensuring that individuals' fundamental rights of conscience, religious freedom, and speech (including herself and the deputy clerks who work for her) are protected. And protecting these

natural and inalienable "religious liberties" is not merely a legitimate government interest, it is a compelling interest of the highest degree and foundational to the very establishment of this Commonwealth. *See* KY. CONST., Preamble (referring to Kentuckians' "religious liberties"); KY. CONST. § 5 ("No human authority shall, in any case whatever, control or interfere with the rights of conscience."). Thus, even if heightened scrutiny applied, Plaintiffs would not automatically prevail on their purported Fourteenth Amendment claims, especially at this early stage of litigation.

Finally, this Court must also deny Plaintiffs' Motion with respect to Plaintiffs Shantel Burke and Stephen Napier because these Plaintiffs put forward no verified specific facts to support their claims. It is well-established law that the party seeking a preliminary injunction must submit proof beyond unverified allegations in a complaint.[23] In the case at bar, neither Plaintiffs' Complaint nor Plaintiffs' Motion for Preliminary Injunction (nor the evidence submitted during the two-day injunction hearing), contains any sworn evidence regarding these two Plaintiffs, who may not even be eligible to marry under Kentucky law or may have already obtained a marriage license. Without any verified facts, there is no record to support injunctive relief.

### D. The Public Interest Weighs In Favor Of Denying Plaintiffs' Motion For Preliminary Injunction.

It is well-settled law that "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). In fact, when it comes to the "protection of First Amendment liberties," the public has a "significant interest." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995). As set forth above, vital First Amendment rights are at stake in this

---

[23]     *See*, *e.g.*, *San Francisco Veteran Police Officers Ass'n v. City & County of San Francisco*, 18 F. Supp. 3d 997, 1006 (N.D. Cal. 2014); *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 868-69 (S.D. W.Va. 2014); *Salmon v. Old Nat'l Bank*, No. 08-116, 2010 WL 716232, at *4 (W.D. Ky. Feb. 24, 2010); *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001); *Eyler v. Babcox*, 582 F. Supp. 981, 986 (N.D. Ill. 1983).

34

lawsuit, which pits Plaintiffs' alleged Fourteenth Amendment claims against Davis' First Amendment protections and other Constitutional and statutory rights.

Dissenting justices in *Obergefell* recognized that "[m]any good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion" is specifically "spelled out" in the First Amendment of the Constitution. *Obergefell*, 135 S.Ct. at 2625 (Roberts, C.J., dissenting). Continuing, these Justices noted that "[r]espect for sincere religious conviction has led voters and legislators in every State that has adopted same-sex marriage democratically to include accommodations for religious practice." *Id.*; *see also id.* at 2638 (explaining the historical significance of "religious liberty") (Thomas, J., dissenting). The majority opinion also recognized that religious freedoms continue unabated even as they redefined marriage:

> Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

*Obergefell*, 135 S.Ct. at 2607 (Kennedy, J., majority). Thus, **in *Obergefell*, the Court unanimously agreed that First Amendment protections remain despite same-sex "marriage."**

Therefore, contrary to Plaintiffs' suggestion, this case is not "really quite simple." Hr'g Tr. (7/13/15), at 100:8. As this Court correctly acknowledged, this case is neither explicitly nor implicitly decided by the majority opinion in *Obergefell*. Instead, the case is deciding a clash or "conflict" that several dissenting Justices prophetically envisioned. *Id.* at 85:7-22. Indeed, Justice Thomas specifically recognized that "It appears all but inevitable that the two [Fourteenth and First Amendments] will come into conflict" as individuals and churches "are confronted with demands to participate in and endorse civil marriages between same-sex couples." *Obergefell*, 135 S.Ct. at

35

2638 (Thomas, J., dissenting). But, perhaps more ominously, this case also represents an exploitive attempt by some to use *Obergefell* "to vilify Americans who are unwilling to assent to the new orthodoxy" and "stamp out every vestige of dissent," including public servants. *Obergefell*, 135 S.Ct. at 2642 (Alito, J., dissenting); *see also id.* at 2642-43 (wondering aloud whether "those who cling to old beliefs will be able to whisper their thoughts in the recesses of their homes, but if they repeat those views in public, they will risk being labeled as bigots and treated as such by governments, employers, and schools").

The limited record in this case already demonstrates that Plaintiffs are not seriously interested in obtaining a Kentucky marriage license. In fact, every day that goes on (and every new county that Plaintiffs drive through and enter) only further evidences that this case is not about a right to marry. Instead, this case is about forcing Davis to violate her conscience, participate in SSM against her convictions, and validate, authorize and approve a union that is not a marriage according to her sincerely held religious beliefs. Indeed, Plaintiffs only attempted to obtain a marriage license from the Rowan County clerk's office after becoming aware of Davis' religious objections to same-sex "marriage."[24]

Finally, prudence and caution further support denial of Plaintiffs' motion because the Kentucky political branches have already indicated an intent to tackle this matter with a legislative solution. Specifically, gubernatorial candidates from both parties in Kentucky have indicated an intent to address this issue—"protecting religious freedoms" (Matt Bevin) or "allow[ing] county clerks some flexibility" (Atty. Gen. Conway)—when the legislature returns to session in January 2016.[25] In fact, two bills addressing religious freedom have already been pre-filed for that general

---

[24]   *See* Hr'g Tr. (7/13/15), Miller Direct, at 25:13-15, 26:19-28:4, 28:23-25, and Miller Cross, at 31:2-4, 31:8-11; *id.*, Fernandez Direct, 35:23-36:5; *id.*, Spartman Direct, 43:1-3, 43:18-24, 47:1-2, and Spartman Cross, at 48:1-6.

[25]   *See* Ex. S, Bevin: Kentucky should stop issuing marriage licenses, Washington Times, July 10, 2015.

session, and one of those bills expressly protects clerks such as Davis from having to issue SSM licenses. This bill amends the Kentucky RFRA to state expressly that "[i]ssuing or recording a marriage license, or solemnizing a marriage, to which a person holds a sincere religious objection or which is contrary to that person's faith tradition due to the marriage being between persons of the same sex shall be considered a substantial burden for which there is no compelling government interest, and that person shall additionally be immune from any civil or criminal liability for declining to solemnize such a marriage." *See* Ex. T, An Act Relating to Marriage, Ky. House Bill 101 (2016 Reg. Sess.). A legislative response in Kentucky would not be the first of its kind to protect religious freedom. For example, North Carolina enacted a statute permitting recusal of officials from "issuing" lawful marriage licenses "based upon any sincerely held religious objection." N.C. GEN. STAT. § 51-5.5. Utah also enacted a statute protecting clerks who opposed SSM. Utah S.B. 297 (2015 Gen. Sess.). Multiple Governors have also issued executive orders to further protect the religious conscience of certain individuals as it relates to marriage.[26] These responses are not uniform, but they provide further reason for this Court to deny Plaintiffs' motion in light of the ongoing public debate between religious liberty and SSM.

> **E.    To The Extent This Court Concludes Plaintiffs Are Entitled To Any Preliminary Injunctive Relief, The Injunction Should Be Directed Exclusively At The Rowan County Judge/Executive.**

The preliminary injunctive relief sought by Plaintiffs against Davis alone needlessly creates a constitutional dilemma. Kentucky law provides that "***In the absence of the county clerk***, or during a vacancy in the office, the county judge/executive may issue the license and, in so doing, he shall perform the duties and incur all the responsibilities of the clerk. The county judge/executive shall return a memorandum thereof to the clerk, and the memorandum shall be

---

[26]    *See*, *e.g.*, La. Gov. Executive Order, BJ 15-8, Marriage and Conscience Order, at § 2 (May 19, 2015), *available at* http://www.doa.louisiana.gov/osr/other/bj15-8.htm (last accessed July 29, 2015).

recorded as if the license had been issued by the clerk." KY. REV. STAT. § 402.240 (emphasis added). Thus, Kentucky law provides an alternative method by which a marriage license can be obtained in each county when a county clerk is deemed absent. Because of her religious conscience objection, *supra*, Davis should be rendered legally absent for purposes of issuing marriage licenses, triggering Section 402.240 of Kentucky's marriage law.

By its terms, Section 402.240 is not exclusively limited to vacancies in the county clerk position for it also applies "[i]n the absence of the county clerk." *Id.* The word "absence" is not defined in this statute or Kentucky's general statute providing definitions for statutory terms, and no legislative history for this statute was found. As a result, this Court is left to interpret the meaning of "absence" in this provision. This Court should interpret "absence" to include unavailability based upon religious conscience objections. Among its dictionary definitions, "absence" can mean "[w]ant, lack, privation, or failure of something,"[27] or "a failure to . . . be available . . . when expected," Black's Law Dictionary (10th ed. 2014). The effectual purpose of the provision supports an interpretation that includes religious conscience-based objections. Davis is not available to issue marriage licenses bearing her imprimatur and requiring her authorization because she has a religious conscience objection. The statute envisions situations (but does not specifically delineate the terms) in which a county clerk may be unable or unavailable to issue a license to a couple looking to be married under Kentucky law.

"Absence" need not be limited to physical absence from the county clerk's office for if the Kentucky legislature intended "absence" to be so limited, it could have expressly limited its definition, as it did in KY. REV. STAT. § 67.725 ("For the purpose of KRS 67.730 to 67.745, the

---

[27] *See* Oxford English Dictionary Online, Oxford University Press, *available at* http://www.oed.com/view/Entry/645?redirectedFrom=absence#eid (last accessed July 29, 2015); *see also* Merriam-Webster Online, Merriam-Webster, *available at* http://www.merriam-webster.com/dictionary/absence ("want" or "lack") (last accessed July 29, 2015).

regular county judge/executive . . . shall be deemed 'absent' when he is outside the county at the time of the occurrence or declaration of the emergency and is unable to return"). By not similarly limiting "absence" in Section 402.240, the word absence need not be so constricted.[28] Therefore, a county clerk's absence could result from a medical procedure, a disability, a vacation, or their conscience. In none of these situations is the purpose of the statute abrogated.

Interpreting Section 402.240 to include conscience-based objections does not shift an unmanageable burden upon county judge/executives in general, or Blevins in particular, because this provision is only triggered if a county clerk asserts a religious conscience-based objection deeming him or her legally absent, which appears to have happened in only a few counties across Kentucky. Moreover, in the case at bar, the undisputed evidence reveals that, on average, the issuance of marriage licenses from the Rowan County clerk's office comprises less than one hour per week. Hr'g Tr. (7/20/15), Davis Direct, at 28:4-9. Each license application takes about 5-7 minutes to complete. *Id.* at 28:24-25. Even in the most active months for the issuance of marriage licenses in 2015, less than 20 marriage licenses were issued in Rowan County. *Id.* at 29:3-6. The fees generated by the county clerk's office from marriage licenses comprise approximately only .01% of the office's revenue. *Id.* at 27:10-10. Thus, shifting the issuance of marriage licenses to the county judge/executive pursuant to this unique Kentucky statute does not unduly burden the judge/executive.[29] In fact, Blevins stated that, if he had to issue marriage licenses, he would likely appoint someone to exercise those duties. Hr'g (7/20/15), Blevins Direct, at 10:23-24, 12:4-10.

---

[28]     In his own understanding, Blevins considered "absence" to mean absent "due to health reasons, due to being out of office or if the clerk passed away or something like that," or "[i]f she was in the hospital or if she was on vacation." Hr'g Tr. (7/20/15), Blevins Direct, at 9:1-7, 9:11-15. Yet Blevins admitted that his understanding was not based upon any Court decision or formal written attorney general opinion. *Id.* at 10:3-6, 10:25-11:2.

[29]     Among the various tasks handled by the county clerk, including collecting taxes, recording deeds and mortgages, registering motor vehicles, maintaining voter registrations, and overseeing elections, *see* Hr'g Tr. (7/20/15), Davis Direct, at 24:13-24; *see also Summe v. Kenton County Clerk's Office*, 604 F.3d 257, 267 (6th Cir. 2010), only the issuance of marriage licenses provides a statutory alternative in the county.

Finally, interpreting "absence" to include religious conscience objections does not merely engender another constitutional conflict in this matter. Blevins admitted that he had the authority to issue marriage licenses in the absence of the county clerk, even though he was unaware of any county judge/executive (including himself) having ever actually utilized this procedure. Hr'g Tr. (7/20/15), Blevins Direct, at 8:9-13, 9:15-16, and Blevins Cross, at 15:24-25. Moreover, Blevins conceded that he does not maintain a religious conscience-based objection to the issuance of SSM licenses, and he would use his authority (if the county clerk is deemed absent) to ensure the licenses were issued. Hr'g Tr. (7/20/15), Blevins Direct, at 14:16-18.[30] This Court should find that Blevins possesses authority to issue a marriage license because Davis is legally absent from issuing marriage licenses based upon her religious conscience objection. Thus, to the extent this Court finds that Plaintiffs are entitled to any preliminary injunctive relief, any injunction must be denied against Davis and instead entered against Rowan County and its chief executive.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction against Davis should be denied.

DATED: July 30, 2015                                 Respectfully submitted:

                                                     /s/ Jonathan D. Christman
A.C. Donahue                                         Roger K. Gannam
Donahue Law Group, P.S.C.                            Jonathan D. Christman
P.O. Box 659                                         Liberty Counsel
Somerset, Kentucky 42502                             P.O. Box 540774
Tel: (606) 677-2741                                  Orlando, Florida 32854
Fax: (606) 678-2977                                  Tel: (800) 671-1776
ACDonahue@DonahueLawGroup.com                        Fax: (407) 875-0770
                                                     rgannam@lc.org
                                                     jchristman@lc.org

                                                     *Attorneys for Defendant Kim Davis*

---

[30]    This Court can alleviate any uncertainty regarding the contents of the Section 402.240 "memorandum," *see* Hr'g Tr. (7/20/15), Blevins Direct, at 11:21-12:3, 13:24-14:3, by directing the preparation of a marriage memorandum issued by Blevins that comports with the KDLA-approved marriage license form.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed via the Court's ECF

filing system and therefore service will be effectuated by the Court's electronic notification system

upon all counsel or parties of record:

Daniel J. Canon
L. Joe Dunman
Laura E. Landenwich
CLAY DANIEL WALTON ADAMS, PLC
462 S. Fourth Street, Suite 101
Louisville, KY 40202
dan@justiceky.com
joe@justiceky.com
laura@justiceky.com

William Ellis Sharp
ACLU OF KENTUCKY
315 Guthrie Street, Suite 300
Louisville, KY 40202
sharp@aclu-ky.org

*Attorneys for Plaintiffs*

Jeffrey C. Mando
Claire Parsons
ADAMS, STEPNER, WOLTERMANN &
DUSING, PLLC
40 West Pike Street
Covington, KY 41011
jmando@aswdlaw.com
cparsons@aswdlaw.com

*Attorneys for Rowan County*

DATED: July 30, 2015

/s/ Jonathan D. Christman_____
Jonathan D. Christman
*Attorney for Defendant Kim Davis*