**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 15-44-DLB**

**APRIL MILLER, et al.**                                                                **PLAINTIFFS**


**vs.**                         **MEMORANDUM OPINION AND ORDER**


**KIM DAVIS, individually and in her official capacity, et al.**          **DEFENDANTS**

************************

## I.      Introduction

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. # 2).  Plaintiffs are two same-sex and two opposite-sex couples seeking to enjoin Rowan County Clerk Kim Davis from enforcing her own marriage licensing policy.  On June 26, 2015, just hours after the U.S. Supreme Court held that states are constitutionally required to recognize same-sex marriage, Davis announced that the Rowan County Clerk's Office would no longer issue marriage licenses to *any* couples.  *See Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).  Davis, an Apostolic Christian with a sincere religious objection to same-sex marriage, specifically sought to avoid issuing licenses to same-sex couples without discriminating against them.  Plaintiffs now allege that this "no marriage licenses" policy substantially interferes with their right to marry because it effectively forecloses them from obtaining a license in their home county.  Davis insists that her policy poses only an incidental burden on Plaintiffs' right to marry, which is justified by the need to protect her own free exercise rights.

1

The Court held preliminary injunction hearings on July 13, 2015 and July 20, 2015. Plaintiffs April Miller, Karen Roberts, Jody Fernandez, Kevin Holloway, Barry Spartman, Aaron Skaggs, Shantel Burke and Stephen Napier were represented by William Sharp of the Americans for Civil Liberties Union ("ACLU") and Daniel Canon.  Jonathan Christman and Roger Gannam, both of the Liberty Counsel, and A.C. Donahue appeared on behalf of Defendant Kim Davis.   Rowan County Attorney Cecil Watkins and Jeff Mando represented Defendant Rowan County.  Official Court Reporters Peggy Weber and Lisa Wiesman recorded the proceedings.  At the conclusion of the second hearing, the Court submitted the Motion pending receipt of the parties' response and reply briefs.  The Court having received those filings (Docs. # 28, 29 and 36), this matter is now ripe for review.

At its core, this civil action presents a conflict between two individual liberties held sacrosanct in American jurisprudence.  One is the fundamental right to marry implicitly recognized in the Due Process Clause of the Fourteenth Amendment.  The other is the right to free exercise of religion explicitly guaranteed by the First Amendment.  Each party seeks to exercise one of these rights, but in doing so, they threaten to infringe upon the opposing party's rights.   The tension between these constitutional concerns can be resolved by answering one simple question: Does the Free Exercise Clause likely excuse Kim Davis from issuing marriage licenses because she has a religious objection to same-sex marriage?  For reasons stated herein, the Court answers this question in the negative.

## II.    Factual and Procedural Background

Plaintiffs April Miller and Karen Roberts have been in a committed same-sex relationship for eleven years.  (Doc. # 21 at 25).  After hearing about the *Obergefell* decision, they went to the Rowan County Clerk's Office and requested a marriage license

2

from one of the deputy clerks.  (*Id.* at 25-26).  The clerk immediately excused herself and went to speak with Kim Davis.  (*Id.* at 28).  When she returned, she informed the couple that the Rowan County Clerk's Office was not issuing any marriage licenses.  (*Id.*).  Plaintiffs Kevin Holloway and Jody Fernandez, a committed opposite-sex couple, had a similar experience when they tried to obtain a marriage license from the Rowan County Clerk's Office.  (*Id.* at 36).

Both couples went straight to Rowan County Judge Executive Walter Blevins and asked him to issue their marriage licenses.  (*Id.* at 30-32, 36).  Blevins explained that, under Kentucky law, a county judge executive can only issue licenses when the elected county clerk is absent.  *See* Ky. Rev. Stat. Ann. § 402.240.  Because Davis continued to perform her other duties as Rowan County Clerk, Blevins concluded that she was not "absent" within the meaning of the statute.  (*Id.*).  Therefore, he did not believe that he had the authority to issue their marriage licenses.  (*Id.*).

Plaintiffs Barry Spartman and Aaron Skaggs also planned to solemnize their long-term relationship post-*Obergefell*.  (*Id.* at 42-44).  Before going to the Rowan County Clerk's Office, they phoned ahead and asked for information about the marriage licensing process.  (*Id.*).  They wanted to make sure that they brought all necessary documentation with them.  (*Id.*).  One of the deputy clerks told the couple "not to bother coming down" because they would not be issued a license.  (*Id.*).

Seven neighboring counties (Bath, Fleming, Lewis, Carter, Elliott, Morgan and Menifee) are currently issuing marriage licenses.  (Doc. # 26 at 53).  All are less than an hour away from the Rowan County seat of Morehead.  (*Id.*).  While Plaintiffs have the means to travel to any one of these counties, they have admittedly chosen not to do so.

3

(Doc. # 21 at 38, 48). They strongly prefer to have their licenses issued in Rowan County because they have significant ties to that community. (*Id.* at 28-29, 47). They live, work, socialize, vote, pay taxes and conduct other business in and around Morehead. (*Id.*). Quite simply, Rowan County is their home.

According to Kim Davis, the Rowan County Clerk's Office serves as a "pass through collection agency" for the State of Kentucky. (Doc. # 26 at 24-25). She and her six deputy clerks regularly handle delinquent taxes, oversee elections, manage voter registration and issue hunting and fishing licenses. (*Id.*). A portion of the fees collected in exchange for these services is used to fund the Office's activities throughout the year. (*Id.*). The remainder is remitted to the State. (*Id.*).

Under Kentucky law, county clerks are also responsible for issuing marriage licenses.[1] *See* Ky. Rev. Stat. Ann. § 402.080. The process is quite simple. The couple must first go to the county clerk's office and provide their biographical information to one of the clerks. *See* Ky. Rev. Stat. Ann. § 402.100. The clerk then enters the information into a computer-generated form, prints it and signs it. *Id.* This form signifies that the couple is licensed, or legally qualified, to marry.[2] *Id.* At the appropriate time, the couple presents this form to their officiant, who must certify that he or she performed a valid marriage ceremony. *Id.* The couple then has thirty days to return the form to the clerk's office for

---

1) This task requires relatively few resources, at least in Rowan County. (Doc. # 26 at 24-30). Davis testified that her Office issued 212 marriage licenses in 2014. Marriage licenses cost $35.50. (*Id.*). Of that sum, the Office retains $21.17, and remits the remaining $14.33 to the State. (*Id.*). Thus, Rowan County Clerk's Office made about $4,500, or roughly 0.1% of its annual budget, from issuing marriage licenses in 2014. (*Id.*). Davis also estimated that the task of issuing marriage licenses occupies one hour of one deputy clerk's time per week. (*Id.*).

2) A couple is "legally qualified" to marry if both individuals are over the age of eighteen, mentally competent, unrelated to each other and currently unmarried. *See* Ky. Rev. Stat. Ann. §§ 402.010, 402.020(a)-(d), (f).

recording.  *See* Ky. Rev. Stat. Ann. §§ 402.220, 402.230. The State will not recognize marriages entered into without a valid license therefor. *See* Ky. Rev. Stat. Ann. § 402.080.

The Kentucky Department of Libraries and Archives ("KDLA") prescribes the above-mentioned form, which must be used by all county clerks in issuing marriage licenses.[3]  Ky. Rev. Stat. Ann. §§ 402.100, 402.110.  It is composed of three sections, which correspond to the steps detailed above: (1) a marriage license, to be completed by a county or deputy clerk; (2) a marriage certificate, to be completed by a qualified officiant; and (3) a recording statement, to be completed by a county or deputy clerk.  The marriage license section has the following components:

> (a)  *An authorization statement of the county clerk issuing the license for any person or religious society authorized to perform marriage ceremonies to unite in marriage the persons named;*
>
> (b)  Vital information for each party, including the full name, date of birth, place of birth, race, condition (single, widowed, or divorced), number of previous marriages, occupation, current residence, relationship to the other party, and full names of parents; and
>
> (c)  The date and place the license is issued, and the signature of the county clerk or deputy clerk issuing the license.

*See* Ky. Rev. Stat. Ann. § 402.100(1) (emphasis added).

Davis does not want to issue marriage licenses to same-sex couples because they will bear the above-mentioned authorization statement.  She sees it as an endorsement of same-sex marriage, which runs contrary to her Apostolic Christian beliefs.  (*Id.* at 42).  Four of Davis' deputy clerks share her religious objection to same-sex marriage, and another is

---

3)  Only one aspect of the form has changed since *Obergefell*–whereas the marriage applicants were once referred to as "Bride" and "Groom," they are now identified as "First Party" and "Second Party."

undecided on the subject.  (*Id.* at 49).  The final deputy clerk is willing to issue the licenses, but Davis will not allow it because her name and title still appear twice on licenses that she does not personally sign.  (Doc. # 29-3 at 7).

In the wake of *Obergefell*, Governor Beshear issued the following directive to all county clerks:

> Effective today, Kentucky will recognize as valid all same sex marriages performed in other states and in Kentucky.  In accordance with my instruction, all executive branch agencies are already working to make any operational changes that will be necessary to implement the Supreme Court decision.  Now that same-sex couples are entitled to the issuance of a marriage license, the Department of Libraries and Archives will be sending a gender-neutral form to you today, along with instructions for its use.

(Doc. # 29-3 at 11).  He has since addressed some of the religious concerns expressed by some county clerks:

> You can continue to have your own personal beliefs but, you're also taking an oath to fulfill the duties prescribed by law, and if you are at that point to where your personal convictions tell you that you simply cannot fulfill your duties that you were elected to do, th[e]n obviously an honorable course to take is to resign and let someone else step in who feels that they can fulfill those duties.

(Doc. # 29-11).  Davis is well aware of these directives.  Nevertheless, she plans to implement her "no marriage licenses" policy for the remaining three and a half years of her term as Rowan County Clerk.  (Doc. # 26 at 67).

## III.    Standard of Review

A district court must consider four factors when entertaining a motion for preliminary injunction:

> (1)    whether the movant has demonstrated a strong likelihood of success on the merits;
>
> (2)    whether the movant would suffer irreparable harm;

6

(3)     whether an injunction would cause substantial harm to others; and

(4)     whether the public interest would be served by the issuance of such an injunction.

*See Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998).   These "are factors to be balanced, and not prerequisites that must be met."   *In re Eagle Picher Indus., Inc.*, 963 F.3d 855, 859 (6th Cir. 1992) (stating further that these factors "simply guide the discretion of the court").

## IV.   Analysis

### A.   *Defendant Kim Davis in her official capacity*

Plaintiffs are pursuing this civil rights action against Defendants Rowan County and Kim Davis, in her individual and official capacities, under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

This statute "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."   *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotations omitted).

At this stage of the litigation, Plaintiffs seek to vindicate their constitutional rights by obtaining injunctive relief against Defendant Kim Davis, in her official capacity as Rowan County Clerk.   Because official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent," one might assume that Plaintiffs are effectively pursuing injunctive relief against Rowan County.   *Monell v. New*

7

*York City Dep't of Soc. Serv.*, 436 U.S. 658, 690 n. 55 (1978).  However, Rowan County can only be held liable under § 1983 if its policy or custom caused the constitutional deprivation.  *Id.* at 694.

A single decision made by an official with final policymaking authority in the relevant area may qualify as a policy attributable to the entity.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986).  Whether an official acted as a final policymaker is a question of state or local law.  *Id.*  However, courts must avoid categorizing an official as a state or municipal actor "in some categorical, 'all or nothing' manner."  *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997).  They key inquiry is whether an official is a "final policymaker [ ] for the local government in a particular area, or on a particular issue."  *Id.*  Accordingly, the Court will focus on whether Davis likely acted as a final policymaker for Rowan County regarding the issuance of marriage licenses.

While Davis is the elected Rowan County Clerk, subject to very little oversight by the Rowan County Fiscal Court, there are no other facts in the record to suggest that she set marriage policy for Rowan County.  After all, the State of Kentucky has "absolute jurisdiction over the regulation of the institution of marriage."  *Pinkhasov v. Petocz*, 331 S.W.3d 285, 291 (Ky. Ct. App. 2011).  The State not only enacts marriage laws, it prescribes procedures for county clerks to follow when carrying out those laws, right down to the form they must use in issuing marriage licenses.  *Id.*; *see also* Ky. Rev. Stat. Ann. §§ 402.080, 402.100.  Thus, Davis likely acts for the State of Kentucky, and not as a final policymaker for Rowan County, when issuing marriage licenses.

This preliminary finding does not necessarily foreclose Plaintiffs from obtaining injunctive relief against Davis.  While the Eleventh Amendment typically bars Plaintiffs from

bringing suit against a state or its officials, "official-capacity actions for prospective relief are not treated as actions against the state." *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985). This narrow exception, known as the *Ex Parte Young* doctrine, permits a federal court to "enjoin state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). "It rests on the premise–less delicately called a 'fiction,'–that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign immunity purposes." *Va. Office for Prot. and Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011). Because Plaintiffs seek to enjoin Davis from violating their federal constitutional rights, this Court has the power to grant relief under *Ex Parte Young*.[4]

### B.  Plaintiffs' Motion for Preliminary Injunction

#### 1.  Plaintiffs' likelihood of success on the merits

##### a.  The fundamental right to marry

Under the Fourteenth Amendment, a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This "due process" clause has both a procedural component and a substantive component. *See EJS Prop., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). Procedural due process simply requires that the government provide a fair procedure when depriving an individual of life, liberty or property. *Id.* By contrast, substantive due process "protects a narrow class

---

4) In their reply brief, Plaintiffs argued that the Court need not decide whether Davis is a state actor or municipal policymaker in order to grant injunctive relief. The Court's preliminary finding on this matter does not necessarily foreclose Plaintiffs from arguing the "municipal policymaker" theory in the future. The Court simply seeks to ensure that it is indeed able to grant injunctive relief against Kim Davis in her official capacity.

of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014).

Although the Constitution makes no mention of the right to marry, the U.S. Supreme Court has identified it as a fundamental interest subject to Fourteenth Amendment protection. *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (striking down Virginia's anti-miscegenation statutes as violative of the Equal Protection and Due Process Clauses of the Fourteenth Amendment). After all, "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id.* This right applies with equal force to different-sex and same-sex couples. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2604-05 (2015) ("[T]he right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment same-sex couples may not be deprived of that right and that liberty.").

If a state law or policy "significantly interferes with the exercise of a fundamental right[, it] cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). A state substantially interferes with the right to marry when some members of the affected class "are absolutely prevented from getting married" and "[m]any others, able in theory to satisfy the statute's requirements[,] will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry." *Id.* at 387 (invalidating a Wisconsin statute that required individuals with child support obligations to

10

obtain a court order before marrying).

However, "not every state action, 'which relates in any way to the incidents of or the prerequisites for marriage must be subjected to rigorous scrutiny.'" *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1134 (6th Cir. 1995) (quoting *Zablocki*, 434 U.S. at 386). States may impose "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship." *Id.* at 1135. If the statute does not create a "direct legal obstacle in the path of persons desiring to get married" or significantly discourage marriage, then it will be upheld so long as it is rationally related to a legitimate government interest. *Id.* (quoting *Zablocki* 434 U.S. at 387-88 n. 12); *see also Califano v. Jobst*, 434 U.S. 47, 54 n.11 (1977) (upholding a Social Security provision that terminated secondary benefits received by the disabled dependent child of a covered wage earner if that child married an individual who was not entitled to benefits).

The state action at issue in this case is Defendant Davis' refusal to issue *any* marriage licenses. Plaintiffs contend that Davis' "no marriage licenses" policy significantly interferes with their right to marry because they are unable to obtain a license in their home county. Davis insists that her policy does not significantly discourage Plaintiffs from marrying because they have several other options for obtaining licenses: (1) they may go to one of the seven neighboring counties that *are* issuing marriage licenses; (2) they may obtain licenses from Rowan County Judge Executive Walter Blevins; or (3) they may avail themselves of other alternatives being considered post-*Obergefell.*

Davis is correct in stating that Plaintiffs can obtain marriage licenses from one of the surrounding counties; thus, they are not totally precluded from marrying in Kentucky. However, this argument ignores the fact that Plaintiffs have strong ties to Rowan County.

11

They are long-time residents who live, work, pay taxes, vote and conduct other business in Morehead.  Under these circumstances, it is understandable that Plaintiffs would prefer to obtain their marriage licenses in their home county.  And for other Rowan County residents, it may be more than a preference.  The surrounding counties are only thirty minutes to an hour away, but there are individuals in this rural region of the state who simply do not have the physical, financial or practical means to travel.[5]

This argument also presupposes that Rowan County will be the only Kentucky county not issuing marriage licenses.  While Davis may be the only clerk currently turning away eligible couples, 57 of the state's 120 elected county clerks have asked Governor Beshear to call a special session of the state legislature to address religious concerns related to same-sex marriage licenses.[6]  (Doc. # 29-9).  If this Court were to hold that Davis' policy did not significantly interfere with the right to marry, what would stop the other 56 clerks from following Davis' approach?  What might be viewed as an inconvenience for residents of one or two counties quickly becomes a substantial interference when applicable to approximately half of the state.

As for her assertion that Judge Blevins may issue marriage licenses, Davis is only partially correct.  KRS § 402.240 provides that, "[i]n the absence of the county clerk, or

---

5) The median household income in Rowan County is $35,236 and 28.6% of the population lives below the poverty line.  *See* United States Census Bureau, http://quickfacts.census.gov/qfd/states/21/21205.html.  For the entire state of Kentucky, the median household income is $43,036 and 18.8% of the population lives below the poverty line.  *Id.*

6) *See also* Jack Brammer, 57 County Clerks Ask Governor for Special Session on Same-Sex Marriage Licenses, The Lexington Herald Leader (July 8, 2015), http://www.kentucky.com/2015/07/08/3936545_57-kentucky-county-clerks-ask.html?rh=1;   Terry   DeMio, Boone, Ky. Clerks Want Same-Sex License Law, Cincinnati Enquirer (July 9, 2015), http://www.cincinnati.com/story/news/local/northern-ky/2015/07/09/boone-clerk-wants-special-legislative-session-address-sex-marriage-issues-clerks/29919103/.

during a vacancy in the office, the county judge/executive may issue the license and, in so doing, he shall perform the duties and incur all the responsibilities of the clerk."  The statute does not explicitly define "absence," suggesting that a traditional interpretation of the term is appropriate.  *See* Merriam-Webster Online Dictionary, 2015, http://www.merriam-webster.com/, (describing "absence" as "a period of time when someone is not present at a place, job, etc.").  However, Davis asks the Court to deem her "absent," for purposes of this statute, because she has a religious objection to issuing the licenses.  While this is certainly a creative interpretation, Davis offers no legal precedent to support it.

This proposal also has adverse consequences for Judge Blevins.  If he began issuing marriage licenses while Davis continued to perform her other duties as Rowan County Clerk, he would likely be exceeding the scope of his office. After all, KRS § 402.240 only authorizes him to issue marriage licenses when Davis is *unable* to do so; it does not permit him to assume responsibility for duties that Davis does not wish to perform.  Such an arrangement not only has the potential to create tension between the next judge executive and county clerk, it sets the stage for further manipulation of statutorily defined duties.[7]  Under these circumstances, the Court simply cannot count this as a viable option for Plaintiffs to obtain their marriage licenses.

---

7) Even if the Court were inclined to accept Davis' interpretation of the term "absence," it would have doubts about the practicality of this approach.  Judge Blevins is the highest elected official in Rowan County.  (Doc. # 26 at 7).  He is frequently out of the office on official business.  (*Id.*).  While Judge Blevins would not have to process a large number of marriage requests, he might not be regularly available for couples seeking licenses. Thus, the Court would be concerned about Judge Blevins' ability to perform this function as efficiently as Davis and her six deputy clerks.

Davis finally suggests that Plaintiffs will have other avenues for obtaining marriage licenses in the future.  For example, county clerks have urged Governor Beshear to create an online marriage licensing system, which would be managed by the State of Kentucky. While these options may be available someday, they are not feasible alternatives at present.  Thus, they have no impact on the Court's "substantial interference" analysis.

Having considered Davis' arguments in depth, the Court finds that Plaintiffs have one feasible avenue for obtaining their marriage licenses–they must go to another county. Davis makes much of the fact that Plaintiffs are able to travel, but she fails to address the one question that lingers in the Court's mind.  Even if Plaintiffs are able to obtain licenses elsewhere, why should they be required to?  The state has long entrusted county clerks with the task of issuing marriage licenses.  It does not seem unreasonable for Plaintiffs, as Rowan County voters, to expect their elected official to perform her statutorily assigned duties.  And yet, that is precisely what Davis is refusing to do.  Much like the statutes at issue in *Loving* and *Zablocki*, Davis' "no marriage licenses" policy significantly discourages many Rowan County residents from exercising their right to marry and effectively disqualifies others from doing so.  The Court must subject this policy apply heightened scrutiny.

### b.    The absence of a compelling state interest

When pressed to articulate a compelling state interest served by her "no marriage licenses" policy, Davis responded that it serves the State's interest in protecting her religious freedom.  The State certainly has an obligation to "observe the basic free exercise rights of its employees," but this is not the extent of its concerns.  *Marchi v. Bd. of Coop. Educ. Serv. of Albany*, 173 F.3d 469, 476 (2d. Cir. 1999).  In fact, the State has some

14

priorities that run contrary to Davis' proffered state interest.  Chief among these is its interest in preventing Establishment Clause violations.  *See* U.S. Const. amend. I (declaring that "Congress shall make no law respecting the establishment of religion").  Davis has arguably committed such a violation by openly adopting a policy that promotes her own religious convictions at the expenses of others.[8]  In such situations, "the scope of the employees' rights must [ ] yield to the legitimate interest of governmental employer in avoiding litigation."  *Marchi*, 173 F.3d at 476.

The State also has a countervailing interest in upholding the rule of law.  *See generally Papachristou v. City of Jacksonville*, 405 U.S. 156, 171 (1972) ("The rule of law, evenly applied to minorities as well as majorities, . . . is the great mucilage that holds society together.").  Our form of government will not survive unless we, as a society, agree to respect the U.S. Supreme Court's decisions, regardless of our personal opinions.  Davis is certainly free to disagree with the Court's opinion, as many Americans likely do, but that does not excuse her from complying with it.  To hold otherwise would set a dangerous precedent.

For these reasons, the Court concludes that Davis' "no marriage licenses" policy likely infringes upon Plaintiffs' rights without serving a compelling state interest.  Because Plaintiffs have demonstrated a strong likelihood of success on the merits of their claim, this first factor weighs in favor of granting their request for relief.

### 2.      Potential for irreparable harm to Plaintiffs

When a plaintiff demonstrates a likelihood of success on the merits of a

---

8) Although it is not the focus of this opinion, Plaintiffs have already asserted such an Establishment Clause claim against Kim Davis in her official capacity.  (Doc. # 1 at 13).

constitutional deprivation claim, it follows that he or she will suffer irreparable injury absent injunctive relief. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir .1998) (finding that the loss of First Amendment rights for a minimal period of time results in irreparable harm); *Ohio St. Conference of NAACP v. Husted*, 43 F. Supp. 3d 808, 851 (S.D. Ohio 2014) (recognizing that a restriction on the fundamental right to vote constitutes irreparable injury).

The Court is not aware of any Sixth Circuit case law explicitly stating that a denial of the fundamental right to marry constitutes irreparable harm. However, the case law cited above suggests that the denial of constitutional rights, enumerated or unenumerated, results in irreparable harm. It follows that Plaintiffs will suffer irreparable harm from Davis' "no marriage licenses" rule, absent injunctive relief. Therefore, this second factor also weighs in favor of granting Plaintiffs' Motion.

### 3.   Potential for substantial harm to Kim Davis

#### a.   The right to free exercise of religion

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof*." *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (applying the First Amendment to the states via the Fourteenth Amendment). This Free Exercise Clause "embraces two concepts,–freedom to believe and freedom to act." *Id.* at 304. "The first is absolute but, in the nature of things, the second cannot be." *Id.* Therefore, "[c]onduct remains subject to regulation for the

16

protection of society." *Id.*

Traditionally, a free exercise challenge to a particular law triggered strict scrutiny. *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 407 (1963). A statute would only be upheld if it served a compelling government interest and was narrowly tailored to effectuate that interest. *Id.* However, the U.S. Supreme Court has retreated slightly from this approach. *See Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). While laws targeting religious conduct remain subject to strict scrutiny, "[a] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Babalu*, 508 U.S. at 532; *see also Smith*, 494 U.S. at 880 (stating further that an individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate").

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Babalu*, 508 U.S. at 532. A law is not neutral if its object "is to infringe upon or restrict practices because of their religious motivation." *Id.* at 533 (finding that a local ordinance forbidding animal sacrifice was not neutral because it focused on "rituals" and had  built-in exemptions for most other animal killings). The Court has not yet "defined with precision the standard used to evaluate whether a prohibition is of general application." *Id.* at 543. However, it has observed that "[t]he Free Exercise Clause 'protect[s] religious observers against unequal treatment,' and inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious

17

motivation." *Id.* at 542.

While *Smith* and *Babalu* do not explicitly mention the term "rational basis," lower courts have interpreted them as imposing a similar standard of review on neutral laws of general applicability. *See, e.g., Seger v. Ky. High Sch. Athletic Ass'n*, 453 F. App's 630, 634 (2011). Under rational basis review, laws will be upheld if they are "rationally related to furthering a legitimate state interest." *Id.* at 635 (noting that "[a] law or regulation subject to rational basis review is accorded a strong presumption of validity"); *see also F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (stating generally that laws subject to rational basis review must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification").

In response to *Smith* and *Babalu*, Congress enacted the Religious Freedom Restoration Act ("RFRA"). *See* 42 U.S.C. § 2000bb-1. It prohibits the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," except when the government demonstrates that the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Id.* Although Congress intended RFRA to apply to the states as well as the federal government, the Court held that this was an unconstitutional exercise of Congress' powers under Section Five of the Fourteenth Amendment. *City of Boerne v. Flores*, 521 U.S. 507, 512 (1997). Free exercise challenges to federal laws remain subject to RFRA, while similar challenges to state policies are governed by *Smith*. *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

For purposes of this inquiry, the state action at issue is Governor Beshear's post-*Obergefell* directive, which explicitly instructs county clerks to issue marriage licenses to

18

same-sex couples.  Davis argues that the Beshear directive not only substantially burdens her free exercise rights by requiring her to disregard sincerely-held religious beliefs, it does not serve a compelling state interest.  She further insists that Governor Beshear could easily grant her a religious exemption without adversely affecting Kentucky's marriage licensing scheme, as there are readily available alternatives for obtaining licenses in and around Rowan County.[9]

This argument proceeds on the assumption that Governor Beshear's policy is not neutral or generally applicable, and is therefore subject to strict scrutiny.[10]  However, the text itself supports a contrary inference.  Governor Beshear first describes the legal impact of the Court's decision in *Obergefell*, then provides guidance for all county clerks in implementing this new law.  His goal is simply to ensure that the activities of the Commonwealth are consistent with U.S. Supreme Court jurisprudence.

While facial neutrality is not dispositive, Davis has done little to convince the Court that Governor Beshear's directive aims to suppress religious practice.  She has only one piece of anecdotal evidence to demonstrate that Governor Beshear "is picking and choosing the conscience-based exemptions to marriage that he deems acceptable." (Doc. # 29 at 24).  In 2014, Attorney General Jack Conway declined to appeal a federal district

---

9) Davis further develops this argument in her own Motion for Preliminary Injunction (Doc. # 39) against Governor Beshear and KDLA Librarian Wayne Onkst.  That Motion is not yet ripe for review.

10) In *Smith*, the U.S. Supreme Court indicated that free exercise claims involving neutral and generally applicable laws may still be subject to heightened scrutiny if asserted alongside another constitutional right. If the Court concludes that the Beshear directive is neutral and generally applicable, Davis argues that strict scrutiny must still apply because her free exercise claim is coupled with a free speech claim.  (Doc. # 29 at 23).  However, this proposal fails because Davis' free speech rights are qualified by virtue of her public employment. *See Draper v. Logan Cnty. Pub. Library*, 403 F. Supp. 2d 608, 621-22 (W.D. Ky. 2005) (applying the *Pickering* balancing test to a combined free exercise and free speech claim asserted by a public employee).  The Court will discuss this concept further in the next section.

court decision striking down Kentucky's constitutional and statutory prohibitions on same-sex marriage.  (Doc. # 29-12).  He openly stated that he could not, in good conscience, defend discrimination and waste public resources on a weak case.[11]  (*Id.*).  Instead of directing Attorney General Conway to pursue the appeal, regardless of his religious beliefs, Governor Beshear hired private attorneys for that purpose.  (Doc. # 29-13).  He has so far refused to extend such an "exemption" to county clerks with religious objections to same-sex marriage.  (Doc. # 29-11).

However, Davis fails to establish that her current situation is comparable to Attorney General Conway's position in 2014.  Both are elected officials who have voiced strong opinions about same-sex marriage, but the comparison ends there.  Governor Beshear did not actually "exempt" Attorney General Conway from pursuing the same-sex marriage appeal.  Attorney General Conway's decision stands as an exercise of prosecutorial discretion on an unsettled legal question.  By contrast, Davis is refusing to recognize the legal force of U.S. Supreme Court jurisprudence in performing her duties as Rowan County Clerk.  Because the two are not similarly situated, the Court simply cannot conclude that Governor Beshear treated them differently based upon their religious convictions.  There being no other evidence in the record to suggest that the Beshear directive is anything but neutral and generally applicable, it will likely be upheld if it is rationally related to a

---

11) Davis refers to the U.S. District Court for the Western District of Kentucky's decisions in *Bourke v. Beshear*, 996 F. Supp. 2d 542, 545 (W.D. Ky. 2014), and *Love v. Beshear*, 989 F. Supp. 2d 536, 539 (W.D. Ky. 2014).  Judge John Heyburn held that Kentucky's constitutional and statutory prohibitions on same-sex marriages "violate[ ] the United States Constitution's guarantee of equal protection under the law, even under the most deferential standard of review." *Bourke*, 996 F. Supp. 2d at 544.  The Sixth Circuit Court of Appeals consolidated these cases with several similar matters originating from Ohio, Michigan and Tennessee and reversed them.  *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014).  The Supreme Court of the United States then granted certiorari on these cases, now collectively known as *Obergefell v. Hodges*, 135 S. Ct. 1039 (2015).

legitimate government purpose.

The Beshear directive certainly serves the State's interest in upholding the rule of law.  However, it also rationally relates to several narrower interests identified in *Obergefell.* By issuing licenses to same-sex couples, the State allows them to enjoy "the right to personal choice regarding marriage [that] is inherent in the concept of individual autonomy" and enter into "a two-person union unlike any other in its importance to the committed individuals."  135 S. Ct. at 2599-2600.  It also allows same-sex couples to take advantage of the many societal benefits and fosters stability for their children.  *Id.* at 2600-01. Therefore, the Court concludes that it likely does not infringe upon Davis' free exercise rights.

### b.  The right to free speech

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  Under the Free Speech Clause, an individual has the "right to utter or print, [as well as] the right to distribute, the right to receive and the right to read." *Griswold v. Connecticut*, 381 U.S. 479, 483 (1965)(*citing Martin v. City of Struthers*, 319 U.S. 141, 143 (1943)).  An individual also has the "right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (invalidating a state law that required New Hampshire drivers to display the state motto on their license plates).  After all, "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts."  *Id.*

While the Free Speech Clause protects citizens' speech rights from government intrusion, it does not stretch so far as to bar the government "from determining the content of what it says."  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239,

2245-46 (2015). "[A]s a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position. In doing so, it represents its citizens and carries out its duties on their behalf." *Id.* That being said, the government's ability to express itself is not unlimited. *Id.* "[T]he Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech." *Id.* (stating further that "[c]onstitutional and statutory provisions outside of the Free Speech Clause may [also] limit government speech").

This claim also implicates the Beshear directive. Davis contends that this directive violates her free speech rights by compelling her to express a message she finds objectionable. Specifically, Davis must issue marriage licenses bearing her "imprimatur and authority" as Rowan County Clerk to same-sex couples . Doc. # 29 at 27). Davis views such an act as an endorsement of same-sex marriage, which conflicts with her sincerely-held religious beliefs.

As a preliminary matter, the Court questions whether the act of issuing a marriage license constitutes speech. Davis repeatedly states that the act of issuing these licenses requires her to "authorize" same-sex marriage. A close inspection of the KDLA marriage licensing form refutes this assertion. The form does not require the county clerk to condone or endorse same-sex marriage on religious or moral grounds. It simply asks the county clerk to certify that the information provided is accurate and that the couple is qualified to marry under Kentucky law. Davis' religious convictions have no bearing on this purely legal inquiry.

The Court must also acknowledge the possibility that any such speech is attributable to the government, rather than Davis. *See Walker*, 135 S. Ct. at 2248 (finding that

specialty license plates are government speech because the government has exercised final approval over the designs, and thus, chosen "how to present itself and its constituency").  The State prescribes the form that Davis must use in issuing marriage licenses.  She plays no role in composing the form, and she has no discretion to alter it.  Moreover, county clerks' offices issue marriage licenses on behalf of the State, not on behalf of a particular elected clerk.

Assuming *arguendo* that the act of issuing a marriage license is speech by Davis, the Court must further consider whether the State is infringing upon her free speech rights by compelling her to convey a message she finds disagreeable.  However, the seminal "compelled speech" cases provide little guidance because they focus on private individuals who are forced to communicate a particular message on behalf of the government.  *See, e.g., W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (striking down a state law that required schoolchildren to recite the Pledge of Allegiance and salute the flag).  Davis is a public employee, and therefore, her speech rights are different than those of a private citizen.[12]  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

"[T]he government may not constitutionally compel persons to relinquish their First Amendment rights as a condition of public employment," but it does have "a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large."  *Connick v. Myers*, 461 U.S. 138, 156 (1983); *Waters v. Churchill*, 511 U.S. 661, 671

---

12) Most free speech cases involving public employees center on compelled silence rather than compelled speech.  *See, e.g., Connick*, 461 U.S. at 147-48 (focusing on a district attorney's claim that she was fired in retaliation for exercising her free speech rights).  "[I]n the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97.

(1994).  Accordingly, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti*, 547 U.S. at 418; *see also U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, (1973) (stating that "neither the First Amendment nor any other provision of the Constitution" invalidates the Hatch Act's bar on partisan political conduct by federal employees).

"[T]wo inquiries [ ] guide interpretation of the constitutional protections accorded to public employee speech." *Garcetti*, 547 U.S. at 418 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 563 (1968)).  First, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Id.* (explaining further that this question often depends upon whether the employee's speech was made pursuant to his or her official duties). *Id.* at 421.  If the answer is no, then the employee's speech is not entitled to First Amendment protection. *Id.* at 421 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.").  If the answer is yes, a court must then consider "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (stating further that the government's restrictions "must be directed at speech that has some potential to affect the entity's operations").

The Court must adapt this test slightly because Davis' claim focuses on her right *not* to speak.  In this context, the first inquiry is whether Davis refused to speak (i.e. refused to issue marriage licenses) as a citizen on a matter of public concern.  The logical answer to this question is no, as the average citizen has no authority to issue marriage licenses. Davis is only able to issue these licenses, or refuse to issue them, because she is the

24

Rowan County Clerk. Because her speech (in the form of her refusal to issue marriage licenses) is a product of her official duties, it likely is not entitled to First Amendment protection. The Court therefore concludes that Davis is unlikely to succeed on her compelled speech claim.

### c.      The prohibition on religious tests

Article VI, § 3 of the U.S. Constitution provides as follows:

> The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

Under this Clause, "[t]he fact [ ] that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution." *Torcaso v. Watkins*, 367 U.S. 488 (1961) (striking down a state requirement that an individual declare his belief in God in order to become a notary public); *see also McDaniel v. Paty*, 435 U.S. 618 (1978) (invalidating a state law that prevented religious officials from serving in the state legislature).

Davis contends that "[c]ompelling all individuals who have any connection with the issuance of marriage licenses . . . to authorize, approve, and participate in that act against their sincerely held religious beliefs about marriage, without providing accommodation, amounts to an improper religious test for holding (or maintaining) public office." (Doc. # 29 at 20). The Court must again point out that the act of issuing a marriage license to a same-sex couple merely signifies that the couple has met the *legal requirements* to marry. It is not a sign of moral or religious approval. The State is not requiring Davis to express a

particular religious belief as a condition of public employment, nor is it forcing her to surrender her free exercise rights in order to perform her duties. Thus, it seems unlikely that Davis will be able to establish a violation of the Religious Test Clause.

Although Davis focuses on the Religious Test Clause, the Court must draw her attention to the first half of Article VI, Clause § 3. It requires all state officials to swear an oath to defend the U.S. Constitution. Davis swore such an oath when she took office on January 1, 2015. However, her actions have not been consistent with her words. Davis has refused to comply with binding legal jurisprudence, and in doing so, she has likely violated the constitutional rights of her constituents. When such "sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied. " *Obergefell*, 135 S. Ct. at 2602. Such policies simply cannot endure.

### d.      The Kentucky Religious Freedom Act

Kentucky Constitution § 1 broadly declares that "[a]ll men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned . . . [t]he right of worshiping Almighty God according to the dictates of their consciences." Kentucky Constitution § 5 gives content to this guarantee:

> No preference shall ever be given by law to any religious sect, society or denomination; nor to any particular creed, mode of worship or system of ecclesiastical polity; nor shall any person be compelled to attend any place of worship, to contribute to the erection or maintenance of any such place, or to the salary or support of any minister of religion; nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed; and the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall,

26

in any case whatever, control or interfere with the rights of conscience.

Kentucky courts have held that Kentucky Constitution § 5 does not grant more protection to religious practice than the First Amendment. *Gingerich v. Commonwealth*, 382 S.W.3d 835, 839-40 (Ky. 2012). Such a finding would normally permit the Court to collapse its analysis of state and federal constitutional provisions. However, the Kentucky Religious Freedom Act, patterned after the federal RFRA, subjects state free exercise challenges to heightened scrutiny:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

Ky. Rev. Stat. Ann. § 446.350.

Davis again argues that the Beshear directive substantially burdens her religious freedom without serving a compelling state interest. The record in this case suggests that the burden is more slight. As the Court has already pointed out, Davis is simply being asked to signify that couples meet the legal requirements to marry. The State is not asking her to condone same-sex unions on moral or religious grounds, nor is it restricting her from engaging in a variety of religious activities. Davis remains free to practice her Apostolic Christian beliefs. She may continue to attend church twice a week, participate in Bible Study and minister to female inmates at the Rowan County Jail. She is even free to believe that marriage is a union between one man and one woman, as many Americans do. However, her religious convictions cannot excuse her from performing the duties that she

27

took an oath to perform as Rowan County Clerk. The Court therefore concludes that Davis is unlikely to suffer a violation of her free exercise rights under Kentucky Constitution § 5.

### 4.    Public interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F. 3d 1071, 1079 (6th Cir. 1994). Because Davis' "no marriage licenses" policy likely infringes upon Plaintiffs' fundamental right to marry, and because Davis herself is unlikely to suffer a violation of her free speech or free exercise rights if an injunction is issued, this fourth and final factor weighs in favor of granting Plaintiffs' Motion.

## V.    Conclusion

District courts are directed to balance four factors when analyzing a motion for preliminary injunction. In this case, all four factors weigh in favor of granting the requested relief. Accordingly, for the reasons set forth herein,

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. # 2) against Defendant Kim Davis, in her official capacity as Rowan County Clerk, is hereby **granted**.

**IT IS FURTHER ORDERED** that Defendant Kim Davis, in her official capacity as Rowan County Clerk, is hereby preliminarily enjoined from applying her "no marriage licenses" policy to future marriage license requests submitted by Plaintiffs.

This 12th day of August, 2015.



Signed By:

*David L. Bunning*   *DB*

**United States District Judge**

G:\DATA\Opinions\Ashland\15-44 MOO Granting Mtn for Preliminary Injunction.wpd