UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
ASHLAND DIVISION

| | | |
|---|---|---|
| **APRIL MILLER, ET AL.,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **0:15-CV-00044-DLB** |
| | : | |
| **KIM DAVIS, ET AL.,** | : | **DISTRICT JUDGE** |
| | : | **DAVID L. BUNNING** |
| **Defendants.** | : | |
| | : | |
| **KIM DAVIS,** | : | |
| | : | |
| **Third-Party Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **STEVEN L. BESHEAR, in his official** | : | |
| **capacity as Governor of Kentucky, and** | : | |
| **WAYNE ONKST, in his official capacity** | : | |
| **as State Librarian and Commissioner,** | : | |
| **Kentucky Department for Libraries and** | : | |
| **Archives,** | : | |
| | : | |
| **Third-Party Defendants.** | : | |
| | : | |

**DEFENDANT/THIRD-PARTY PLAINTIFF KIM DAVIS' RESPONSE IN OPPOSITION TO THIRD-PARTY DEFENDANTS' MOTION TO DISMISS THIRD-PARTY COMPLAINT**

Horatio G. Mihet
Roger K. Gannam
Jonathan D. Christman
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854
Tel: (800) 671-1776
Fax: (407) 875-0770
hmihet@lc.org / rgannam@lc.org /
jchristman@lc.org

A.C. Donahue
DONAHUE LAW GROUP, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
Tel: (606) 677-2741
Fax: (606) 678-2977
ACDonahue@DonahueLawGroup.com

*Attorneys for Defendant/Third-Party Plaintiff Kim Davis*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................ 1

THIRD-PARTY COMPLAINT ALLEGATIONS ...................................................... 2

    A.  Gov. Beshear's SSM Mandate ........................................................................ 2

    B.  Davis' Sincerely Held Religious Beliefs About Marriage ............................... 4

    C.  Plaintiffs' Underlying Lawsuit ........................................................................ 5

STANDARD OF REVIEW .......................................................................................... 7

ARGUMENT ................................................................................................................ 8

    A.  This Court Is Deprived Of Jurisdiction To Consider The Third-Party Defendants' Motion
       To Dismiss ....................................................................................................... 8

    B.  Davis Has Standing To Pursue Her Claims Against The Third-Party Defendants ............. 9

    C.  The Eleventh Amendment Does Not Bar Davis' Claims Against The Third-Party
       Defendants ...................................................................................................... 15

    D.  Davis Sufficiently Alleges Actionable Claims Against The Third-Party Defendants ...... 19

        1.  Davis Sufficiently Alleges A Cause Of Action Under The Kentucky Religious
           Freedom Restoration Act (Counts I, II) ...................................................... 20

        2.  Davis Sufficiently Alleges A Cause Of Action Under The Free Exercise Clause Of
           The First Amendment To The United States Constitution And Similar Kentucky
           Constitutional Provisions (Counts I, III, IV, V, VIII, IX, X) .................................... 26

        3.  Davis Sufficiently Alleges A Cause Of Action Under The Free Speech Clause Of The
           First Amendment To The United States Constitution And Similar Kentucky
           Constitutional Provisions (Counts I, VI, XI) ............................................... 34

        4.  Davis Sufficiently Alleges A Cause Of Action Under The Religious Test Clause Of
           The United States Constitution And Kentucky Constitutional Provisions (Counts I,
           VII, XII) ...................................................................................................... 37

CONCLUSION ........................................................................................................... 39

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

<u>Cases</u>

<u>*State*</u>

*Brown v. Barkley,*
 628 S.W.2d 616 (Ky. 1982) ....................................................................................11

<u>*Federal*</u>

*ACLU v. Mercer Cnty., Ky.*,
 432 F.3d 624 (6th Cir. 2005) ...................................................................................33

*Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*,
 512 F.3d 800 (6th Cir. 2008) ...................................................................................19

*Ang. v. Proctor & Gamble Co.*,
 932 F.2d 540 (6th Cir. 1991) .....................................................................................7

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)...................................................................................................8

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)...................................................................................................7

*Bloch v. Ribar,*
 156 F.3d 673 (6th Cir. 1998) .....................................................................................7

*Borough of Duryea, Pa. v. Guarnieri,*
 131 S.Ct. 2488 (2011) (2015) ..................................................................................30

*Bradford v. Bracken Cnty.*,
 767 F. Supp. 2d 740 (E.D. Ky. 2011) .......................................................................7

*Budsgunshop.com, LLC v. Security Safe Outlet, Inc.*,
 No. 10-390, 2012 WL 1899851 (E.D. Ky. May 23, 2012).......................................19

*Burwell v. Hobby Lobby Stores, Inc.*,
 134 S.Ct. 2751 (2014)..................................................................... *passim*

*Cady v. Arenac Cnty.*,
 574 F.3d 334 (6th Cir. 2009) ...................................................................................15

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)...................................................................................................9

*Children's Healthcare is a Legal Duty, Inc. v. Deters*,
    92 F.3d 1412 (6th Cir. 1996) ..............................................................................16

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)....................................................................................27, 28, 29

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)...............................................................................................21

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*,
    483 U.S. 327 (1987)...............................................................................................33

*Employment Div., Dep't of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990)...............................................................................................27

*Ex Parte Young*,
    209 U.S. 123 (1908)....................................................................................15, 16, 17

*Floyd v. Cnty. of Kent*,
    454 Fed. App'x 493 (6th Cir. 2012) ....................................................................16

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Resources*,
    71 F.3d 1197 (6th Cir. 1995) ................................................................................8

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)........................................................................................30, 36

*Gillis v. U.S. Dep't of Health & Human Servs.*,
    759 F.2d 565 (6th Cir. 1985) ................................................................................9

*Girouard v. U.S.*,
    328 U.S. 61 (1946)..........................................................................................31, 38

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)........................................................................................24, 25

*Haight v. Thompson*,
    763 F.3d 554 (6th Cir. 2014) ....................................................................22, 23, 26

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
    480 U.S. 136 (1987)...............................................................................................33

*Hollowell v. Cincinnati Ventilating Co., Inc.*,
    711 F. Sup. 2d 751 (E.D. Ky. 2010) ...................................................................7

*Holt v. Hobbs*,
    135 S.Ct. 853 (2015) ..........................................................................................22, 23

*Island Creek Coal Sales Co. v. City of Gainesville*,
    764 F.2d 437 (6th Cir. 1985) ...........................................................................8

*Jackson v. Ylst*,
    921 F.2d 882 (9th Cir. 1990) ...........................................................................17

*Johanns v. Livestock Marketing Ass'n*,
    544 U.S. 550 (2005) ..........................................................................................35

*J.R. v. Cox-Cruey*,
    No. 14-149, 2015 WL 4080052 (E.D. Ky. July 6, 2015) ...................................15

*Kalosho v. Kapture*,
    868 F. Supp. 882 (E.D. Mich. 1994) ...............................................................17

*Keohane v. Swarco, Inc.*,
    320 F.2d 429 (6th Cir. 1963) ...........................................................................8

*Lane v. Franks*,
    134 S.Ct. 2369 (2014) ......................................................................................30

*Lopez v. Vanderwater*,
    620 F.2d 1229 (7th Cir. 1980) .........................................................................12

*Lugar v. Edmonson Oil Co., Inc.*,
    457 U.S. 922 (1982) ..........................................................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................9

*Marrese v. Am. Academy of Orthopaedic Surgeons*,
    470 U.S. 373 (1985) ..........................................................................................8

*McDaniel v. Paty*,
    435 U.S. 618 (1978) ..........................................................................................37

*Meiman v. Kenton Cnty., Ky.*,
    No. 10-156, 2011 WL 721478 (E.D. Ky. Feb. 22, 2011) ...................................15

*Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*,
    755 F.3d 372 (6th Cir. 2014) ...........................................................................21

*Moir v. Greater Cleveland Reg'l Transit Auth.*,
    895 F.2d 266 (6th Cir. 1990) ...........................................................................15

iv

*Moor v. Cnty. of Alameda*,
   411 U.S. 693 (1973)..................................................................................................18

*NLRB v. Cincinnati Bronze, Inc.*,
   829 F.2d 585 (6th Cir. 1987) ....................................................................................8

*Obergefell v. Hodges*,
   135 S.Ct. 2584 (2015)....................................................................................... *passim*

*Parratt v. Taylor*,
   451 U.S. 527 (1981)..................................................................................................17

*Prater v. City of Burnside, Ky.*,
   289 F.3d 417 (6th Cir. 2002) ...............................................................................26, 27

*Riley v. Nat'l Federation of Blind of N.C., Inc.*,
   487 U.S. 781 (1988)..................................................................................................34

*Robertson v. Wegmann*,
   436 U.S. 584 (1978)..................................................................................................18

*Sherbert v. Verner*,
   374 U.S. 398 (1963)........................................................................................22, 27, 29

*Slater v. Douglas Cnty.*,
   743 F. Supp. 2d 1188 (D. Or. 2010) ....................................................................30, 31

*Spoonamore v. Fed. Housing Fin. Agency*,
   No. 12-220, 2014 WL 201609 (E.D. Ky. Jan. 17, 2014) .........................................9

*Spruyette v. Walters*,
   753 F.2d 498 (6th Cir. 1985) ..................................................................................17

*Stormans, Inc. v. Selecky*,
   844 F. Supp. 2d 1172 (W.D. Wash. 2012)..............................................................31

*Tate v. Frey*,
   735 F.2d 986 (6th Cir. 1984) ..................................................................................16

*Thiokol Corp. v. Dep't of Treasury*,
   987 F.2d 376 (6th Cir. 1993) ..............................................................................15, 16

*Thomas v. Collins*,
   323 U.S. 516 (1945).................................................................................................24

*Thomas v. Review Bd. of Indiana Employment Security Div.*,
   450 U.S. 707 (1981)............................................................................................23, 24

*Top Flight Entm't, Ltd. v. Schuette*,
    729 F.3d 623 (6th Cir. 2013) ......................................................................9, 16

*Torcaso v. Watkins*,
    367 U.S. 488 (1961)............................................................................37, 38

*Universal Linen Serv., LLC v. Cherokee Chem. Co., Inc.*,
    No. 12-238, 2013 WL 4039051 (W.D. Ky. Aug. 7, 2013)....................................19

*U.S. v. Holloway*,
    740 F.2d 1373 (6th Cir. 1984) ......................................................................8

*Wallace v. Jaffree*,
    472 U.S. 38 (1985)......................................................................................26

*Williams v. Leatherwood*,
    258 Fed. App'x 817 (6th Cir. 2007) ..............................................................18

*Wilson v. Garcia*,
    471 U.S. 261 (1985)....................................................................................18

*Wilson v. Morgan*,
    477 F.3d 326 (6th Cir. 2007) ......................................................................18

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972).....................................................................................27

*Wooley v. Maynard*,
    430 U.S. 705 (1976).............................................................................35, 36

*Zorach v. Clauson*,
    343 U.S. 306 (1952)....................................................................................33

## Constitutional Provisions

### *State*

KY. CONST. § 1 ...............................................................................27, 34

KY. CONST. § 5 ....................................................................................27

KY. CONST. § 8 ....................................................................................34

KY. CONST. § 80 ...................................................................................13

KY. CONST. § 99 ...................................................................................38

KY. CONST. § 100 .................................................................................38

KY. CONST. § 233A ...................................................................................................................2

### Federal

U.S. CONST. amend I ....................................................................................... *passim*

U.S. CONST. amend XIV .............................................................................................17, 37

U.S. CONST. art. VI ...............................................................................................................37

**Statutes**

### State

KY. REV. STAT. § 171.130 .................................................................................................17

KY. REV. STAT. § 402.005 .............................................................................................2, 12

KY. REV. STAT. § 402.020 .................................................................................................12

KY. REV. STAT. § 402.080 .................................................................................................12

KY. REV. STAT. § 402.100 .................................................................................................12

KY. REV. STAT. § 402.110 .................................................................................................12

KY. REV. STAT. § 402.230 .................................................................................................12

KY. REV. STAT. § 402.990 .................................................................................................12

KY. REV. STAT. § 446.010 .............................................................................................13, 20

KY. REV. STAT. § 446.030 .................................................................................................13

KY. REV. STAT. § 446.090 .................................................................................................13

KY. REV. STAT. § 446.140 .................................................................................................13

KY. REV. STAT. § 446.350 ................................................................................... *passim*

### Federal

8 U.S.C. § 1182(g) .............................................................................................................31

18 U.S.C. § 3597(b) ...........................................................................................................31

42 U.S.C. § 1983 ................................................................................................................17

42 U.S.C. § 1988(a)..............................................................................................................17, 18

42 U.S.C. § 2000bb-1..........................................................................................................21, 24

**Rules**

*Federal*

Fed. R. Civ. P. 12(b)(1)...............................................................................................................15

Fed. R. Civ. P. 12(b)(6)..........................................................................................................7, 15

Fed. R. Civ. P. 14......................................................................................................................19

Defendant/Third-Party Plaintiff Kim Davis ("Davis"), by and through her undersigned counsel, respectfully submits this Response in Opposition to Third-Party Defendants' Motion to Dismiss Davis' Third-Party Complaint (D.E. 92).

## I.   __INTRODUCTION__

But for Gov. Beshear's edict directing Kentucky County Clerks, including Davis, to authorize same-sex "marriage" ("SSM") licenses bearing their own name without exception, on a marriage license form he deemed valid under Kentucky law, Plaintiffs' underlying lawsuit would be against him, not her. In her third-party complaint, Davis alleges that a SSM license issued on her authorization and bearing her name and imprimatur substantially and irreparably burdens her conscience and sincerely-held religious beliefs, which dictate to Davis that such unions are not and cannot be "marriage." Because of these beliefs, Davis sought a simple religious accommodation from the state-wide SSM Mandate issued by Gov. Beshear which, until recently, had gone completely unresponded to by the Governor. Indeed, Davis has faced the underlying lawsuit, in significant part, because Gov. Beshear refused to take elementary steps to accommodate Davis' undisputed, sincerely-held religious beliefs about marriage.

Importantly, in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), the Supreme Court neither overwrote the First Amendment or other critical religious liberty protections for persons nor compelled States to accomplish recognition of SSM by invading and trampling upon the consciences of individual county clerks. Thus, coercing an individual county clerk (Davis) to authorize and personally approve SSM in violation of her religious liberty and speech rights, as Gov. Beshear did under the SSM Mandate, is wrong. That is especially true here, where Davis took office when Kentucky marriage law perfectly aligned with her deep religious convictions, and there are multiple alternatives available (including the current status quo in Rowan County)

1

by which individuals can obtain SSM licenses without voiding Davis' conscience and stripping Davis of her liberties.

In the case at bar, Davis has sufficiently alleged that any potential liability that Davis faces in the underlying lawsuit is the result of Gov. Beshear's SSM Mandate that provided no religious accommodation to Davis. Under the governing standard for reviewing motions to dismiss (which is the only relevant standard on the instant motion), the third-party defendants have failed to demonstrate that Davis can prove no set of facts that support her claims. Davis has alleged enough facts to state viable and actionable claims against the third-party defendants. Accordingly, the motion to dismiss her third-party complaint should be denied.

## II.    THIRD-PARTY COMPLAINT ALLEGATIONS

### A.    Gov. Beshear's SSM Mandate.

On June 26, 2015, a majority of the Supreme Court held that laws from four states (including Kentucky)[1] that defined marriage as the union of a man and a woman were "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Obergefell*, 135 S.Ct. at 2605. Almost immediately, Gov. Beshear issued his SSM Mandate commanding all county clerks that "[e]ffective today, Kentucky will recognize as valid all same sex marriages performed in other states and in Kentucky." D.E. 34, Verified Third-Party Complaint (hereinafter, "VTC"), ¶¶ 25, 33, and Ex. C, Ltr. from Gov. Steven L. Beshear to Kentucky County Clerks, dated June 26, 2015 (hereinafter, "Beshear Letter").

Gov. Beshear further ordered that Kentucky clerks "must license and recognize the marriages of same-sex couples," and further instructed that "[n]ow that same-sex couples are

---

[1]    *See* KY. CONST. § 233A ("Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky."); *see also* KY. REV. STAT. § 402.005 ("'[M]arriage refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex.").

entitled to the issuance of a marriage license, the [KDLA] will be sending a gender-neutral form to you today, along with instructions for its use." VTC, Ex. C, Beshear Letter; *see also* VTC, ¶ 25. The Kentucky Department for Libraries and Archives ("KDLA") subsequently provided this new marriage form to county clerks, including Davis. VTC, ¶ 26. The form retained all of the references to "marriage," as well as the name, signature and authorization requirements of the county clerk. VTC, ¶ 26, and Exs. A, D.

Following Gov. Beshear's decree, county clerks across Kentucky began issuing SSM licenses, with almost no exception. VTC, ¶ 27. According to Gov. Beshear, "government officials in Kentucky . . . must recognize same-sex marriages as valid and allow them to take place," and "[s]ame-sex couples are now being married in Kentucky and such marriages from other states are now being recognized under Kentucky law." VTC, ¶ 27. In these same pronouncements, Gov. Beshear stated that the "overwhelming majority of county clerks" are "iss[uing] marriage licenses regardless of gender" and only "two or three" county clerks (of 120) were "refusing" to issue such licenses due to their "personal beliefs" and "personal feelings." *Id*. In subsequent pronouncements, Gov. Beshear has maintained that county clerks must issue marriage licenses, including SSM licenses, despite their "own personal beliefs." VTC, ¶ 28. For Gov. Beshear, the only options available to county clerks who oppose SSM are (1) issue the licenses against their "personal convictions," or (2) resign. VTC, ¶¶ 28, 36.

Notably, Gov. Beshear did not provide the same ultimatum to Kentucky Attorney General Jack Conway ("Atty. Gen. Conway") when he refused to defend the Kentucky Constitution and democratically-enacted marriage law. VTC, ¶¶ 15, 34. According to Atty. Gen. Conway in his tearful and prayer-induced proclamation at the time, "There are those who believe it's my mandatory duty, regardless of my personal opinion, to continue to defend this case…**I can only**

**say that I am doing what I think is right. In the final analysis, I had to make a decision that I could be proud of** – for me now, and my daughters' judgment in the future." VTC, ¶ 14 (emphasis added). Gov. Beshear did not force Atty. Gen. Conway to abandon his "inescapable" conscience and instead hired outside counsel to represent Kentucky in defending its own Constitution and democratically-enacted laws—which cost the Commonwealth upwards of $200,000. VTC, ¶¶ 14-15, 34-36.

        **B.**    **<u>Davis' Sincerely Held Religious Beliefs About Marriage.</u>**

Davis serves as the elected county clerk for Rowan County, Kentucky. VTC, ¶ 5. Before taking office as the county clerk in January 2015, she worked at the Rowan County Clerk's Office as a deputy clerk for nearly thirty years. VTC, ¶ 5. Davis is a professing Apostolic Christian who is heavily involved in her local church, attends weekly Bible study and worship services, and leads a weekly Bible study with women at a local jail. VTC, ¶ 16. As a Christian, Davis possesses a sincerely held religious belief that "[m]arriage is a union between one man and one woman," only. VTC, ¶ 17. As county clerk before the SSM Mandate, she authorized the "marriage" licenses issued from her office. VTC, ¶ 18. But Davis cannot authorize the marriage of same-sex couples because it violates her religious beliefs and convictions, and she cannot have her name on a SSM license because her name equates to approval of the proposed union. VTC, ¶ 18.

On June 27, 2015, following the issuance of Gov. Beshear's SSM Mandate, Davis discontinued issuing **any** marriage licenses. VTC, ¶ 29. On July 8, 2015, Davis sent a letter appealing to Gov. Beshear to uphold her religious conscience rights, and to call a special session of the Kentucky General Assembly to legislatively address the conflict between her religious beliefs and the SSM Mandate effected by Gov. Beshear. VTC, ¶ 30, and Ex. E. To date, Davis has received no response to her letter. During Davis's entire tenure in the Rowan County Clerk's

Office, spanning nearly thirty years, she has never asserted a religious objection to performing any function of the clerk's office. VTC, ¶ 31.

**C.** __Plaintiffs' Underlying Lawsuit.__

On July 2, 2015, less than one week after Gov. Beshear issued his SSM Mandate, Plaintiffs filed this lawsuit demanding that a particular person (Davis) in a particular county (Rowan County) authorize and approve their Kentucky marriage licenses, despite widespread availability of licenses and Davis' undisputed religious conscience objection to SSM. *See* D.E. 1. Plaintiffs also sought preliminary injunctive relief against Davis in her official capacity, pointing to Gov. Beshear's SSM Mandate as support for such relief and seeking enforcement of same. *See* D.E. 2-2 at 6 (contending that Davis' refusal to act "is contrary to the direct admonition of the Governor"); *see also* D.E. 1, Compl., at ¶¶ 32-33 (referring to the June 26, 2015 "directive from the Chief Executive [Gov. Beshear]" that was sent to "all of Kentucky's County Clerks").

On August 4, 2015, Davis filed in this action a verified third-party Complaint against Gov. Beshear, the issuer of the SSM Mandate, and Commr. Onkst, who oversees the KDLA, the state agency responsible for designing Kentucky marriage license forms. *See* D.E. 34.[2] Davis also filed a motion for preliminary injunction to enjoin enforcement of Gov. Beshear's SSM Mandate and obtain an exemption "from having to authorize the issuance of Kentucky marriage licenses." *See* D.E. 39-7. Importantly, the grounds on which Davis sought preliminary injunctive relief against Gov. Beshear and Commr. Onkst are necessarily intertwined with the grounds on which she opposed Plaintiffs' request for preliminary injunction against her. *See* D.E. 29, 39-1.

---

[2]     On August 4, 2015, in accordance with Federal Rule of Civil Procedure 12, Davis filed a motion to dismiss Plaintiffs' Complaint in its entirety. *See* D.E. 32. Among other things, Davis moved to dismiss the official capacity claims against her as duplicative of the Plaintiffs' claims against Defendant Rowan County.

Notwithstanding, on August 12, 2015, this Court granted Plaintiffs' motion for preliminary injunction and enjoined Davis "from applying her 'no marriage licenses' policy to future marriage license requests submitted by Plaintiffs," while simultaneously acknowledging the "further develop[ment]" of Davis' religious conscience exemption request against Gov. Beshear. *See* D.E. 43 at 19, n. 9, and 28. In granting Plaintiffs' motion for preliminary injunction, this Court also recognized that "this civil action presents a conflict between two individual liberties held sacrosanct in American jurisprudence," thereby acknowledging that Davis' religious rights are, in fact, being both "threaten[ed]" and "infringe[d]" by Plaintiffs' demands for her approval of their proposed unions, and by Gov. Beshear's SSM Mandate to provide exactly that or resign. *Id.* at 2. Davis filed a notice of appeal of this injunction order on the same day it was issued. *See* D.E. 44.[3]

On August 25, 2015, this Court entered an order, on its own motion, staying any briefing or consideration of Davis' motion to dismiss Plaintiffs' Complaint and Davis' motion for preliminary injunction against Gov. Beshear and Commr. Onkst "pending review of the Court's Memorandum Opinion and Order (Doc. # 43) by the United States Court of Appeals for the Sixth Circuit," D.E. 58, which had the practical effect of denying Davis' motion for preliminary injunction against the Third-Party Defendants. On August 31, 2015, Davis filed a notice of appeal of this Court's August 25, 2015 order to the Sixth Circuit. *See* D.E. 66.[4]

On September 3, 2015, with no decision on Davis' motion to dismiss Plaintiffs' Complaint in its entirety and multiple appeals to the Sixth Circuit pending on the parties' injunction requests,

---

[3]    That appeal has been docketed in the Sixth Circuit as *April Miller, et al. v. Kim Davis*, Case No. 15-5880 (6th Cir.).

[4]    That appeal has been docketed in the Sixth Circuit as *April Miller, et al. v. Kim Davis, et al.*, Case No. 15-5961 (6th Cir.). The third-party defendants have moved to dismiss that appeal, which the Sixth Circuit denied on September 15, 2015.

this Court found Davis in contempt of its August 12, 2015 injunction and ordered that she be incarcerated. *See* D.E. 75.[5] Davis was released from jail on September 8, 2015. *See* D.E. 89.

Also on September 8, 2015, the third-party defendants filed a motion to dismiss Davis' third-party complaint against them. *See* D.E. 92. Pursuant to this Court's orders (D.E. 96, 101), Davis herein responds to that motion.

## III.   STANDARD OF REVIEW

"A motion to dismiss may only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle plaintiff to relief." *Bradford v. Bracken Cnty.*, 767 F. Supp. 2d 740, 744 (E.D. Ky. 2011) (Bunning, J.) (citing *Ang. v. Proctor & Gamble Co.*, 932 F.2d 540, 544 (6th Cir. 1991). "In reviewing a Rule 12(b)(6) motion to dismiss, this Court 'must construe the complaint in a light most favorable to the plaintiff, and accept all of [the] factual allegations as true. When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor.'" *Hollowell v. Cincinnati Ventilating Co., Inc.*, 711 F. Supp. 2d 751, 757-58 (E.D. Ky. 2010) (Bunning, J.) (quoting *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). "To survive a motion to dismiss, the complaint 'does not need detailed factual allegations,' but it must present 'enough facts to state a claim to relief that is plausible on its face.'" *Hollowell*, 711 F. Supp. 2d at 758 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (internal citation omitted). "To satisfy this standard, the complaint must provide 'more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action,' and the '[f]actual allegations must be enough to raise a right to relief above the speculative level.' *Hollowell*, 711 F. Supp. 2d at 758 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the

---

[5]     This order is also on appeal to the Sixth Circuit, and has been docketed in that Court as *April Miller, et al. v. Kim Davis, et al.*, Case No. 15-5978 (6th Cir.).

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

IV.   **ARGUMENT**

    A.   **This Court Is Deprived Of Jurisdiction To Consider The Third-Party Defendants' Motion To Dismiss.**

       As an initial matter, this Court is deprived of jurisdiction to consider the Third-Party Defendants' motion to dismiss while this Court's denial of Davis' preliminary injunction against the Third-Party Defendants is on appeal. "As a general rule, an effective notice of appeal divests the district court of jurisdiction over the matter forming the basis for the appeal." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987); *see also Marrese v. Am. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 378-79 (1985); *Island Creek Coal Sales Co. v. City of Gainesville*, 764 F.2d 437, 439 (6th Cir. 1985); *Keohane v. Swarco, Inc.*, 320 F.2d 429, 432 (6th Cir. 1963) ("The taking of the appeal even though from an interlocutory nonappealable order nevertheless transferred jurisdiction to the Court of Appeals."). Indeed, it is well-settled law that the notice of appeal divests this Court of jurisdiction "to act in a case, **except on remedial matters unrelated to the merits of the appeal**." *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Resources*, 71 F.3d 1197, 1203 (6th Cir. 1995) (emphasis added). Orders entered by a district court lacking jurisdiction over a matter while a case is on appeal are "null and void." *U.S. v. Holloway*, 740 F.2d 1373, 1382 (1984).

       As noted above, Davis appealed this Court's August 25, 2015 order staying consideration on Davis' motion for preliminary injunction pending resolution of her Sixth Circuit appeal of this Court's August 12, 2015 injunction order. That order effectively and practically denied her request

for preliminary injunction, which is immediately appealable.[6] Based upon the foregoing Sixth Circuit precedent, Davis' notice of appeal therefore deprives this Court of jurisdiction over **non-remedial matters** forming the basis of her appeal against Gov. Beshear and Commr. Onkst, including their instant motion to dismiss. Thus, this Court has no jurisdiction to consider the Third-Party Defendants' motion to dismiss while this Court's August 25, 2015 order is on appeal to the Sixth Circuit because that matter is non-remedial and related to the merits of the appeal.

      **B.**    **Davis Has Standing To Pursue Her Claims Against The Third-Party Defendants.**

Objections to standing, among other jurisdictional arguments raised by the Third-Party Defendants, are meritless attempts to avoid a problem Gov. Beshear created, and should be rejected by this Court at this pleading stage. In the case at bar, Davis has Article III standing to bring her claims against Gov. Beshear and Commr. Onkst. To have Article III standing, a plaintiff "must establish the following: (1) that they suffered an injury (2) that there is 'a causal connection between the injury and the conduct complained of,' and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Spoonamore v. Fed. Housing Fin. Agency*, No. 12-220, 2014 WL 201609, at *2 (E.D. Ky. Jan. 17, 2014) (Bunning, J.) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Top Flight Entm't, Ltd. v. Schuette*, 729 F.3d 623, 630 (6th Cir. 2013). As is clear from her pleading, Davis' third-party complaint satisfies each of these factors. First, Davis alleges that she suffered an injury—specifically, deprivation of her constitutional and statutory rights. Second, there is a causal connection between the deprivation of said rights and the actions taken by the third-party defendants in connection with Gov. Beshear's SSM Mandate. Third, a favorable opinion in this

---

[6]    *See Gillis v. U.S. Dep't of Health & Human Servs.*, 759 F.2d 565, 567 (6th Cir. 1985); *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981).

matter (*i.e.*, accommodation) would certainly redress Davis' injury, as it would protect and uphold her constitutional and statutory rights.

Contrary to Gov. Beshear's suggestion, he does, in fact, possess the authority to provide a simple accommodation to Davis—he just refused (until recently) to grant her request. Gov. Beshear disingenuously alleges that the Beshear Letter "does not instruct Davis or any other county clerk to do anything." D.E. 92-1, at 3. This litigation-generated contention collapses under the weight of the evidence, and contradicts this Court's conclusion from its prior injunction order (which Gov. Beshear ignores) that the Beshear Letter and Gov. Beshear's subsequent "directives" constitute state action. D.E. 43, at 6, 18-22, 27 (referring to the "Beshear directive"). Any suggestions by the Third-Party Defendants to the contrary, *see*, *e.g.*, D.E. 92-1, at 13, are baseless.

The Beshear Letter is not a collection of gubernatorial musings that do not "command Davis to do anything." D.E. 92-1, at 4; *see also id.* at 2. To the contrary, it is a **directive** issued from the chief executive officer in the Commonwealth of Kentucky written on official letterhead to all Kentucky County Clerks. The letter commands all county clerks that "[e]ffective today, **Kentucky will recognize** as valid all same sex marriages performed in other states and in Kentucky." VTC, at ¶¶ 25, 33, and Ex. C, Beshear Letter (emphasis added). Gov. Beshear further ordered that Kentucky clerks "**must license and recognize** the marriages of same-sex couples," and further instructed that "[n]ow that same-sex couples are entitled to the issuance of a marriage license, the [KDLA] will be sending **a gender-neutral form to you today, along with**

**instructions for its use**." *Id.* (emphasis added).[7] Gov. Beshear cannot seriously contend that he was not instructing the county clerks to comply with his SSM Mandate.[8]

Following issuance of the Beshear Letter, county clerks across Kentucky began authorizing SSM licenses on the new forms, with almost no exception. VTC, at ¶ 27. In subsequent public statements, Gov. Beshear further implemented the directives in the Beshear Letter, stating that "government officials in Kentucky . . . must recognize same-sex marriages as valid and allow them to take place," and "[s]ame-sex couples are now being married in Kentucky and such marriages from other states are now being recognized under Kentucky law." *Id*. Gov. Beshear also stated that the "overwhelming majority of county clerks" are "iss[uing] marriage licenses regardless of gender" and only "two or three" county clerks (of 120) were "refusing" to issue such licenses due to their "personal beliefs" and "personal feelings." *Id*. In subsequent pronouncements, Gov. Beshear has maintained that county clerks must issue SSM marriage licenses, despite their "own personal beliefs." *Id*. at ¶ 28. For Gov. Beshear, the only options available to county clerks who oppose SSM are (1) issue the licenses against their "personal convictions," or (2) resign. *Id.* at ¶¶ 28, 36. In addition to his "approve or resign" rule, Gov. Beshear has ominously declared that "the courts" will deal with county clerks who do not comply with his SSM Mandate. *Id.* at ¶ 35.

Although the Beshear Letter is not a formal executive order issued under Chapter 12 of Kentucky's revised statutes, it effectively operates as one, directing county clerks to take certain actions and providing instructions on the issuance of marriage licenses and recognition of same-sex "marriages." *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) (holding that state

---

[7]     Shortly thereafter, the KDLA provided this new marriage form to county clerks, including Davis. VTC, at ¶ 26.

[8]     Gov. Beshear contends that, as the highest officer in the Commonwealth of Kentucky, he exercises no supervisory authority over county clerks. D.E. 92-1, at 7, 10, 13. The case of *Brown v. Barkley*, 628 S.W.2d 616 (Ky. 1982), cited by Gov. Beshear for this proposition, involves state-wide officials, not county officials.

action occurs when the conduct allegedly depriving the claimant of constitutional rights is fairly attributable to the state, which arises when the deprivation is caused by "a rule of conduct imposed by the state or by a person for whom the State is responsible").[9] This directive—issued before the ink was even dry from the Supreme Court's decision in *Obergefell*—installs Gov. Beshear as the controlling policymaker of Kentucky marriage law post-*Obergefell*, at least until the General Assembly has an opportunity to meet.

Gov. Beshear incorrectly suggests that the *Obergefell* decision did not alter marriage licensing schemes. *See* D.E. 92-1, at 2-4. In fact, **the entire Kentucky marriage licensing scheme turns on the definition of "marriage,"** which is defined at the very beginning of Chapter 402 of Kentucky's revised statutes. *See* KY. REV. STAT. § 402.005 ("'[M]arriage refers only to the civil status, condition, or relation of one (1) man and one (1) woman united in law for life, for the discharge to each other and the community of the duties legally incumbent upon those whose association is founded on the distinction of sex."). This definition was found to be unconstitutional by the majority in *Obergefell*. But *Obergefell* did not replace that definition with a new legislatively-enacted definition for "marriage" in Kentucky, or consider the implications of its ruling on legislative marriage schemes. Every provision that follows § 402.005 in Chapter 402, including the penalty provisions, depends upon the prior definition of marriage, which has been found unconstitutional **but not yet replaced**.[10] Until the General Assembly has an opportunity to

---

[9]      *See also Lopez v. Vanderwater*, 620 F.2d 1229, 1236 (7th Cir. 1980) ("Action taken by a state official who is cloaked with official power and who purports to be acting under color of official right is state action.").

[10]      *See, e.g.,* KY. REV. STAT. § 402.020 ("**Marriage** is prohibited and void: . . .") (emphasis added); KY. REV. STAT. § 402.080 ("No **marriage** shall be solemnized without a license therefor.") (emphasis added); KY. REV. STAT. § 402.100 ("Each county clerk shall use the form prescribed by the Department for Libraries and Archives when issuing a **marriage** license") (referring to "marriage" or "married" **21 times**) (emphasis added); KY. REV. STAT. § 402.110 ("The form of **marriage** license prescribed in KRS 402.100 shall be uniform throughout this state…") (emphasis added); KY. REV. STAT. § 402.230 (noting that "**marriage**" certificate must be "filed in the county clerk's office") (emphasis added); KY. REV. STAT. § 402.990(6) ("Any clerk who knowingly issues a **marriage** license to any persons prohibited by this chapter from marrying shall be guilty of a Class A misdemeanor and removed from office by the judgment of the court in which he is convicted.") (emphasis added); KY. REV. STAT. § 402.990(7) ("Any

12

reconvene (which Gov. Beshear refuses to do through a special session pursuant to KY. CONST. §
80, despite bipartisan requests) and address Kentucky's marriage law, there is no absolutely clear,
or necessarily operative, legislatively-enacted duties on marriage.[11] **But there *is* Gov. Beshear's
SSM Mandate**.

Gov. Beshear has the power to grant the relief, because his actions are actually responsible
for this litigation. At the initiative of Gov. Beshear, the KDLA designed and approved a post-
*Obergefell* marriage license form. In fact, the Third-Party Defendants admit these actions in their
motion to dismiss. *See*, *e.g.*, D.E. 92-1, at 7-8. Gov. Beshear certainly was under no obligation to
issue the **modified** form that he ultimately did. He also could have stated on June 26, 2015 that, in
light of *Obergefell*, any marriage licenses will be issued on his authority (not the county clerks'
authority) until the Kentucky Legislature has an opportunity to address the legislative scheme.
Rather than wait even a single business day, he fired off the Beshear Letter and commandeered
individual county clerks to join in, participate in, and approve of SSM regardless of their individual
beliefs, and immediately without any consideration of religious accommodation and without any
consideration of the First Amendment and the Kentucky RFRA.[12]

---

clerk who knowingly issues a **marriage** license in violation of his duty under this chapter shall be guilty of a Class A
misdemeanor.") (emphasis added).

[11]    Indeed, Kentucky Senate President Robert Stivers argued in an amicus filing in this Court that "the concept
of marriage as between a man and a woman is so interwoven into KRS Chapter 402 that the defendant County Clerk
cannot reasonably determine her duties until such time as the General Assembly has clarified the impact of *Obergefell*
by revising KRS Chapter 402 through legislation," or "[a]lternatively the clerk's duties could be clarified by Executive
Order of the Governor under KRS Chapter 12." D.E. 73, at 2.

[12]    Kentucky marriage law cannot be interpreted without also considering and applying the Kentucky RFRA,
for its statutory placement requires its application in conjunction with every Kentucky legislative scheme. Specifically,
the Kentucky RFRA is housed under Chapter 446 of Kentucky's statutes, which is entitled "Construction of Statutes,"
and includes such other generally applicable provisions as "Definitions for Statutes Generally," "Computation of
Time," "Severability," "Titles, Headings, and Notes," KY. REV. STAT. §§ 446.010, 446.030, 446.090, 446.140. Even
more specifically, the Kentucky RFRA is included under a section of Chapter 446 reserved for "Rules of Codification."
Thus, any suggestion that Kentucky marriage law imposes upon Davis the obligation to issue SSM licenses fails to
consider the necessary Kentucky RFRA analysis embedded in any state-wide marriage licensing scheme.

13

Yet it was his newly revised form that came with "**instructions**" for its use (VTC, Ex. D, Post-*Obergefell* Marriage License), and his SSM Mandate that county clerks "**must license**" (VTC, Ex. C, Beshear Letter; emphasis added), that triggered the underlying lawsuit **against Davis**. *See* D.E. 1, Compl., at ¶¶ 32-33 (referring to the Beshear Letter as a "directive from the Chief Executive"); *see also* D.E. 2-1, at 6 (identifying the Beshear Letter as a "direct admonition of the Governor"). Indeed, without this new form available, there would have been no gender-neutral license for Plaintiffs to even obtain. *See* VTC, Ex. A, Pre-*Obergefell* Marriage License (designating "bride" and "groom"). Thus, rather than being in the "same position" or having "wholly unaffected" legal responsibilities if Gov. Beshear's SSM Mandate had never been handed down, as Gov. Beshear erroneously contends, *see* D.E. 92-1, at 4, Davis would have been in a very different position. To obtain a license, Plaintiffs would have had to sue Gov. Beshear (not Davis) and seek injunctive relief from him in the form of a modified license issued on his authority.

To avoid this logical conclusion, Gov. Beshear declares that Davis has a "statutory" duty to issue marriage licenses to qualified same-sex couples. *See* D.E. 92-1, at 4, 10, 16, 18, 20. One glaring problem with this statement, however, is that Gov. Beshear cannot identify any such **statutory** requirement; instead, to the extent Davis had a "requirement" to issue such licenses, it is one imposed by his SSM Mandate that failed to even consider religious accommodation requests. Not only that, Gov. Beshear further states that "[Kentucky] statute authorizes only county clerks **and their deputies** to issue marriage licenses.") (emphasis added). *Id.* at 7 n.2; *see also id.* at 10 n.3. But no statutory authority allows deputy clerks to authorize the issuance of marriage licenses, and for Gov. Beshear to suggest otherwise is only further indication that he has usurped control of Kentucky marriage law post-*Obergefell*. Indeed, if deputy clerks are now authorized to issue marriage licenses on their authority (or, better said, on the authority of Gov. Beshear), then

14

Gov. Beshear has deputized new individuals who are able to authorize marriage licenses under Kentucky law. And if he can deputize additional authorizing agents, he is similarly empowered to exempt others. By extension, he is also equipped to revise the form (which he has already done previously) or validate a new form to reflect this other authority.

Finally, the mootness doctrine briefly cited by the Third-Party Defendants in their motion to dismiss also fails to provide grounds for dismissal of Davis' third-party complaint. *See* D.E. 92-1 at 10. The constitutional and statutory injuries alleged by Davis would be cured by a favorable decision on her claims against the Third-Party Defendants because it would provide her with an ongoing religious accommodation and also establish that any potential liability she faces in the Plaintiffs' underlying lawsuit is the result of Gov. Beshear's SSM Mandate, and should therefore be transferred to the Third-Party Defendants.

### C.   The Eleventh Amendment Does Not Bar Davis' Claims Against The Third-Party Defendants.

Third-Party Defendants contend that Davis' claims against them are barred on sovereign immunity grounds under the Eleventh Amendment.[13] These arguments should be rejected. In the first instance, federal constitutional-based claims seeking prospective or declaratory relief against state officials in their official capacity, which Davis alleges, are not barred by state sovereign immunity under the *Ex Parte Young*, 209 U.S. 123 (1908), exception. *See Cady v. Arenac Cnty.*, 574 F.3d 334, 344 (6th Cir. 2009) (recognizing exception to Eleventh Amendment immunity "if an official-capacity suit seeks only prospective injunctive or declaratory relief"); *see also Thiokol*

---

[13]     The Third-Party Defendants filed their motion to dismiss expressly "pursuant to Federal Rule of Civil Procedure 12(b)(6)," D.E. 92, at 1, although an Eleventh Amendment sovereign immunity argument is more appropriately styled as a Rule 12(b)(1) challenge. As such, this Court typically considers "the Rule 12(b)(1) argument first because the Rule 12(b)(6) argument becomes moot if the Court lacks subject matter jurisdiction." *See, e.g., Meiman v. Kenton Cnty., Ky.*, No. 10-156, 2011 WL 721478, at *2 (E.D. Ky. Feb. 22, 2011) (Bunning, J.) (citing *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990); *see also J.R. v. Cox-Cruey*, No. 14-149, 2015 WL 4080052, at *4-5 (E.D. Ky. July 6, 2015) (Bunning, J.).

*Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) ("[T]he amendment does not preclude actions against state officials sued in their official capacity for prospective injunctive or declaratory relief."); D.E. 103, at 4. Therefore, Davis' federal constitutional claims for injunctive and declaratory relief against the Third-Party Defendants are not barred under the Eleventh Amendment. *See Tate v. Frey*, 735 F.2d 986, 989-90 (6th Cir. 1984) (permitting third-party complaint by county officials against state officials for underlying claims brought by inmates at the county jail).

The Third-Party Defendants seek to avoid the undeniable applicability of the *Ex parte Young* exception by claiming that they lack sufficient connection or responsibility for the alleged constitutional violations. *See* D.E. 92-1, at 6-8. As detailed above, the SSM Mandate—which was issued by Gov. Beshear—was ***the*** cause of the alleged deprivation of Davis' rights, and Gov. Beshear clearly acted under color of state law as the state's highest elected official to set state-wide marriage policy. It is not Gov. Beshear's "general authority" to enforce or execute the laws of Kentucky that makes him a proper defendant in his official capacity in this case. *See Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996). Rather, his specific actions in his SSM Mandate, and his particular enforcement of Kentucky marriage law and policies, including the SSM Mandate, provide the requisite "connection" for the "alleged unconstitutional act or conduct" of which Davis complains. *See Top Flight*, 729 F.3d at 634 (citing *Floyd v. Cnty. of Kent*, 454 Fed. App'x 493, 499 (6th Cir. 2012)). In fact, in the *Obergefell* decision, Gov. Beshear (a named defendant in one of the cases consolidated in that decision) is identified as one of the "state officials responsible for enforcing the [marriage] laws in question." *Obergefell*, 135 S.Ct. at 2593. As such, Gov. Beshear certainly has the requisite connection and responsibility for Kentucky marriage law and policies, especially post-*Obergefell*, for Davis to

16

assert claims against him pursuant to the *Ex Parte Young* exception. As for Commr. Onkst, he is the person charged with overseeing the executive department (the KDLA) responsible for the design of the Kentucky marriage forms. *See* KY. REV. STAT. § 171.130 (the KDLA is "headed by a commissioner whose title shall be state librarian who shall be appointed by and serve at the pleasure of the Governor"). Thus, he too has the requisite connection to Kentucky marriage law.

In addition to the federal constitutional claims asserted by Davis, sovereign immunity does not preclude state law claims based upon violations of state statutes that compel nondiscretionary duties, as are involved here, pursuant to the Fourteenth Amendment's Due Process Clause.[14] The Kentucky RFRA mandates an analysis for all government action, and is not discretionary in its terms. *See* Ky. Rev. Stat. § 446.350 ("Government **shall not** substantially burden a person's freedom of religion.") (emphasis added). As such, the Kentucky RFRA creates a liberty interest protected by the Fourteenth Amendment's Due Process Clause and thus a violation of it constitutes an unconstitutional denial of liberty without due process. *See Spruyette v. Walters*, 753 F.2d 498 506 (6th Cir. 1985); *see also*, *e.g.*, *Jackson v. Ylst*, 921 F.2d 882, 886 (9th Cir. 1990); *Kalosho v. Kapture*, 868 F. Supp. 882, 889 (E.D. Mich. 1994) (state statutes provide protected liberty interests if they contain mandatory terms such as "shall" or "will").

The Kentucky RFRA claims against the Third-Party Defendants are also not barred by sovereign immunity, based upon the applicability of 42 U.S.C. § 1988(a) to this § 1983 action.[15]

---

[14]    On September 11, 2015, this Court denied Davis' motion for injunction pending appeal against the Third-Party Defendants, and stating that Davis was unable to pursue her claims based in state law under the Eleventh Amendment. *See* D.E. 103, at 4-6. Davis identifies herein the ongoing legal basis for alleging state law claims in her third-party complaint, which was not addressed in prior briefing, because the Third-Party Defendants did not make any specific Eleventh Amendment arguments directly in their response to Davis' motion for injunction pending appeal. *See generally* D.E. 91.

[15]    Moreover, to allege a prima facie case under 42 U.S.C. § 1983, upon which Davis' third-party complaint rests, a plaintiff must plead two elements: (1) the action occurred "under color of law" and (2) the action deprived the plaintiff of a constitutional or federal statutory right. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Both elements are

Section 1988 "authorize[s] federal courts, where federal law is unsuited or insufficient 'to furnish suitable remedies [in a civil rights action], to look to principles of the common law, as altered by state law,' so long as such principles are not inconsistent with the Constitution and laws of the United States." *Moor v. Cnty. of Alameda*, 411 U.S. 693, 702-03 (1973) (citing 42 U.S.C. § 1988(a)). Indeed, "[Section 1988] recognizes that . . . federal law simply does not 'cover every issue that may arise in the context of a federal civil rights action.'" *Robertson v. Wegmann*, 436 U.S. 584, 588 (1978) (quoting *Moor*, 411 U.S. at 703). Where applicable, Section 1988 "adopt[s] the statute governing an analogous cause of action under state law" such that "federal law incorporates the State's judgment on the proper balance between the policies [at issue, *e.g.*, repose] and the substantive policies of enforcement embodied in the state cause of action." *Wilson v. Garcia*, 471 U.S. 261, 271 (1985). Because existing federal law does not provide a framework for balancing the conflict of rights involved in this dispute, this Court should "borrow" the principles of Kentucky state law, in this case the Kentucky RFRA to resolve the conflict between the parties to this case. *See Wilson v. Morgan*, 477 F.3d 326, 332 (6th Cir. 2007); *Williams v. Leatherwood*, 258 Fed. App'x 817 (6th Cir. 2007). Critically, the Kentucky RFRA is **not inconsistent** with federal law, and it should therefore be applied in this dispute. This case presents a prime example for the application of Section 1988 because of the "inevitable" civil rights conflict presented by the Supreme Court's *Obergefell* decision on persons' First Amendment rights, and the lack of a federal law or rule of decision to weigh and balance the implications and consequences of that conflict. For all the foregoing reasons, none of Davis' claims against the Third-Party Defendants are barred by the Eleventh Amendment.

---

satisfied here, as Gov. Beshear's SSM Mandate was an action taken under color of law and it deprived Davis of her constitutional rights.

**D.**    **Davis Sufficiently Alleges Actionable Claims Against The Third-Party Defendants.**

Federal Rule of Civil Procedure 14 permits a third party complaint to be served upon "a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed. R. Civ. P. 14(a). "The purpose of Rule 14 is to permit additional parties whose rights may be affected by the decision in the original action to be joined so as to expedite the final determination of the rights and liabilities of all the interested parties in one suit." *Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008). "Underlying Rule 14 is a desire 'to promote economy by avoiding the situation where a defendant has been adjudicated liable and then must bring a totally new action against a third party who may be liable to him for all or part of the original plaintiff's claim against him.'" *American Zurich*, 512 F.3d at 805 (citation omitted); *see also Universal Linen Serv., LLC v. Cherokee Chem. Co., Inc.*, No. 12-238, 2013 WL 4039051, at *1 (W.D. Ky. Aug. 7, 2013).

The "essential criterion" of a third-party claim is that a defendant is "attempting to transfer the liability asserted against him by the original plaintiff to the third-party defendant." *American Zurich*, 512 F.3d at 805; *see also Budsgunshop.com, LLC v. Security Safe Outlet, Inc.*, No. 10-390, 2012 WL 1899851, at *4 (E.D. Ky. May 23, 2012). A third-party claim is "in the nature" of an indemnity or contribution claim but need not only be such claims—a standard which can thus be satisfied where the third-party claims are said to be "derivative" of or "dependent upon" the underlying claim. *American Zurich*, 512 F.3d at 806; *see also Budsgunshop*, 2012 WL 1899851, at *7 (discussing the purposes of Rule 14 and finding that "it is better to err on the side of promoting judicial efficiency and permit SSO's third-party claims under Rule 14"). In the case at bar, Davis alleges that her claims against the Third-Party Defendants derive from, and are the result of, the Plaintiffs' underlying claims against her, because those claims are only brought against her as a

19

result of Gov. Beshear's SSM Mandate and subsequent refusal to grant a simple accommodation to Davis pursuant to her own constitutional and statutory rights. Moreover, it will promote judicial economy and efficiency to keep all of these claims in a single action, to avoid needless overlap in litigation, including duplicative discovery and the risk of inconsistent decisions.

      **1.**      **Davis Sufficiently Alleges A Cause Of Action Under The Kentucky Religious Freedom Restoration Act (Counts I, II).[16]**

Under the relevant pleading standards, Davis sufficiently alleges a cause of action under the Kentucky RFRA. Davis' inability to personally authorize and approve SSM licenses bearing her imprimatur against her religious conscience is protected by the Kentucky RFRA. *See* KY. REV. STAT. § 446.350. The Kentucky RFRA was enacted by an overwhelming majority in 2013, *over Governor Beshear's veto*, and provides that:

> Government **shall not** substantially burden a person's freedom of religion. The right to act **or refuse to act** in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest.

KY. REV. STAT. § 446.350 (emphasis added). The Kentucky RFRA protects all persons, and the Third-Party Defendants' suggestion that public officials are not "persons" protected under the statute is groundless.[17] The Kentucky RFRA protects not only a person's beliefs but also a person's actions (or non-actions) based thereon, and subjugates to the strictest scrutiny any governmental action (be it legislative or regulatory scheme, or executive action) infringing religiously-motivated

---

[16]     Davis is able to allege her Kentucky RFRA claims in this action against the Third-Party Defendants based upon the analysis set forth above in Section IV.C, *supra*.

[17]     The Kentucky RFRA protects the religious freedom of all "persons" in Kentucky. While "person" is not defined in the Kentucky RFRA, it is defined in Kentucky's general definitions statute to include "individuals," and **publicly elected officials are not excluded**. *See* KY. REV. STAT. § 446.010(33).

actions (or non-actions).[18] Thus, Gov. Beshear's SSM Mandate—the state action relevant to Davis' claims (*see* D.E. 43, at 6, 18-22, 27)—must survive strict scrutiny.

Davis establishes a prima facie case under the Kentucky RFRA by showing a substantial burden on her "right to act or refuse to act in a manner motivated by a sincerely held religious belief." *See Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 384 (6th Cir. 2014) (discussing elements of prima facie Federal RFRA claim), *judgment vacated on other grounds*, 135 S.Ct. 1914 (2015). Upon this showing, the burden then shifts to the government to satisfy a particularized compelling interest test accomplished by the least restrictive means, *id.*—and, under the Kentucky RFRA, by a heightened standard of proof, *see* KY. REV. STAT. § 446.350.

Under Supreme Court and Sixth Circuit precedent interpreting the analogous Federal RFRA, Davis has sufficiently alleged that her religious freedom is substantially burdened by Gov. Beshear's SSM Mandate forcing her to authorize SSM licenses. As indicated above, the Kentucky RFRA protects a person's "right to act *or refuse to act* in a manner motivated by a sincerely held religious belief." KY. REV. STAT. § 446.350. As such, the Kentucky RFRA is not solely directed at what a person may believe—but also how those beliefs translate to actions (or non-actions). Davis indisputably holds sincere religious beliefs about marriage and her inability to issue SSM licenses is motivated by those convictions. VTC, ¶¶ 17-18. In her belief, marriage is the sacred union of a man and a woman, only. VTC, ¶ 17. Until recently, the prescribed marriage license form under Gov. Beshear's SSM Mandate provided no opportunity for the religious objector (Davis) not to participate in endorsement and approval of SSM. But Davis cannot authorize a union of two persons which, in her sincerely-held belief, is not marriage. VTC, ¶¶ 17-18.

---

[18]    The Kentucky RFRA is similar to (but goes even further in protecting religious liberties than) the federal Religious Freedom Restoration Act ("Federal RFRA"), 42 U.S.C. § 2000bb-1(a) & (b), which was enacted to "provide very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014), and imposes "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Gov. Beshear had flatly rejected Davis' request for religious exemption. In his view under the SSM Mandate, Davis must either comply with the SSM Mandate, or resign from office. VTC, ¶¶ 28, 36. On Gov. Beshear's own initiative, the KDLA prepared a revised mandatory marriage form in connection with his SSM Mandate, which was then circulated to county clerks for them to begin using immediately, without exception. VTC, ¶¶ 25-26, and Ex. C. This form provided no opportunity for county clerks (or deputy clerks for that matter) with religious objections to SSM **not** to participate in endorsement and approval of SSM. On this form provided pursuant to the SSM Mandate, the "authorization" or permission to marry (even on licenses she does not personally sign) still unmistakably came from Davis herself. VTC, ¶ 12, and Ex. C. As in the old forms, this form required Davis to put her imprimatur no less than two times on each and every marriage license issued in her county. VTC, ¶¶ 11, 26, and Ex. C. However, as indicated above, to authorize a SSM license bearing her imprimatur sears her conscience because she would be endorsing the proposed union and calling something "marriage" that is not marriage according to her beliefs. VTC, ¶¶ 17-18.

Thus, through the SSM Mandate, Gov. Beshear imposed a direct, severe, and substantial pressure on Davis by forcing her "to choose between following the precepts of her religion and forfeiting benefits [her job], on the one hand, and abandoning one of the precepts of her religion in order to accept work [keep her job], on the other hand." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *see also Holt v. Hobbs*, 135 S.Ct. 853, 862 (2015) (government places a "substantial burden" on religious exercise if policy requires person "to 'engage in conduct that seriously violates [her] religious beliefs" or "contravene that policy and . . . face serious disciplinary action"); *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (government places a "substantial burden" on religious belief when it "'place[s] substantial pressure on an adherent to modify his

22

behavior and to violate his beliefs,' or 'effectively bar[s]' his sincere faith-based conduct"). This Hobson's choice placed undue pressure on Davis to choose between her job and her religion. Not only that, Davis is being threatened with (or has already experienced) sanctions, private lawsuits in federal court, contempt motions, and incarceration by choosing to adhere to her sincere religious beliefs rather than the SSM Mandate. Certainly, religious liberty protections, including the Kentucky RFRA, are designed to protect a person from such substantial burdens upon their religious freedom.[19]

It is not for this Court to question the reasonableness or scriptural accuracy of Davis' beliefs about marriage at any stage of litigation, let alone when this Court is considering a motion to dismiss. *See Hobby Lobby*, 134 S.Ct. at 2779 (citing *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 716 (1981)). Judges "are not arbiters of scriptural interpretation," and they are not tasked with determining who "more correctly" perceives their faith's commands. *Thomas*, 450 U.S. at 716. Moreover, it is not for this Court to determine whether Davis' religious beliefs are "mistaken" or "insubstantial." *Hobby Lobby*, 134 S.Ct. at 2779; *see also Haight*, 763 F.3d at 566 (First Amendment does not permit "government or courts to inquire into the centrality to a faith of certain religious practices—dignifying some, disapproving others.").[20] Instead, the "'narrow function' . . . in this context is to determine' whether the line drawn reflects 'an honest

---

[19]     A proposed Kentucky legislative act on what constitutes a substantial burden in the marriage license context post-*Obergefell* agrees with Davis. This bill would expressly protect clerks like Davis from having to issue SSM licenses, amending the Kentucky RFRA to state expressly that "[i]ssuing or recording" a SSM license can be considered a "substantial burden for which there is no compelling government interest, and that person shall additionally be immune from any civil or criminal liability for declining to solemnize such a marriage." *See* An Act Relating to Marriage, Ky. House Bill 101 (2016 Reg. Sess.).

[20]     Moreover, the substantial burden analysis under Supreme Court and Sixth Circuit precedent does not invite consideration of what other religious-based actions a claimant may still undertake. *See Holt*, 135 S.Ct. at 862 (finding that "substantial burden" inquiry under the analogous RLUIPA test "asks whether the government has substantially burdened exercise," not whether the claimant "is able to engage in other forms of religious exercise"); *Haight*, 763 F.3d at 566.

conviction.'" *Hobby Lobby*, 134 S.Ct. at 2779 (quoting *Thomas*, 450 U.S. at 716). Davis has undeniably alleged the requisite "honest conviction" exists here, and she has faced (and is facing) severe consequences of adhering to that conviction.

To overcome this substantial burden on Davis' religious freedom, Gov. Beshear must demonstrate by **clear and convincing evidence** that Kentucky has (1) a compelling governmental interest in infringing Davis' religious conscience through the SSM Mandate and (2) it has used the least restrictive means to accomplish that interest.

At this pleading stage, the Third-Party Defendants have not demonstrated a compelling governmental interest in forcing Davis to violate her religious freedom. This inquiry "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law '**to the person**'—the particular claimant whose sincere exercise of religions is being substantially burdened," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006) (emphasis added) (quoting 42 U.S.C. § 2000bb-1(b)), and further requires courts "to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of **granting specific exemptions to particular religious claimants**'—in other words, to look to the marginal interest in enforcing" the SSM Mandate in this case. *See Hobby Lobby*, 134 S.Ct. at 2779 (emphasis added) (quoting *O Centro*, 546 U.S. at 431). Here, to overcome the substantial burden on Davis' religious freedom, Gov. Beshear and Commr. Onkst must demonstrate a compelling government interest in infringing upon Davis' inability to authorize SSM licenses that is "beyond broadly formulated interests," and shows why granting a "specific exemption" to this "particular religious claimant," *O Centro*, 546 U.S. at 431, will commit a "grave[] abuse[], endangering paramount interests." *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

The proffered compelling government interests that purportedly overcome the burden on Davis' religious freedom (*i.e.*, "uniform application of the rule of law" or providing same-sex couples with "societal benefits," *see* D.E. 92-1 at 15) are the type of "broadly formulated" governmental interests that fail to satisfy RFRA-based strict scrutiny because they do not show any actual harm in granting a "specific exemption" to a "particular religious claimant." *See O Centro*, 546 U.S. at 430-31. Providing accommodation to Davis—who is treating all persons the same—neither endorses discrimination nor prevents qualified individuals from uniformly acquiring Kentucky marriage licenses from more than 130 marriage licensing locations. Therefore, Gov. Beshear has not shown that granting a specific exemption to Davis will endanger the Commonwealth of Kentucky, let alone Kentucky's marriage licensing scheme.

But even if a compelling interest can be shown, the infringement upon Davis' religious freedom caused by the SSM Mandate must also satisfy the "exceptionally demanding" least-restrictive-means standard. *See Hobby Lobby*, 134 S.Ct. at 2780. Gov. Beshear and Commr. Onkst cannot demonstrate that they "lack[] other means" of issuing marriage licenses to same-sex couples "without imposing a substantial burden" on Davis' "exercise of religion." *Id.* Not only that, the least-restrictive-means test may "require the Government to expend additional funds" to accommodate "religious beliefs." *Id.* at 2781. Thus, even if proposed less restrictive alternatives require additional costs in applying Kentucky marriage law, such costs are specifically envisioned by the Kentucky RFRA to ensure that a person's religious freedom is protected. In this matter, even if the "desired goal" is providing persons with Kentucky marriage licenses **in Rowan County**[21], *see id.*, **numerous less restrictive means** are available to accomplish it without

---

[21]     Nothing in *Obergefell* suggests that individuals have a fundamental right to receive a marriage license from a particular clerk, in a particular county.

substantially burdening Davis' religious freedom and conscience, including the current status quo in Rowan County.

But Gov. Beshear appears not to have evaluated, let alone even considered, any less restrictive alternatives before issuing his SSM Mandate. However, government's failure to actually "consider[] and reject[] alternatives more tailored" to its alleged interests "cannot withstand" the least restrictive means test. *Haight*, 763 F.3d at 564. Here, the ink was barely dry from the *Obergefell* decision when Gov. Beshear issued his SSM Mandate to all Kentucky County Clerks on June 26, 2015—the same day the *Obergefell* decision was announced. VTC, ¶¶ 24-25, and Ex. C. Yet the entire Kentucky marriage licensing scheme is founded upon the millennia-old natural definition of marriage. Gov. Beshear could have taken steps sooner (and still can take additional steps) that both recognize SSM and protect county clerks' religious conscience rights in response to the redefinition of marriage in *Obergefell*. Therefore, Davis has sufficiently alleged a Kentucky RFRA claim.

2.    **Davis Sufficiently Alleges A Cause Of Action Under The Free Exercise Clause Of The First Amendment To The United States Constitution And Similar Kentucky Constitution Provisions (Counts I, III, IV, V, VIII, IX, X).**

Under the relevant pleading standards, Davis sufficiently alleges a cause of action under the Free Exercise Clause of the First Amendment, and similar Kentucky Constitution provisions. The First Amendment of the United States Constitution requires that government must not "prohibit[] the free exercise" of religion, U.S. CONST. amend I, and ensures that a person may "express himself in accordance with the dictates of his own conscience." *Wallace v. Jaffree*, 472 U.S. 38, 49 (1985). The Free Exercise Clause "protects not only the right to hold a particular

26

religious belief, but also the right to engage in conduct motivated by that belief." *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 427 (6th Cir. 2002).[22]

Most cases with free exercise claims are considered under the framework established by the Supreme Court in *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). According to this well-established framework, a neutral and generally applicable law does not violate the Free Exercise Clause "even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Smith*, 494 U.S. at 878-80. However, if the free exercise claim is combined with another constitutional right, as involved here, *see* Section IV.D.3 (free speech rights), *infra*, the standard of protection is at its constitutional zenith. *Smith*, 494 U.S. at 881. Thus, similar to the Kentucky RFRA analysis set forth above, a successful free exercise claim can be alleged if the individual demonstrates that (1) a sincerely held religious belief (2) was burdened by a governmental action, and the government cannot show that it had (3) a compelling reason for burdening the religious belief and (4) it used the least restrictive means to achieve its interest. *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Sherbert*, 374 U.S. 398. For the same reasons set forth above, Davis' third-party complaint sufficiently alleges all of these elements.

Moreover, even if the *Smith* test applies, by directing county clerks to disregard their religious beliefs in no uncertain terms, Gov. Beshear did not apply Kentucky marriage law in a neutral and generally applicable manner through his SSM Mandate. A law or policy "burdening religious practice that is not neutral or not of general application must undergo the most rigorous

---

[22]     The Kentucky Constitution also provides expansive constitutional protections for religious liberties and conscience. KY. CONST., § 1 (identifying the "inherent and inalienable rights" of persons, including the "right of worshipping Almighty God according to the dictates of their consciences"); *id.*, § 5 ("[T]he civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching. No human authority shall, in any case whatever, control or interfere with the *rights of conscience*.").

of scrutiny," and laws or policies that "target religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. The SSM Mandate specifically targeted county clerks like Davis who possesses certain religious beliefs about marriage. This targeting is demonstrated by the exemption Gov. Beshear granted to Atty. Gen. Conway when— after "pray[ing] over this decision"—he was unwilling to defend Kentucky's democratically-enacted marriage law pursuant to his own personal beliefs and feelings (his purported conscience) about "doing what I think is right" and "mak[ing] a decision that I could be proud of." VTC, ¶¶ 14-15, 34.

This discrepancy in treatment shows that Gov. Beshear was picking and choosing the conscience-based exemptions to marriage that he deems acceptable—which is constitutionally unacceptable. For instance, when Atty. Gen. Conway refused to defend the Kentucky Constitution on marriage, Gov. Beshear did not direct Conway that "Neither your oath nor the Supreme Court dictates what you must believe. But as elected officials, they do prescribe how we must act," but he did so direct county clerks like Davis. VTC, ¶ 35, and Ex. C, Beshear Letter. Gov. Beshear did not command Atty. Gen. Conway that "when you accepted this job and took that oath, it puts you on a different level," and "[y]ou have official duties now that the state law puts on you," but he did deliver this command to county clerks like Davis. VTC, ¶¶ 28, 35. Gov. Beshear did not publicly proclaim that Atty. Gen. Conway was "refusing to perform [his] duties" and failing to "follow[] the law and carry[] out [his] duty," and should instead "comply with the law regardless of [his] personal beliefs," but he did make this proclamation (repeatedly) about county clerks like Davis VTC, ¶¶ 27, 35. Gov. Beshear did not instruct Atty. Gen. Conway that "if you are at that point to where your personal convictions tell you that you simply cannot fulfill your duties that

you were elected to do, than obviously the honorable course to take is to resign and let someone else step-in who feels that they can fulfill these duties," but he did issue this instruction to county clerks like Davis. VTC, ¶¶ 28, 35. Gov. Beshear did not ominously declare that "[t]he courts and voters will deal appropriately with" Atty. Gen. Conway, but he did so declare with the "two or three" county clerks who are not issuing marriage licenses. VTC, ¶¶ 27, 35

In no uncertain terms, the SSM Mandate implemented by Gov. Beshear had "as [its] object the suppression of religion," *Lukumi*, 508 U.S. at 542—even worse, a particular religious belief. Thus, although Atty Gen. Conway was given a pass for his conscience about marriage without any threats of repercussions, clerks like Davis have been repeatedly told by Gov. Beshear through his SSM Mandate to abandon their religiously-informed beliefs or resign. There is no compelling reason, let alone an "interest of the highest order," *Lukumi*, 508 U.S. at 546, to impose this choice on Davis when no "substantial threat to public safety, peace or order" is at stake, *Sherbert*, 374 U.S. at 403-04, and numerous accommodations were (and are) available, including the current status quo in Rowan County.

Moreover, notwithstanding the Third-Party Defendants' underlying refrain, *Obergefell* does not require Davis' individual religious freedom to be violated. Immediately following *Obergefell*, Gov. Beshear, on his own initiative, decreed his SSM Mandate, which was neither expressly nor impliedly compelled by the Supreme Court's decision in *Obergefell*. The SSM Mandate left no room for individual county clerks' religious freedoms. But **in *Obergefell*, the Court unanimously agreed that First Amendment protections remain despite same-sex "marriage."** Specifically, dissenting justices in *Obergefell* recognized that "[m]any good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion" is specifically "spelled out" in the First Amendment of the Constitution. *Obergefell*, 135 S.Ct. at

2625 (Roberts, C.J., dissenting). Continuing, these Justices noted that "[r]espect for sincere religious conviction has led voters and legislators in every State that has adopted same-sex marriage democratically to include accommodations for religious practice." *Id.*; *see also id.* at 2638 (explaining the historical significance of "religious liberty") (Thomas, J., dissenting). **The majority opinion also recognized that religious freedoms continue unabated even as they redefined marriage**:

> Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and **persons** are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.

*Obergefell*, 135 S.Ct. at 2607 (Kennedy, J., majority) (emphasis added). Gov. Beshear was thus under no compulsion to order each and every individual Kentucky County Clerk to authorize and approve SSM marriage. Contrary to the Third-Party Defendants' suggestion, Davis does not shed her personal convictions and individual rights at the entry door of public service. It is well-established law that a person's constitutional and statutory rights and liberties are not immediately eviscerated the moment they take their oath of office.[23]

Moreover, providing accommodation for religious conviction is not antithetical for public employees or inconsistent with governmental mandates. *See*, *e.g.*, *Slater v. Douglas Cnty.*, 743 F.

---

[23]     "Almost fifty years ago, this Court declared that citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 134 S.Ct. 2369, 2374 (2014). Indeed, the Supreme Court has "made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Although a citizen entering government service must "by necessity" accept "certain limitations on his or her freedom," *id.* at 417, such person's constitutional rights are not circumscribed in their entirety. Instead, there are "some rights and freedoms so fundamental to liberty" that a citizen is "'not deprived of [these] fundamental rights by virtue of working for the government.'" *Borough of Duryea, Pa. v. Guarnieri*, 131 S.Ct. 2488, 2493-94 (2011) (citation omitted).

Supp. 2d 1188, 1192-95 (D. Or. 2010) (denying summary judgment to county defendant that refused to accommodate county clerk employee's objection on religious grounds to issuing same-sex domestic partnership registrations). By way of further example, federal and state employees who have a "moral or religious" conviction against capital punishment are provided an exemption from "be[ing] in attendance at" or "participat[ing] in any prosecution or execution" performed under the Federal Death Penalty Act. 18 U.S.C. § 3597(b). In a similar fashion, medical providers (and other persons) with conscience-based objections to governmental mandates and programs related to providing abortions, abortion-related drugs, and abortion-related insurance coverage may also be exempted from generally applicable requirements. *See*, *e.g.*, *Stormans, Inc. v. Selecky*, 844 F. Supp. 2d 1172, 1188-93 (W.D. Wash. 2012) (pharmacists with religious objection based upon sincerely held beliefs against providing certain abortion-related drugs did not have to comply with government's mandate to carry those drugs); *Hobby Lobby*, 134 S.Ct. at 2759 (holding that government mandate to force closely held corporations to provide health insurance coverage for methods of contraception that violated the sincerely-held religious beliefs of the companies' owners was an unlawful burden on religious exercise). Moreover, persons can be naturalized as citizens with conscience-based non-combatant objections, *Girouard v. U.S.*, 328 U.S. 61, 64-67 (1946), or religious-based objections to certain vaccinations, 8 U.S.C. § 1182(g).

The foregoing examples illustrate that, in certain matters, the law already accounts for religious-based objections to generally applicable legal duties or mandates. In each of the foregoing areas (*i.e.*, abortion, capital punishment, non-combatant in wartime), there are well-established historical roots for the objection. For marriage, the nature of the objection is even more firmly established in history because the "meaning of marriage" as a union between one man and one woman "has persisted in every culture," "has formed the basis of human society for millennia,"

31

and has singularly "prevailed in the United States throughout our history." *Obergefell*, 135 S. Ct. at 2612-13 (Roberts, C.J., dissenting); *see also id.* at 2641 ("For millennia, marriage was inextricably linked to the one thing that only an opposite-sex couple can do: procreate.") (Alito, J., dissenting). In fact, the majority in *Obergefell* conceded that the institution of marriage as exclusively a union between a man and a woman "has existed for millennia and across civilizations" and this view "long has been held—**and continues to be held—in good faith by reasonable and sincere people here and throughout the world**." *Obergefell*, 135 S. Ct. at 2594 (Kennedy, J., majority) (emphasis added). Thus, although the traditional view of marriage was discarded in *Obergefell*, that long-held view of marriage provides the historical underpinnings for a religious exemption and accommodation from the redefinition of marriage.

Accommodating a person's sincere religious beliefs and practices about marriage and ensuring that individual religious freedom is not substantially burdened promotes the religious pluralism and tolerance that have made this country distinctive, Gov. Beshear's view under the SSM Mandate notwithstanding. Of course, religious accommodations are not provided for each and every whim or scruple raised by a person, and merely stating a religious objection does not mean that any county clerk can deny a marriage license at any time for any reason. That is not this case. As noted above, Davis has served in the Rowan County Clerk's Office for thirty years, and, during this entire time period, this is the first instance in which she (or anyone else for that matter) has raised a religious objection to performing a function in the county clerk's office. VTC, ¶ 31. Plainly, this is not a situation where an accommodation of Davis' religious objections will swallow the general law on marriage and marriage licenses in Kentucky.

Further, contrary to the Third-Party Defendants' suggestion, providing accommodation for Davis' religious objection does not violate the Establishment Clause. *See* D.E. 92-1, at 16-18. IN

32

fact, "government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338 (1987) (there is "ample room for accommodation of religion under the Establishment Clause"); *ACLU v. Mercer Cnty., Ky.*, 432 F.3d 624, 639 (6th Cir. 2005) ("Our Nation's history is replete with . . . accommodation of religion."). After all, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952).

Finally, in their motion to dismiss, Third-Party Defendants refer to the August 26, 2015 decision from a motion panel of the Sixth Circuit in Case No. 15-5880, denying an emergency motion to stay this Court's August 12, 2015 injunction enjoining Davis in her official capacity from applying a "no marriage license" policy to future license requests by the named Plaintiffs. *See* D.E. 92-1, at 11-12. That opinion is limited, and not controlling on the instant Motion for several reasons. First, the decision is not a merits determination. Second, the decision is limited in its reach because it found that this Court's August 12, 2015 injunction "relates solely to an injunction against Davis in her official capacity" and "operates not against Davis personally, but against the holder of her office of Rowan County Clerk." *See Miller v. Davis*, No. 15-5880 (6th Cir. Aug. 25, 2015). Third, the decision wrongly divides the personhood of Davis, as discussed extensively above, and ignores the reality that Davis personally (not her "office") was hauled to jail for her conscience. The stay decision magnified this Court's denial of Davis' religious liberty defenses by acting as if Davis the person does not exist when she acts as Davis the Rowan County Clerk, and wholly ignoring Davis' individual-based claims. Contrary to the implications of the opinion denying a stay, elected officials possess individual free exercise and speech rights. Fourth,

33

the Third-Party Defendants are not parties to that appeal, and thus, the decision does not involve

Davis' claims for a simple accommodation from the Third-Party Defendants.[24] Finally, the Third-

Party Defendants also repeatedly claim that their motion to dismiss should be granted based upon

this Court's memorandum opinion and order granting Plaintiffs' motion for preliminary injunction,

contending that this Court has already rejected Davis' constitutional and statutory claims, and

found that Davis has no "cognizable constitutional injury." *See*, *e.g.*, D.E. 92-1, at 11. In doing so,

however, Plaintiffs grossly misapply the legal standard governing motions to dismiss, and also

overlook that this Court has previously acknowledged that fundamental rights are implicated in

this case—which is a far more important prior conclusion with respect to evaluating a motion to

dismiss. *See*, *e.g.*, D.E. 21, Hr'g Tr. (7/13/15), at 84:3-4, 85:20-22, 98:19-22, 99:19-21, 103:15-

18, 104:8-9. Therefore, Davis has sufficiently alleged a religious free exercise claim.

### 3. Davis Sufficiently Alleges A Cause Of Action Under The Free Speech Clause Of The First Amendment To The United States Constitution And Similar Kentucky Constitution Provisions (Counts I, VI, XI).

Under the relevant pleading standards, Davis sufficiently alleges a cause of action under

the Free Speech Clause of the First Amendment, and similar Kentucky Constitution provisions.

U.S. CONST. amend. I (government may not "abridg[e] the freedom of speech"); KY. CONST., § 1

(persons have an inalienable right of "freely communicating their thoughts and opinions"); *id.*, §

8 ("[e]very person may freely and fully speak"). The Free Speech Clause of the First Amendment

protects "the decision of both what to say and what ***not*** to say." *Riley v. Nat'l Federation of Blind*

*of N.C., Inc.*, 487 U.S. 781, 797 (1988) (emphasis in original). Indeed, "[t]he right to speak and

---

[24]     On September 15, 2015, that same panel of Sixth Circuit judges denied a motion for injunction pending appeal filed by Davis in Case No. 15-5961. However, similar to this same panel's earlier ruling, it is not a merits-based determination and the burden for overcoming a motion to dismiss is not the same as establishing an injunction pending appeal.

the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Wooley v. Maynard*, 430 U.S. 705, 714 (1976) (citation omitted).

This "compelled-speech" doctrine applies when "an individual is obliged personally to express a message he disagrees with, imposed by the government." *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005). In this matter, Davis is faced with a state measure that "forces an individual, as part of [her] daily life" to "be an instrument for fostering public adherence to an ideological point of view [she] finds unacceptable." *See Wooley*, 430 U.S. at 715. Under the SSM Mandate, Davis was directed to issue a single-page KDLA-approved form that uses the word "marriage" at six different places on the document (not including the reference to "join[ing] together in the state of matrimony"), and twice designated her as the person authorizing the marriage license. VTC, ¶¶ 11-12, and Exs. A, D. Unlike other governmental licensing or registration schemes that Kentucky provides (*e.g.*, driver's licenses, fishing and hunting licenses, motor vehicle registration, voter registration), the issuance of a marriage licenses pursuant to the SSM Mandate required an individual person (the county clerk) to authorize a particular relationship between persons against their religious convictions. Thus, Gov. Beshear's SSM Mandate directed Davis to validate and affirm on the prescribed KDLA form a view and message that she finds "morally objectionable" and "repugnant to [her] moral and religious beliefs." *See Wooley*, 430 U.S. at 707. Thus, under the SSM Mandate, her name and approval cannot be divorced from a SSM license. The principles enshrined in *Wooley*, and other compelled speech cases, therefore protect Davis from being coerced into placing her imprimatur on a union that, in her view, is not a marriage. To hold otherwise forces Davis to agree with a message and point of view she finds abhorrent and unconstitutionally "invades" her "intellect and spirit."

35

Further, even if the marriage form ordered by the SSM Mandate is state-issued, state-designed, and identified with the state, the form still required personal speech from a person (the county clerk) to validate, authorize and approve the marriage. This form identified "Kim Davis" by name in several places and further designated her as the individual under whose "authority" the license was issued. S*ee* VTC, Exs. A, D. Thus, even if the license entailed government speech to a certain degree, it also necessarily implicated the private speech of Davis on any license bearing her name and/or personal identifiers. *See Wooley*, 430 U.S. 705 (engraved message on standardized, state-issued license plates implicated driver's free speech rights).

Finally, the Third-Party Defendants' reliance upon *Garcetti*, 547 U.S. 410, as grounds for dismissing Davis' free speech claim, is misplaced. *See* D.E. 92-1, at 19-20. The speech limitations accepted in *Garcetti* protected the government's interests as an employer, so that it can discipline employees without having to conduct strict scrutiny speech panels. The speech at issue here is of an entirely different sort. The SSM Mandate ordered Davis to place her name—not a Commonwealth seal or a generic governmental stamp—on a proposed union that does not constitute marriage according to her undisputed religious beliefs. Her name is personal to her, and its usage on state-issued forms implicates her private speech rights in a fashion similar to the state-issued license plates in *Wooley*. Here, the compelled speech is being forced to have one's name and title branded on a proposed union that violates sincerely-held beliefs. If Gov. Beshear states that Kentucky will issue SSM licenses and recognize SSM licenses from other States following *Obergefell* that is one thing. But if Gov. Beshear, through his SSM Mandate, commandeers Davis to be an "instrument" for a message that she finds objectionable, it is another thing altogether and violates her free speech rights. Therefore, Davis has sufficiently alleged a free speech claim.

36

4.  **Davis Sufficiently Alleges A Cause Of Action Under The Religious Test Clause Of The United States Constitution And Kentucky Constitution Provisions (Counts I, VII, XII).**

Davis also alleges a viable claim under the Religious Test Clause of the Constitution, which mandates that "no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States," U.S. CONST. art. VI, and Kentucky Constitution provisions protecting religious freedom. Compelling all individuals who have any connection with the issuance of marriage licenses (*e.g.*, a county clerk like Davis) to authorize, approve, and participate in that act against their sincerely held religious beliefs about marriage, without providing accommodation, amounts to an improper religious test for holding (or maintaining) public office.

Third-Party Defendants allege that the Religious Test Clause "applies only to offices created under federal law – not state officials such as Davis." *See* D.E. 92-1, at 21. In prior cases overturning state-based religious tests, the Supreme Court has found such tests to violate the First and Fourteenth Amendments without reaching the Religious Test Clause. *Torcaso v. Watkins*, 367 U.S. 488, 495-96 (1961) (holding that a Maryland religious test for public office "unconstitutionally invades the appellant's freedom of belief and religious and therefore cannot be enforced against him"); *see also McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (holding that a Tennessee religious test that barred clergy from public office unlawfully "conditioned the exercise" of one right "on the surrender" of another).[25] Because *Torcaso* and *McDaniel* have found state-based religious tests to violate the First Amendment, through incorporation by the Fourteenth Amendment, it is more than likely that Article VI would similarly be deemed applicable to the States if the Sixth Circuit or Supreme Court were to decide the issue.

---

[25]   In *Torcaso*, the Supreme Court found it "unnecessary" to answer the question on whether the Religious Test Clause applies to state as well as federal offices, because it was reversing judgment under the First and Fourteenth Amendment. 367 U.S. at 488 n.1.

37

The Kentucky Constitution includes a limited number of requirements for county clerks to hold office, including age and Kentucky residency. KY. CONST. §§ 99, 100. None of the requirements pertain to religious belief or practice. Gov. Beshear, through the SSM Mandate, imported a newly minted qualification to the Kentucky Constitution's prescribed qualifications for county clerks: approval of SSM. In Gov. Beshear's view under the SSM Mandate, religious persons like Davis, who became county clerk before *Obergefell*, must either participate without exception in the issuance of SSM marriage licenses (her conscience be damned) or resign since holding public office is her choice (her livelihood, qualifications for office, and commitment to public service be damned). Thus, she is told to cast aside her deep religious convictions after entering the door of public service, and those not yet serving in similar public roles are told to shed any such convictions before taking office. But the fact "that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution." *Torcaso*, 367 U.S. at 495-96. Indeed, the very idea that religious persons "need not apply" for these public positions that have historically been accessible to them constitutes an unmistakable religious litmus test that is "abhorrent to our tradition." *Girouard*, 328 U.S. at 68. Imposing on all public officials—whether elected or appointed—a mandate to participate in SSM, without any protection for religious conscience, violates the Religious Test Clause.

## V.  **CONCLUSION**

For all the foregoing reasons, Third-Party Defendants' Motion to Dismiss Davis' Third-Party Complaint should be denied.

DATED: September 24, 2015

Respectfully submitted:

A.C. Donahue
Donahue Law Group, P.S.C.
P.O. Box 659
Somerset, Kentucky 42502
Tel: (606) 677-2741
Fax: (606) 678-2977
ACDonahue@DonahueLawGroup.com

/s/ Jonathan D. Christman
Horatio G. Mihet
Roger K. Gannam
Jonathan D. Christman
Liberty Counsel
P.O. Box 540774
Orlando, Florida 32854
Tel: (800) 671-1776
Fax: (407) 875-0770
hmihet@lc.org / rgannam@lc.org /
jchristman@lc.org

*Attorneys for Defendant/Third-Party Plaintiff Kim Davis*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed via the Court's ECF

filing system and therefore service will be effectuated by the Court's electronic notification system

upon the following counsel or parties of record:

Daniel J. Canon
L. Joe Dunman
Laura E. Landenwich
CLAY DANIEL WALTON ADAMS, PLC
462 S. Fourth Street, Suite 101
Louisville, KY 40202
dan@justiceky.com
joe@justiceky.com
laura@justiceky.com

William Ellis Sharp
ACLU OF KENTUCKY
315 Guthrie Street, Suite 300
Louisville, KY 40202
sharp@aclu-ky.org

*Attorneys for Plaintiffs*

Jeffrey C. Mando
Claire Parsons
ADAMS, STEPNER, WOLTERMANN &
DUSING, PLLC
40 West Pike Street
Covington, KY 41011
jmando@aswdlaw.com
cparsons@aswdlaw.com

*Attorneys for Rowan County*

William M. Lear, Jr.
Palmer G. Vance II
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380
william.lear@skofirm.com
gene.vance@skofirm.com

DATED: September 24, 2015

/s/ Jonathan D. Christman
Jonathan D. Christman
*Attorney for Defendant/Third-Party Plaintiff
Kim Davis*