UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND

|  |  |
|---|---|
| APRIL MILLER, *et al.*,<br><br>                              Plaintiffs,<br><br>v.<br><br>KIM DAVIS, *et al.*,<br><br>                              Defendants. | Case No. 0:15-cv-00044-DLB<br><br>***Electronically filed*** |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

Plaintiffs, by counsel, submit this memorandum in support of their motion for an award of attorneys' fees and costs in the above-styled action. The requested fees and costs are attributable to work spent preparing, filing, and litigating this matter, and for the present fees motion. The accompanying declarations establish the attorneys' time, requested hourly rates, and the amount of costs incurred.

### *Procedural History*

On June 27, 2015—one day after the U.S. Supreme Court's ruling in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)—Rowan County Clerk Kim Davis decided that her office would no longer issue marriage licenses because of her personal, religious opposition to marriage for same-sex couples. [RE #26: 7/20/15 Hr'g Tr.] Rather than issue licenses to same-sex couples, Davis adopted a "no marriage licenses" policy that barred *all* qualified applicants from obtaining licenses in Rowan County. After Davis adopted this policy, her office enforced it by denying marriage licenses to Plaintiffs—two same-sex and two opposite-sex couples who reside in Rowan County and who were otherwise legally entitled to wed. [RE #21: 7/13/15 Hr'g Tr.]

1

After being denied marriage licenses, Plaintiffs filed a putative class-action suit challenging the "no marriage licenses" policy under the First and Fourteenth Amendments. Plaintiffs also brought official-capacity claims against Davis seeking preliminary and permanent injunctive relief barring future enforcement of the policy as well as individual-capacity damages claims against Davis and Rowan County for the license denials. [RE #1: Compl.; RE #2: Mot. for Prelim. Inj.]

On August 12, 2015, this Court, following an evidentiary hearing and full briefing by the parties, granted Plaintiffs' request for preliminary injunctive relief.  The court barred Davis, in her official capacity, from enforcing the "no marriage licenses" policy against Plaintiffs. [RE #43: Memo. Op. & Order.] Davis appealed from that ruling [RE #44: Notice of Appeal], and she sought a stay of the injunction pending appeal. [RE #45: Stay Mot.][1]

This Court denied Davis' stay motion, but also stayed its denial of the motion pending review by the Sixth Circuit Court of Appeals. [RE #52: Order.] Then, on August 19, 2015, this Court amended its earlier ruling by clarifying that the "temporary stay" of the preliminary injunction would expire on August 31, 2015, absent further order from the Court of Appeals. [RE #55: Order.] Davis then filed a motion to stay the preliminary injunction with the Court of Appeals, but that stay request was denied. [*Miller v. Davis*, No. 15-5880, 2015 WL 10692640 (6th Cir. Aug. 26, 2015).] In denying Davis' stay request, a unanimous panel of the Court of Appeals explained:

> The request for a stay pending appeal relates solely to an injunction against Davis in her official capacity. The injunction operates not against Davis personally, but against the holder of her office of Rowan County Clerk. In light of the binding holding of *Obergefell*, *it cannot be defensibly argued that the holder of the Rowan*

---

[1] In addition to the trial and appellate litigation related to Plaintiffs' requested preliminary injunction, the parties also engaged in simultaneous litigation in this Court and the Court of Appeals regarding Davis' third-party complaint against then-Governor Steve Beshear and Wayne Onkst, then the Librarian and Commissioner for the Department for Libraries and Archives. [RE #34: Verified Third-Party Compl. of Defendant Kim Davis.]

> *County Clerk's office, apart from who personally occupies that office, may decline to act in conformity with the United States Constitution as interpreted by a dispositive holding of the United States Supreme Court. There is thus little or no likelihood that the Clerk in her official capacity will prevail on appeal.*

[*Id.* at 2, *1 (emphasis added).]

Davis then sought an emergency stay of the preliminary injunction from the Supreme Court. But, in a one-line order, the Supreme Court denied that request without asking for a response from Plaintiffs and without any published dissent. *Davis v. Miller*, 136 S. Ct. 23 (2015).

Having exhausted all attempts to stay the preliminary injunction ruling, Davis then proceeded to willfully disregard this Court's ruling by directing her employees to continue enforcing the "no marriage licenses" policy. [RE #78: 9/3/15 Hr'g Tr.] That decision resulted in Plaintiffs April Miller and Karen Roberts again being denied a marriage license on September 1, 2015. [*Id.*] Left with no other recourse, Plaintiffs moved to hold Davis in civil contempt for her refusal to comply with the preliminary injunction. [RE #67: Mot. to Compel.] Plaintiffs also filed a Rule 62(c) motion to modify the preliminary injunction so that Davis would be barred from enforcing her "no marriage licenses" policy against *any* eligible applicants, not just the named Plaintiffs. [RE #68: Mot. to Amend/Correct.] On September 1, 2015, the same day Plaintiffs filed their motions, this Court held a telephonic conference and scheduled a hearing on Plaintiffs' contempt motion for September 3, 2015. [RE #69: Min. Entry Order.]

At the September 3 hearing, this Court granted Plaintiffs' motion under Rule 62(c) and entered an order ("September 3 Order") modifying the preliminary injunction. [RE #74: Order.] In doing so, this Court explained that, even though briefing on Plaintiffs' still-pending class certification motion had been stayed and Davis had appealed the preliminary injunction ruling, it maintained jurisdiction to grant the requested modification. The Court reasoned that allowing the preliminary injunction "to apply to some, but not others" would not "make practical sense." [RE

#78: 9/3/15 Hr'g Tr.] The Court also noted that, after Plaintiffs filed this suit, two related cases were filed by couples whom Davis also denied marriage licenses. [*Id.*] The Court concluded that those cases raised identical legal issues, and that the reasoning behind the preliminary injunction applied with equal force to the plaintiffs in those cases. [*Id.*] Thus, the Court modified the September 3 Order by preliminarily enjoining Davis, in her official capacity, from enforcing her "no marriage licenses" policy against *any* applicants who were otherwise legally eligible to marry. [*Id.*]

On September 3, this Court also found Davis in civil contempt for her continued refusal to comply (or to allow her subordinates to comply) with the preliminary injunction, and the Court remanded her to the custody of the U.S. Marshal. [RE #75: Minutes Order.] Prior to the conclusion of the day's proceedings, and after Davis' deputy clerks agreed to comply with the preliminary injunction by not enforcing Davis' "no marriage license" policy, the Court afforded Davis an opportunity to purge herself of contempt by agreeing not to interfere with the deputy clerks' compliance with the preliminary injunction. [RE #78: 9/3/15 Hr'g Tr.] Davis' counsel met with her during a court recess to discuss the matter and subsequently informed the Court that she would not agree to do so. [*Id.*]

While Davis remained in custody on the civil contempt ruling, several of the named Plaintiff couples sought and received marriage licenses [RE #84: Status Report], as did plaintiffs from the related cases. [RE #113-1: Def./Third-Party Pl. Kim Davis' Mem. of Law in Support of Mot. for Immediate Consideration & Mot. to Stay Sept. 3, 2015 Inj. Order, 13 n.7.] This Court then lifted the contempt sanction and released Davis from custody in light of the deputies'

compliance with the preliminary injunction.[2] The court further ordered that Davis "**shall not interfere** in any way, directly or indirectly, with the efforts of her deputy clerks to issue marriage licenses to all legally eligible couples." [RE #89: Order (emphasis in original).]

Davis sought an emergency stay of the September 3 Order with the Court of Appeals, but that motion was denied because Davis failed to first seek a stay with this Court as required by FRCP 8(a)(1). [RE #43: Appellant Davis' Emergency Mot. to Stay District Ct.'s Sept. 3, 2015 Inj. Order Pending Appeal (15-5880); RE #50-1: Order (15-5880).] Davis then sought emergency relief with this Court to stay the September 3 Order, but that motion, too, was denied. [RE #121: Order.] In denying the requested stay, this Court found that the September 3 Order was necessary to preserve the status quo created by the preliminary injunction, which enjoined Davis from enforcing her "no marriage licenses" policy—a policy the Court found violated the Supreme Court's *Obergefell* decision by imposing an unlawful burden on the fundamental right to marry. [*Id.*] The Court also concluded that it would be "inconsistent with basic principles of justice and fairness" to enjoin Davis from applying her unconstitutional "no marriage licenses" policy only to some couples while leaving other eligible couples at Davis' mercy. [*Id.*]

More than a week after this Court denied Davis' emergency motion for a stay, Davis again moved the Court of Appeals for a stay of the September 3 Order. [RE #57-1: Renewed Mot. of Appellant to Stay Sept. 3, 2015 Inj. Order Pending Appeal (15-5880).] That stay request was again denied. [RE #62-1: Order (15-5880).]

---

[2] Earlier on September 8, prior to her release, Davis filed an emergency motion with the Court of Appeals to stay the contempt sanction, but that motion was denied as moot because Davis had already been released from custody by the time the motion was fully submitted. [RE #39-1: Order (15-5978).]

During the pendency of Davis' three separate appeals in this litigation, the Kentucky General Assembly enacted SB 216 amending Kentucky's marriage licensing requirements. Among its provisions, SB 216 eliminated the requirement that certain information appear on Kentucky marriage licenses, including: 1) an authorizing statement providing that the license is issued in the name of the county clerk; 2) the signature of the county clerk or deputy clerk from the county in which the license was issued; 3) a statement on the marriage certificate signed by the county clerk or deputy clerk from the county in which the marriage license was issued; and 4) any reference on the marriage certificate that the license was issued under the authority of a county clerk.

As a result of these changes, Davis filed, and the Court of Appeals granted, a motion to dismiss her appeals for lack of jurisdiction. [RE #95 (15-5880); RE #101: Order (15-5880).] The Court of Appeals also ordered the preliminary injunction ruling and subsequent modification of that ruling vacated, but it declined to likewise order the contempt ruling vacated. [RE #101: Order (15-5880).] On remand, this Court vacated the preliminary injunction rulings consistent with the appellate decision but also *sua sponte* dismissed Plaintiffs' remaining damages claims as well the related actions. [RE #181.] Plaintiffs now timely move for an award of attorneys' fees and costs as prevailing parties in the above litigation.

### *Argument*

## I.   PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES AS PREVAILING PARTIES IN THIS ACTION.

A plaintiff qualifies as a "prevailing party," and is thus entitled to recover attorneys' fees under the Civil Rights Attorney's Fees Act of 1976, 42 U.S.C. § 1988, where she succeeds "on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989)

(internal quotation marks and citation omitted). "The touchstone of the prevailing party inquiry …. [is] the material alteration of the [parties'] legal relationship . . . in a manner which Congress sought to promote in the fee statute." *Id.* at 792-93.

"A material alteration [in the parties' legal relationship] requires that '[t]he plaintiff [] obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement.'" *DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 670 (6th Cir. 2006) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)). This change in the parties' legal relationship must be court-ordered, and it must directly benefit the plaintiff "at the time of the judgment or settlement." *Id*. (internal quotation marks omitted); *Buckhannon Bd. & Care Home Inc. v. W. Va. Dep't of Health & Human Servs.*, 532 U.S. 598, 605 (2001).

Here, the merits-based preliminary injunction barring Davis, in her official capacity, from enforcing the "no marriage licenses" policy is sufficient to confer prevailing party status on Plaintiffs notwithstanding that the ruling was later vacated due to mootness. The Sixth Circuit has held that a merits-based preliminary injunction that directly benefits the plaintiff, but is later vacated because of mootness, may nonetheless constitute a material change in the parties' legal relationship sufficient to confer prevailing party status. *McQueary v. Conway*, 614 F.3d 591, 599-601 (6th Cir. 2010).

In order to determine whether a merits-based preliminary injunction is sufficient to confer prevailing party status, courts in this circuit must conduct a "contextual and case-specific inquiry" that examines, *inter alia*, the nature of the relief obtained. *Id*. at 601. When properly applied here, the contextual and case-specific inquiry supports Plaintiffs' prevailing party status because: 1) Plaintiffs obtained a merits-based preliminary injunction; 2) the preliminary injunction materially altered the parties' legal relationship and conferred a direct and irrevocable benefit to Plaintiffs;

7

and 3) the preliminary injunction was vacated *only* because of mootness resulting from a change

in the law, *not* because of a subsequent merits-based decision.

First, it cannot be reasonably disputed that this Court granted Plaintiffs' requested

preliminary injunctive relief *on the merits of their claims*. Specifically, this Court applied

heightened scrutiny to analyze the challenged "no marriage licenses" policy because the policy

directly and significantly interfered with individuals' fundamental right to marry. [RE #43: Mem.

Op. & Order at 11-12.]

> It does not seem unreasonable for Plaintiffs, as Rowan County voters, to expect
> their elected official to perform her statutorily assigned duties.  And yet, that is
> precisely what Davis is refusing to do.  Much like the statues at issue in *Loving* [*v.
> Virginia*, 388 U.S. 1 (1968)] and *Zablocki* [*v. Redhail*, 434 U.S. 374 (1978)], Davis'
> "no marriage licenses" policy significantly discourages many Rowan County
> residents from exercising their right to marry and effectively disqualifies others
> from doing so.

[*Id*. at 14.]

The Court further found that the "no marriage license" policy did not serve a compelling

governmental interest and, instead, actually *undermined* the state's countervailing (and

compelling) interests in preventing Establishment Clause violations and in upholding the rule of

law. [*Id*. at 15.] Thus, the Court held that Plaintiffs were likely to succeed on the merits of their

claims and would suffer irreparable harm absent the injunction. [*Id*. at 15-16.] The Court also

examined, and rejected, each of the purported harms Davis alleged would result if an injunction

were granted. [*Id*. at 18; 21 (Davis unlikely to prevail on free exercise claims); *id*. at 21-24 (Davis

unlikely to prevail on free speech claim); *id*. at 25-27 (Davis unlikely to prevail under Religious

Test Clause and Kentucky Religious Freedom Restoration Act).][3]

---

[3] Further reinforcing the merits-based nature of the ruling, a unanimous panel of the Court of
Appeals denied Davis' attempt to stay the preliminary injunction ruling and, in doing so, concluded
that "it cannot be defensibly argued that the holder of the Rowan County Clerk's office, apart from

And once issued, the court-ordered preliminary injunction materially altered the parties' legal relationship in that it compelled Davis, in her official capacity, to refrain from enforcing her "no marriage licenses" policy as to the Plaintiffs. Then, following the September 3 modification, the Court further barred her enforcement of the policy as to *all* eligible applicants. The material alteration in the parties' legal relationship is also evident by the fact that Davis, unsatisfied with the adverse ruling, persisted in refusing to comply with the ruling even after she sought (unsuccessfully) to stay its enforcement with the Supreme Court. *Davis v. Miller*, 136 S. Ct. 23 (2015). Because Davis persisted in refusing to comply (or allow her subordinates to comply) with the preliminary injunction ruling, this Court properly found her in civil contempt. [RE #75.] Only upon Davis' incarceration for civil contempt did her subordinates comply with the preliminary injunction ruling by issuing marriage licenses to several Plaintiffs in this case and in the related actions. [RE #84); RE #113-1: Def./Third-Party Pl. Kim Davis' Mem. of Law in Support of Mot. for Immediate Consideration & Mot. to Stay Sept. 3, 2015 Inj. Order Pending Appeal).]

In addition to being a court-ordered material change in the parties' legal relationship, the preliminary injunction also provided a direct and lasting benefit to Plaintiffs in the form of marriage licenses that were then used by two of the Plaintiff couples to marry.[4] This is the relief requested by Plaintiffs in their Complaint, and that is the measure of whether one obtains a direct

---

who personally occupies that office, may decline to act in conformity with the United States Constitution as interpreted by a dispositive holding of the United States Supreme Court." The panel further concluded that "[t]here is thus little or no likelihood that [Davis] in her official capacity will prevail on appeal." [*Miller v. Davis*, No. 15-5880, 2015 WL 10692640 (6th Cir. Aug. 26, 2015).]

[4] Plaintiffs Miller and Roberts obtained their marriage license on September 4, 2015, and were married on September 10, 2015; and Plaintiffs Skaggs and Spartman obtained their marriage license on September 4, 2015, and were married on September 9, 2015. [*See attached* Plaintiffs' Exhibits 1 and 2, respectively.] Plaintiffs Fernandez and Holloway obtained a marriage licenses on September 8, 2015, but, for personal reasons, decided to marry in 2016, which required them to obtain a new marriage license.

benefit from the ruling. *McQueary*, 614 F.3d at 602 ("In considering whether a claimant directly benefitted from litigation, we usually measure the plaintiff's gain based on the relief requested in his complaint . . . ."); *id.* at 601 (holding that merits-based preliminary injunction barring enforcement of various restrictions on funeral protest activities conferred direct benefit on plaintiff who sought to engage in those prohibited, and enjoined, activities). Just as with individuals seeking injunctive relief to engage in specific protest activities, Plaintiffs here successfully attained a merits-based preliminary injunction barring enforcement of a policy that blocked them from obtaining a marriage license. Once enjoined, Plaintiffs were not only able to obtain their marriage licenses, but were able to wed, thus further solidifying the irrevocable nature of the benefit obtained. *See id.* at 599 (agreeing with cases in which preliminary injunction winners are prevailing parties) (citing *Young v. City of Chicago*, 202 F.3d 1000 (7th Cir. 2000); *Watson v. Cty. of Riverside*, 300 F.3d 1092 (9th Cir. 2002); *Thomas v. Nat'l Sci. Found.*, 330 F.3d 486 (D.C. Cir. 2003)).

Short of obtaining a final judgment, Plaintiffs could attain no more success than they achieved here: 1) a merits-based ruling enjoining the official-capacity enforcement of the challenged "no marriage licenses" policy; and 2) Defendant's court-ordered (as opposed to voluntary) compliance with the preliminary injunction ruling thereby, resulting in Plaintiffs' attainment of a direct and irrevocable benefit in the form of marriage licenses that enabled them to marry.

Moreover, the fact that the preliminary injunction was later vacated does not divest Plaintiffs of their prevailing party status. Specifically, the preliminary injunction rulings were vacated, not because of a merits-based decision, but because action by the Kentucky General Assembly rendered Davis' appeals moot. As recognized by *McQueary*, a preliminary injunction

later vacated for reasons unrelated to its merits may nonetheless be sufficient to confer prevailing party status, particularly where, as here, it conferred a direct and lasting benefit to Plaintiffs that materially altered the parties' legal relationship. Other circuits have similarly held that merits-based preliminary injunctions that are subsequently rendered moot may nonetheless confer prevailing party status. *See, e.g.*, *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 683 F.3d 903, 910 (8th Cir. 2012) (upholding award of attorneys' fees based on preliminary injunction success later rendered moot); *Kan. Judicial Watch v. Stout*, 653 F.3d 1230, 1240-41 (10th Cir. 2011) (recognizing prevailing party status where plaintiffs "obtained a preliminary injunction that provided some of the relief sought in the complaint, represented an unambiguous indication of probable success on the merits, and was dissolved only after the actions of third parties mooted the case"); *Dearmore v. City of Garland*, 519 F.3d 517, 521 (5th Cir. 2008) (holding that plaintiffs were entitled to attorneys' fees based on preliminary injunction in which the district court made an "unambiguous indication of probable success on the merits," despite city's decision to subsequently amend the challenged ordinance, thereby mooting the case); *but see Smyth v. Rivero*, 282 F.3d 268, 276-77 (4th Cir. 2002) (holding that preliminary injunctions insufficient to confer prevailing party status).

The Tenth Circuit's post-*McQueary* decision in *Kansas Judicial Watch* is particularly instructive. There, the plaintiffs challenged certain portions of the Kansas Code of Judicial Conduct on free speech grounds, and they sought a declaratory judgment as well as preliminary and permanent injunctive relief to bar enforcement of those provisions. 653 F.3d at 1232-33. The district court awarded the plaintiffs a merits-based preliminary injunction, but the defendant appealed that adverse ruling. *Id*. at 1234 (noting that district court conducted a "painstaking examination of the merits prong of the preliminary-injunction standard"). While the preliminary

11

injunction ruling was on appeal, the Kansas Supreme Court amended the challenged Code provisions, causing the Tenth Circuit to vacate the preliminary injunction, dismiss the appeal as moot, and remand for entry of dismissal. *Id.* (citing *Kansas Judicial Review v. Stout*, 562 F.3d 1240, 1249 (10th Cir. 2009)).

On remand, the district court dismissed the case and denied plaintiffs' request for attorneys' fees because, in its view, the preliminary injunction did not "materially alter" the parties' legal relationship due to plaintiffs' failure to achieve their "primary relief," *i.e.*, final declaratory relief that the rules were invalid both on their face and as-applied. *Kan. Judicial Review*, 653 F.3d at 1239-40. In the subsequent appeal of that prevailing party decision, however, the Tenth Circuit reversed. The Tenth Circuit considered whether the preliminary injunction provided "relief on the merits," *i.e.*, whether the preliminary injunction "afford[ed] relief sought in the plaintiff's complaint," and whether it "represent[ed] an unambiguous indication of probable success on the merits," a necessary element for prevailing party status (as opposed to a mere status quo injunction). *Id.* at 1238.   In concluding that it did, the court stated:

> Appellants sought two basic types of relief in their complaint: (1) a declaration that the Pledges, Commits, and Solicitation clauses were unconstitutional; and (2) preliminary and permanent injunctions that would prohibit the Commission from enforcing the canons against judicial candidates who responded to KJR's questionnaire. *The preliminary injunction issued by the district court provided the second form of relief as long as it was in effect.* That is, the preliminary injunction prohibited enforcement of the challenged canons and allowed Appellants to engage in their speech activities without fear of a disciplinary action during the pendency of the case.

*Id.* at 1239 (emphasis added). Because the preliminary injunction also represented "an unambiguous indication of probable success on the merits" (that was not later undone by an adverse ruling on the merits), the Tenth Circuit held that it sufficed to confer prevailing party status notwithstanding that the preliminary injunction was later vacated. *Id.* at 1239-40 (emphasizing

"the critical distinction between preliminary injunctions vacated on mootness grounds and preliminary injunctions vacated as a result of an adverse decision on the merits").

As in *Kansas Judicial Watch*, Plaintiffs here sought, *inter alia*, both declaratory and injunctive relief in their complaint, and they attained a merits-based preliminary injunction barring Davis, in her official capacity, from enforcing the "no marriage licenses" policy. [RE #1: Complaint, at 14.] In spite of Davis' willful refusal to comply with the ruling after exhausting all attempts to stay its enforcement, Plaintiffs nonetheless secured the direct and irrevocable benefit they sought—issuance of a marriage license and thus the ability to wed—once Davis was found in civil contempt and no longer able to bar her subordinates from complying with the ruling. Thus, *Kansas Judicial Watch* makes clear that the preliminary injunction ruling was sufficiently "enduring" to support Plaintiffs' status as prevailing parties in this litigation.

*Kansas Judicial Watch* is also instructive in that it establishes that prevailing party status is not confined to situations in which mootness is caused by the mere passage of time. There, the preliminary injunction barred defendants' ability to enforce the challenged provisions during the pendency of the case. *Id*. And, as here, the plaintiffs' claims were not rendered moot by the mere passage of time, but rather by the affirmative repeal by a third party of the challenged provisions after the entry of the merits-based preliminary injunction barring their enforcement. *Id*. at 1234, 1240. By holding that the preliminary injunction success supported prevailing party status despite the subsequent repeal, the Tenth Circuit implicitly rejected the contention that *only* preliminary injunction winners whose claims are rendered moot by the "passage of time" can attain prevailing party status.

Because Plaintiffs obtained a merits-based preliminary injunction that granted them a direct and lasting benefit that materially altered the parties' relationship, and that was later undone solely due to mootness unrelated to the merits of their claims, Plaintiffs are thus prevailing parties.

## II.      PLAINTIFFS' REQUESTED ATTORNEYS' FEES ARE REASONABLE.

Once a civil rights plaintiff attains prevailing party status, the plaintiff "should ordinarily recover an attorney's fee from the defendant." *Fox v. Vice*, 563 U.S. 826, 833 (2011) (internal quotation marks and citation omitted). In awarding attorneys' fees, the "primary concern . . . is that the fee awarded be reasonable, that is, one that is adequately compensatory to attract competent counsel." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (internal quotation marks and citation omitted).

The amount of fees to be recovered is based on "the fee applicant's lodestar, which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his court-ascertained reasonable hourly rate." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013) (internal quotation marks and citation omitted). A fee determined by the lodestar method is entitled to a "strong presumption" that it "represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (internal quotation marks and citation omitted). Here, several attorneys for the Plaintiffs invested a total of 608.8 hours in the prosecution (and defense) of the merits-based preliminary injunction at all three levels of the federal judiciary and in multiple appeals. Because both the hours expended in this case (and the requested hourly rates) are reasonable, the Court should award Plaintiffs their full lodestar amount as set forth below.

### A.      The Hours Expended By Counsel For The Plaintiffs Are Reasonable.

A successful civil rights plaintiff is entitled to recover attorneys' fees for hours she establishes, via time records and declarations, that were "actually and reasonably expended in the

prosecution of the litigation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008 (internal quotation marks and citations omitted).

In this case, Plaintiffs' counsel include the following: William E. Sharp, Dan Canon, Laura Landenwich, L. Joe Dunman, Ria Tabacco Mar, James Esseks, Daniel Mach and Heather L. Weaver. Attached are counsels' declarations containing their time entries in this case. [*See attached* Exh. 4: Sharp Decl.; Exh. 5: Canon Decl.; Exh. 6: Esseks Decl.; Exh. 8: Mach Decl.] As evidenced by those declarations, each attorney provides sufficient detail regarding the duration of time spent working on (and the specific nature of) various tasks throughout this litigation to enable this court to determine that the hours "were actually and reasonably expended" in prosecuting this case.

Specifically, the attached declarations establish that the hours contributed by counsel for the Plaintiffs are as follows: William Sharp (230.5 hours); Dan Canon (134 hours); Laura Landenwich (38.6 hours); L. Joe Dunman (30.4 hours); Ria Tabacco Mar (66.3 hours); James Esseks (21.1 hours); Dan Mach (26.4 hours); and Heather Weaver (70.4 hours). This investment of time by multiple attorneys is consistent with the able prosecution of a civil rights action, particularly one as procedurally complex as this one in which multiple appeals were involved and where litigation occurred on multiple fronts (and in more than one federal court) simultaneously.

Moreover, the utilization of multiple counsel in complex litigation "is a common practice, primarily because it results in a more efficient distribution of work. It allows more experienced, accomplished, and expensive attorneys to handle more complicated matters and less experienced, accomplished, and expensive counsel to handle less complicated ones." *Gautreaux v. Chicago Hous. Auth.*, 491 F.3d 649, 661 (7th Cir. 2007) (internal citation omitted). And it this allocation of personnel resources that allowed Plaintiffs to litigate this case effectively and efficiently as

15

reflected by the billing records attached. To the extent that there is overlap in the hours expended by counsel, it was only when necessary in light of the compressed timeframes in which litigation events occurred. And "duplicative" billing, where two attorneys are billing for the same telephone conversation or meeting, is both necessary and reasonable in this instance because consultation among counsel resulted in a more efficient division of labor. *See Haile v. Holder*, 384 Fed. Appx. 501, 503 (7th Cir. 2010) ("The practice of law often, indeed usually, involves significant periods of consultation among counsel." (internal quotation marks and citation omitted)). Additionally, Plaintiffs have not sought reimbursement for over 70 hours contributed by experienced Supreme Court litigators at the ACLU. [Exh. 6: Esseks Decl., at ¶ 17.]

Further, the time entries contain sufficient detail to identify the specific tasks for which each attorney's time was devoted. Because these tasks were reasonably spent in furtherance of this litigation (or in preparation for this litigation), and because counsel efficiently divided tasks thereby effectively eliminating unnecessary duplication of efforts, any reduction in hours is unwarranted. *See Webb v. Bd. of Educ. of Dyer Co., Tenn.*, 471 U.S. 234, 243 (1985) ("Of course, some of the services performed before a lawsuit is formally commenced by the filing of a complaint are performed 'on the litigation.' Most obvious examples are the drafting of the initial pleadings and the work associated with the development of the theory of the case.").

### B.    Counsel's Requested Hourly Rates Are Reasonable.

The second step in calculating the lodestar amount is multiplying the number of compensable hours by the attorney's hourly rate. *Waldo*, 726 F.3d at 821. In doing so, district courts enjoy "broad discretion" to determine the reasonableness of claimed hourly rates. *Wayne v. Vill. of Sebring*, 36 F.3d 517, 533 (6th Cir. 1994). Courts must evaluate the hourly rates within "'the prevailing market rate in the relevant community'" — here, the Eastern District of Kentucky

for many of Plaintiffs' counsel and other jurisdictions for other of Plaintiffs' counsel. *Adcock–Ladd,* 227 F.3d at 350 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). For local counsel, the "prevailing market rate is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Waldo*, 726 F.3d at 821-22 (internal quotation marks and citation omitted).

As for the hourly rates for ACLU attorneys located outside Kentucky, local hourly rates should not apply because those attorneys were included only after the Plaintiffs obtained the merits-based preliminary injunction and Davis' litigation strategy required the participation of additional counsel. "Where a fee applicant seeks to recover fees for an out-of-town specialist, the district court must determine (1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Ne. Ohio Coalition for the Homeless v. Husted*, __ F.3d __, Nos. 14-4083/ 4084/ 4132/ 4133/ 15-3295/ 3296/ 3380/ 3381, 2016 WL 4073489, at *20 (6th Cir. Aug. 1 2016) (internal quotation marks and citation omitted). As noted above, the multiplication of the litigation by Davis in terms of the arguments advanced, the sheer number of filings, and in the procedural complexity of the litigation in which three separate appeals were generated and third-party claims advanced, rendered imminently reasonable the inclusion of outside counsel who, like the ACLU counsel, were sufficiently experienced in civil rights litigation to ably, and efficiently, assist with the litigation tasks demanded of this case.

Accordingly, Plaintiffs request that the out-of-state ACLU counsel be compensated using rates that are more aligned with the rates in their legal markets— New York City and Washington D.C., as discussed further below. Specifically, Plaintiffs request the following hourly rates: William Sharp ($350); Dan Canon ($300); Laura Landenwich ($300); Joe Dunman ($250); Ria

Tabacco Mar ($350); James Esseks ($700); Daniel Mach ($675); and Heather L Weaver ($500). Given each counsel's respective qualifications, these hourly rates are consistent with those charged by attorneys in the relevant jurisdictions with comparable skill and experience. [*See* Exh. 3: Belzley; Exh. 4: Sharp Decl.; Exh. 5: Canon Decl.; Exh. 6: Esseks Decl.; Exh. 7: Clark Decl.; Exh. 8: Mach Decl.]

### 1.    Local Counsel

The requested hourly rate of $350 for William Sharp is reasonable. Mr. Sharp possesses more than sixteen years' litigation experience, almost ten of which have been with the ACLU of Kentucky where his practice has been devoted almost exclusively to federal civil rights litigation. [Exh. 4: Sharp Decl., at ¶ 6] In 2014 (the most recent contested fee decision in which a court assessed Mr. Sharp's hourly rate), the court awarded Sharp his requested hourly rate of $275 for successfully prosecuting a voting rights case on behalf of his clients. [*Id.* at ¶ 10(a).] And in 2011, a court awarded Mr. Sharp his requested hourly rate of $200 for appellate work spent successfully opposing certiorari in the U.S. Supreme Court, but noted that "[t]he court would not be surprised if a large firm in Kentucky *were to charge more than twice Sharp's rate for an attorney with the same amount of experience to litigate the same matter*." *ACLU of Ky. v. McCreary Cnty*, Civil Action No. 99-507-JBC (E.D. Ky. May 17, 2011) (emphasis added). Similarly, Louisville-based attorney Greg Belzley makes clear in his declaration that his familiarity with fees charged by attorneys in the Eastern District of Kentucky leads him to conclude that Sharp's requested hourly rate of $350 is comparable to that charged by attorneys with similar skill and experience. [*See generally* Exh. 3: Belzlely Decl.]

Attorney Daniel Canon has been practicing law for nine years and is a dedicated civil rights lawyer who has represented plaintiffs in a wide variety of claims under 42 U.S.C. § 1983, and

constitutional actions generally, including inmates' rights cases and class action claims. [Exh. 5: Canon Decl. ¶ 9.] He is consistently recognized by peer groups as a top attorney in the Louisville area in the area of individual/constitutional rights, with experience that includes cases heard by the United States Supreme Court and the Supreme Court of Kentucky. [*Id.* ¶¶ 9-10.] [5]

Attorney Laura Landenwich has also been practicing law for nine years. She is admitted to practice in Kentucky and Indiana state courts, all Kentucky federal courts, the U.S. District Court for the Southern District of Indiana, the Sixth Circuit Court of Appeals, and the United States Supreme Court. [Exh. 5: Canon Decl. ¶ 12.] Ms. Landenwich has focused her practice in the area of civil rights and employment litigation. She has represented plaintiffs in civil rights cases at both the trial and appellate court level, most recently at the United States Supreme Court. [*Id.*] She has been named a Kentucky "Super Lawyer" for 2014-16 and received the "Top Lawyer" recognition by Louisville Magazine based upon peer vote. [*Id.*]

L. Joe Dunman graduated from the University of Louisville, Louis D. Brandeis School of Law in 2012. Mr. Dunman is admitted to practice before all Kentucky state courts, the U.S. District Court for the Western District of Kentucky, and the Sixth Circuit Court of Appeals. [Exh. 5: Canon Decl. ¶ 14.] He has briefed several cases before the Kentucky Court of Appeals, the Kentucky Supreme Court, and the Sixth Circuit Court of Appeals. [*Id.*] He is also an adjunct professor of constitutional rights at Bellarmine University. [*Id.*]

---

[5] *See, e.g., Obergefell v. Hodges,* 135 S. Ct. 2584 (2015); *Bourke v. Beshear*, 996 F. Supp. 2d 542 (W.D. Ky. 2014); *Sietsema v. Adams* Nos. 2013-CA-001159-MR, 2013-CA-001461-MR, 2015 Ky. App. LEXIS 116 (Ct. App. Aug. 14, 2015); *Admin. Office of the Courts v. Vidaud,* 2015 Ky. App. LEXIS 44 (Ky. Ct. App. Apr. 3, 2015); *Allen v. Commonwealth,* 395 S.W.3d 451 (Ky. 2013); *King v. Taylor,* 694 F.3d 650 (6th Cir. 2012); *Martin v. O'Daniel,* 2011 Ky. App. Unpub. LEXIS 429 (Ky. Ct. App. May 20, 2011); *McKinney v. City of Paducah*, 2014 Ky. App. Unpub. LEXIS 138 (Ky. Ct. App. Feb. 14, 2014).

## 2.      Out-Of-State Counsel

The hourly rates sought for out-of-town specialists from the ACLU also are reasonable. Lawyers from the ACLU's national offices in New York City and Washington, D.C. contributed invaluable experience, resources, and insight. The United States District Court for the Western District of Kentucky recently approved out-of-town rates for ACLU lawyers (including one of the lawyers associated with this case) in the Kentucky marriage litigation, finding that the requested rates were "reasonable for attorneys in the relevant market." *Bourke v. Beshear*, No. 3:13-CV-00750-CRS, 2016 WL 164626, at *6 (W.D. Ky. Jan. 13, 2016).

Specifically, James Esseks has been the director of the ACLU's LGBT & HIV Project since 2010. [Exh. 6: Esseks Decl. ¶ 6.] He was the litigation director of the Project from 2001 to 2010. [*Id.*] His practice is based in New York, but the scope of his work is national. [*Id.* ¶¶ 7-12.]  He was co-counsel in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), which established the freedom to marry for same-sex couples nationwide, and in *Bourke v. Beshear* and *Love v. Beshear*, the Kentucky marriage cases, which were consolidated with *Obergefell* in the Supreme Court. *Id.* ¶ 8.] In addition, he has been co-counsel in dozens of other marriage cases in state and federal courts throughout the country. [*Id.* ¶¶ 7-12.]   He graduated from Harvard Law School and clerked for a federal district judge in the Southern District of New York, as well as a federal circuit judge in the Ninth Circuit. [*Id.* ¶¶ 2-4.]  He worked for a private firm in New York prior to joining the ACLU. [*Id.* ¶ 5.]  His claimed rate of $700 per hour is commensurate with practitioners of similar skill and experience in the New York City market and was approved earlier this year by the United States District Court for the Western District of Kentucky in the Kentucky marriage litigation.  *Bourke*, 2016 WL 164626, at *5-*6 (finding that $700 per hour is a reasonable rate for attorneys of Esseks's

skill and experience in the New York City market for work done in a Kentucky case). The reasonableness of his rate is further justified by the declaration of Anne L. Clark, a partner with the firm Vladeck, Raskin & Clark, P.C., in New York City, attached as Exhibit 7.

Ria Tabacco Mar is a staff attorney with the ACLU's LGBT & HIV Project. [Exh. 6: Esseks Decl. ¶ 22.] She is a graduate of Harvard College and New York University School of Law. [*Id.* ¶ 19.] Ms. Mar served as a judicial law clerk for the Honorable Julia Smith Gibbons, United States Circuit Judge for the Sixth Circuit, from 2008 to 2009, and for the Honorable Victor Marrero, United States District Judge for the Southern District of New York, from 2010 to 2011. [*Id.* ¶ 20.] She has practiced law since 2008 and has developed an expertise in federal constitutional law and LGBT rights. [*Id.* ¶¶ 20-22.]   Her requested rate of $350 per hour is commensurate with rates recently awarded by the United States District Court for the Western District of Kentucky for the work of other staff attorneys in the ACLU's LGBT & HIV Project with skills and experience similar to that of Ms. Mar.  *See Bourke*, 2016 WL 164626, at *5 -*6 (awarding $400 per hour for 2005 law graduate and $325 per hour for 2010 law graduate as reasonable rates in the New York City market for work done in a Kentucky case); *see also* Exh. 7: Clark Decl., at ¶ 9 (lawyers in the New York market with Ms. Mar's skills and experience command at least $375 per hour).

The hourly rates requested for Mr. Mach ($675) and Ms. Weaver ($500) are consistent with the hourly rates awarded to the out-of-town ACLU attorneys in *Bourke*, and in fact, are lower than the hourly rates established in the adjusted "*Laffey* Matrix"—an attorneys' fee schedule that "sets out a general guideline for awarding attorneys' fees based on experience" in fee-shifting civil rights cases involving complex litigation in the D.C. area. *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015).  In *Salazar*, the Court of Appeals agreed that the "Legal Services Index ("LSI") *Laffey* Matrix," an updated version of the *Laffey* Matrix that adjusts

the hourly rate for attorneys based on inflation, was a proper basis on which to award attorneys' fees in a § 1983 class action. *Id.* at 63-66.  Indeed, as the court noted, "the LSI-adjusted matrix is probably a conservative estimate of the actual cost of legal services in this area." *Id.* at 48 (internal quotation marks and citation omitted). *See also Makray v. Perez*, 159 F.Supp.3d 25 (D.D.C. 2016) (discussing at length the LSI *Laffey* Matrix, and awarding hourly rate in sex discrimination case based on LSI *Laffey* Matrix); *Electronic Privacy Info. Ctr. v. Dep't of Homeland Sec.*, __ F. Supp. 3d __, No. 13-260 (JEB), 2016 WL 3919810 (D.D.C. July 18, 2016) (noting that "[t]he parties agree that the LSI Laffey Matrix acts as a starting point"); *cf.* D.C. Code Ann. §§32-1308(b)(1) (providing that attorneys' fees in civil actions alleging violations of the Minimum Wage Revision Act, the Sick and Safe Leave Act, or the Living Wage Act, must be "computed pursuant to the matrix approved in *Salazar v. District of Columbia*, 123 F.Supp.2d 8 (D.D.C. 2000), and updated to account for the current market hourly rates for attorney's services. The court shall use the rates in effect at the time the determination is made.").

Under the LSI *Laffey* Matrix, an attorney who is 20 or more years out of law school, such as Mr. Mach, would be entitled to an hourly rate of $797 for work performed between June 1, 2015, and May 31, 2016, and an hourly rate of $826 for work performed after June 1, 2016. *Compare* (*Salazar*, 809 F.3d 58, Joint Appendix at 1248, *available online* at http://tpmlaw.com/global_pictures/Joint_Appendix__Volume_III_.PDF (LSI *Laffey* Matrix with setting hourly rate at $753 for work performed between June 1, 2012, and May 31, 2013, by attorneys with 20-plus years of experience), *with Adjustments to the 1988-1989* Laffey *Matrix Rates Using the Legal Services Index,* Terris, Prevlik & Millian, LLP, at 4, *available online* at http://tpmlaw.com/global_pictures/Laffey_Matrix_Updated_Using_Legal_Services_Index_(000 42285-5xC4E0D).PDF (showing most recent LSI *Laffey* Matrix update setting hourly rate for

22

attorneys with 20-plus years of experience at $797 for work performed between June 1, 2015, and May 31, 2016, and $826 for work performed after June 1, 2016). But, here Mr. Mach is asking only for $675—an hourly rate that is more-than-justified by his extensive experience in First Amendment litigation.

Mr. Mach received his J.D., *magna cum laude*, from the New York University School of Law (Order of the Coif) in 1996. [Exh. 8: Mach Decl. ¶ 2.]. He then served as a law clerk to the Honorable Barry T. Moskowitz of the U.S. District Court for the Southern District of California. [*Id.* ¶ 9.] As a partner in the Washington, D.C. office of Jenner & Block, he specialized in First Amendment and appellate law as a member of the firm's Appellate and Supreme Court, and Media and First Amendment practices. [*Id.* ¶ 8.] In that position, he served as direct counsel in a wide variety of cases in state courts, federal district courts, federal courts of appeals, and several constitutional cases before the U.S. Supreme Court, including *Vieth v. Jubelirer*, 541 U.S. 267 (2004); *Lawrence v. Texas*, 539 U.S. 558 (2003); and *United States v. American Library Ass'n*, 539 U.S. 194 (2003). [*Id.*]

Mr. Mach joined the ACLU's Program on Freedom of Religion and Belief in 2006. Today, as the director of PFRB, he litigates and coordinates a wide range of religious liberty cases nationwide in both state and federal courts, and at the trial, appellate, and Supreme Court levels. [*Id.* ¶¶ 4-5.] These cases are primarily brought under the Establishment Clause and the Free Exercise Clause of the First Amendment to the U.S. Constitution, as well as numerous federal and state religious freedom statutes. ). [*Id.* ¶ 5 (listing examples of the numerous religious freedom cases litigated by Mr. Mach)]. He also serves as an adjunct professor of law at the George Washington University School of Law, focusing on constitutional law and religious liberty,

testifies before governmental agencies, and writes and speaks widely about religious freedom issues.  [*Id.* ¶¶ 6-7.]

Under the most recently updated LSI *Laffey* Matrix, Ms. Weaver would command as much as $662 per hour for work performed between June 1, 2015, and May 31, 2016, and as much $686 per hour for work performed after June 1, 2016.  *See Adjustments to the 1988-1989 Laffey Matrix Rates Using the Legal Services Index*, Terris, Prevlik & Millian, LLP, at 4, *available online* at http://tpmlaw.com/global_pictures/Laffey_Matrix_Updated_Using_Legal_Services_Index_(000 42285-5xC4E0D).PDF (showing most recent *Laffey* Matrix with Legal Services Index Update setting hourly rate for attorneys who graduated between with  11-19 years ago). Here, Plaintiffs seek only $500 as her hourly rate, a rate that is justified by Ms. Weaver's decade-plus of experience in litigating religious-freedom cases.

Ms. Weaver is a senior staff attorney with PFRB.  She received her J.D. from the University of California, Berkeley, Boalt Hall, in 2003, where she was a Notes and Comments Editor for the California Law Review.  [Exh. 8: Mach Decl. ¶ 13.].  After working as a litigation associate for a San Francisco law firm from 2003-2005, Ms. Weaver joined Americans United for Separation of Church and State, where she litigated religious-freedom case until 2008.  [Exh. 8: Mach Decl. ¶ 15].  In 2008, Ms. Weaver joined the ACLU.  Like Mr. Mach, Ms. Weaver has developed a special expertise in constitutional litigation pertaining to religious-freedom rights, including litigation involving claims for religious discrimination and for religious exemptions and accommodations.  [*Id.* (collecting various cases litigated by Ms. Weaver).]  Ms. Weaver is also a recognized expert in her field, writing and speaking widely on matters of religious liberty and the law. [Exh. 8: Mach Decl. ¶ 17.]

### C.     Computation of Fees.

Multiplying counsels' hourly rates by the respective number of hours each contributed to this litigation, the lodestar computation in this case is as follows:

| Attorney | Rate | Hours | Lodestar |
|---|---|---|---|
| William Sharp | $350 | 230.5 | $80,675.00 |
| Dan Canon | $300 | 134 | $40,200.00 |
| Laura Landenwich | $300 | 38.6 | $11,580.00 |
| L. Joe Dunman | $250 | 30.4 | $7,600.00 |
| Ria Tabacco Mar | $350 | 66.3 | $23,205.00 |
| James Esseks | $700 | 21.1 | $14,770.00 |
| Dan Mach | $675 | 26.4 | $17,820.00 |
| Heather Weaver | $500 | 70.4 | $35,200.00 |
| | | **Total** | $231,050.00 |

## III.   THE PLAINTIFFS ARE ENTITLED TO RECOVER THE FULL AMOUNT OF THEIR COSTS.

### A.     The Plaintiffs Are Entitled To Their Reasonable Out-Of-Pocket Expenses Under 42 U.S.C. § 1988.

In addition to reasonable attorneys' fees, prevailing civil rights plaintiffs may also recover their costs under 42 U.S.C. § 1988. "The award of statutory costs is a matter for the district court, in its best judgment as to what was reasonable and necessary, and the appellate courts will not normally interfere with the exercise of that discretion." *Waldo*, 726 F.3d at 827 (internal quotation marks omitted). Reasonable costs include those that are "incurred by the attorney which are normally charged to a fee-paying client." *Id.* (internal quotation marks omitted).

Here, the costs associated with the litigation are detailed in the declarations of William Sharp. [Exh. 4.] Those costs include:

| | | |
|---|---|---|
| 7/1/15 | Travel to Rowan Co. - client meeting | $75.71 |
| 7/1/15 | Return travel from Rowan Co. | $75.71 |
| 7/2/15 | Case filing fee | $400.00 |
| 7/12/15 | Lodging (2 rooms) in Ashland, KY for hearing | $292.00 |
| 7/13/15 | Per diem in Ashland, KY | $24.00 |
| 7/16/15 | Transcript of Proceedings | $100.80 |
| 7/19/15 | Lodging (2 rooms) in Covington, KY for hearing | $322.78 |
| 7/29/15 | Transcript of Proceedings | $73.80 |
| 8/26/15 | Telephone conference transcript | $9.00 |
| 9/2/15 | Travel to Ashland, KY for hearing | $106.78 |
| 9/2/15 | Lodging (1 room) in Ashland, KY | $106.40 |
| 9/3/15 | Return travel from Ashland, KY | $106.78 |
| 9/9/15 | Transcript of Proceedings | $162.90 |
| 9/25/15 | Travel to Rowan Co. - client/witness meetings | $75.71 |
| 9/25/15 | Return travel from Rowan Co. | $75.71 |
| | ***Total*** | **$ 2,008.08** |

Because these above-listed costs are reasonably incurred and normally charged to fee-paying clients, the Plaintiffs' motion to recover these costs should be granted.

### *Conclusion*

Plaintiffs are "prevailing parties" in this litigation, and as such are entitled to recover their reasonable attorneys' fees and costs. As noted above, the attached declarations establish with sufficient particularity the claimed hours and the reasonableness of their requested hourly rates. Because the Plaintiffs obtained a direct benefit from the court-ordered preliminary injunction that materially altered the parties' legal relationship, and because the claimed hours and hourly rates

26

are reasonable, the Court should award them their attorneys' fees and costs in full. It should

therefore award $ 231,050.00 in attorneys' fees and $ 2,008.08 in costs, pursuant to 42 U.S.C. §

1988, for a total award of $233,058.08 for all work performed from July 1, 2015 through

September 14, 2016.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>s/ William E. Sharp</td></tr>
<tr><td>Daniel J. Canon</td><td>William E. Sharp</td></tr>
<tr><td>Laura E. Landenwich</td><td>Legal Director</td></tr>
<tr><td>L. Joe Dunman</td><td>ACLU OF KENTUCKY</td></tr>
<tr><td>CLAY DANIEL WALTON & ADAMS, PLC</td><td>315 Guthrie Street, Suite 300</td></tr>
<tr><td>462 South Fourth Street</td><td>Louisville, KY 40202</td></tr>
<tr><td>Suite 101</td><td>(502) 581-9746</td></tr>
<tr><td>Louisville, KY 40202</td><td>sharp@aclu-ky.org</td></tr>
<tr><td>(502) 561-2005</td><td></td></tr>
<tr><td>ACLU OF KENTUCKY Cooperating</td><td>Ria Tabacco Mar*</td></tr>
<tr><td>    Attorneys</td><td>James D. Esseks*</td></tr>
<tr><td>dan@justiceky.com</td><td>AMERICAN CIVIL LIBERTIES UNION</td></tr>
<tr><td>laura@justiceky.com</td><td>    FOUNDATION</td></tr>
<tr><td>joe@justiceky.com</td><td>125 Broad Street</td></tr>
<tr><td></td><td>New York, NY 1004</td></tr>
<tr><td>Daniel Mach*</td><td>(212) 549-2627</td></tr>
<tr><td>Heather L. Weaver*</td><td>rmar@aclu.org</td></tr>
<tr><td>AMERICAN CIVIL LIBERTIES UNION</td><td>jesseks@aclu.org</td></tr>
<tr><td>    FOUNDATION</td><td></td></tr>
<tr><td>915 15th Street NW</td><td></td></tr>
<tr><td>Washington, DC  20005</td><td></td></tr>
<tr><td>(202) 675-2330</td><td></td></tr>
<tr><td>dmach@aclu.org</td><td></td></tr>
<tr><td>hweaver@aclu.org</td><td>*Counsel for Plaintiffs*</td></tr>
<tr><td>* Admitted *pro hac*<br>*vice*</td><td></td></tr>
</table>

**CERTIFICATE OF SERVICE**

I certify that on September 19, 2016, I filed this motion and accompanying proposed

order with the Clerk of the Court by using the CM/ECF system, which will send a notice of

electronic filing to the following:

Jeffrey C. Mando
Claire E. Parsons
Cecil Watkins
jmando@aswdlaw.com
cparsons@aswdlaw.com
cwatkins@prosecutors.ky.gov

*Counsel for Rowan County*


Anthony C. Donahue
Roger Gannam
acdonahue@donahuelawgroup.com
rgannam@lc.org

*Counsel for Kim Davis*


s/ Heather L. Weaver
*Counsel for Plaintiffs*