**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CIVIL ACTION NO. 15-44-DLB**

**APRIL MILLER, et al.**                                                                              **PLAINTIFFS**


**vs.**                              **MEMORANDUM OPINION AND ORDER**


**KIM DAVIS, individually and**
**in her official capacity, et al.**                                              **DEFENDANTS**

* * * * * * * * * * * * * * * *

## I.    INTRODUCTION

In the summer of 2015, the Supreme Court put the national debate concerning same-sex marriage to bed.  The Court determined that same-sex couples need not "await further legislation, litigation, and debate," and held that the Constitution's fundamental right to marry extended to same-sex couples.  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2605 (2015).  The dissenting justices warned that there would be "consequences to shutting down the political process on an issue of such profound public significance." *Id.* at 2625 (Roberts, J., dissenting).  At least in some respects, the dissenting justices' concerns proved correct.  *Obergefell*'s watershed decision floated downstream to district courts, including this one.

Less than one week after the Supreme Court's decision in *Obergefell*, the instant case landed on the Court's docket when Kim Davis, the Rowan County Clerk, refused to issue marriage licenses.  This litigation has produced many appeals, a jailing for contempt, at least two marriages, and legislative action.  Now, this protracted case has

1

boiled down to a single remaining issue: attorneys' fees.

Pursuant to this Court's September 21, 2016 Order (Doc. # 184), Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. # 183) was referred to Magistrate Judge Edward B. Atkins for a Report and Recommendation ("R&R"). Judge Atkins recommended that the Court deny Plaintiffs' Motion for Attorneys' Fees and Costs. (Doc. # 199). The Plaintiffs having objected to the R&R (Doc. # 201), the Defendants having filed their Responses (Docs. # 203 and 204), and the Plaintiffs having filed a Reply (Doc. # 205), the R&R is ripe for review. For the reasons set forth herein, Plaintiffs' Objections are **sustained**, the R&R is **rejected** as the findings of fact and conclusions of law of the Court, and the Plaintiffs' Motion for Attorneys' Fees and Costs is **granted** as set forth herein.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

On June 26, 2015, the Supreme Court issued its landmark decision in *Obergefell*, reaffirming that the right to marry is a fundamental right under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and holding that same-sex couples may not be deprived of that right. *Obergefell*, 135 S. Ct. 2584. Accordingly, Kentucky's constitutional amendment defining marriage as a union between one man and one woman violated the Constitution, and Kentucky could no longer "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Id.* at 2605.

Just hours after the Supreme Court's decision in *Obergefell*, Defendant Kim Davis, the Rowan County Clerk, unilaterally decided that her office would no longer issue marriage licenses to *any* couples, same-sex or otherwise. (Doc. # 43 at 1). That same day, Plaintiffs April Miller and Karen Roberts, who had been in a committed same-sex

relationship for eleven years, decided to get married.  (Doc. # 21 at 25).  Four days later, Ms. Miller and Ms. Roberts went to the Rowan County Clerk's Office and requested a marriage license.  *Id.* at 26.  The couple's request was denied and they were informed of the Rowan County Clerk's "no marriage license" policy.  *Id.*  Two opposite-sex couples—Kevin Holloway and Jody Fernandez and Shantel Burke and Stephen Napier—as well as another same-sex couple—Barry Spartman and Aaron Skaggs—claimed to have suffered a similar fate when they requested marriage licenses from the Rowan County Clerk's Office.  *Id.* at 36, 42-44.

On July 2, 2015, Plaintiffs April Miller, Karen Roberts, Shantel Burke, Stephen Napier, Jody Fernandez, Kevin Holloway, Aaron Skaggs, and Barry Spartman (collectively "Plaintiffs") filed a civil-rights complaint pursuant to 42 U.S.C. § 1983 against Defendants Rowan County, Kentucky and Kim Davis, individually and in her official capacity as Rowan County Clerk (collectively "Defendants").  (Doc. # 1).  Plaintiffs also filed a Motion for Preliminary Injunction.  (Doc. # 2).  In their Complaint, Plaintiffs claimed their constitutional rights were violated by the Rowan County Clerk's "no marriage license" policy, which refused marriage licenses to couples who were otherwise legally entitled to marry.  (Doc. # 1 at ¶ 1).  Specifically, Plaintiffs brought claims against Defendants for violations of the First and Fourteenth Amendments and requested seven specific types of relief: (1) class certification under Federal Rule of Civil Procedure 23, (2) a preliminary injunction, (3) a permanent injunction, (4) a declaratory judgment, (5) damages, (6) attorneys' fees and costs, and (7) a trial by jury.  (Doc. # 1 at pp. 10-14).

In response, Davis filed a Motion to Dismiss Plaintiffs' Complaint (Doc. # 32), opposed Plaintiffs' Motion for Preliminary Injunction (Doc. # 29), and filed a Third-Party

Complaint (Doc. # 34) and Motion for Preliminary Injunction (Doc. # 39) against then-Governor of Kentucky, Steven Beshear, and the Commissioner of the Kentucky Department for Libraries and Archives, Wayne Onkst[1] (collectively "the State Defendants").[2]  In her Third-Party Complaint, Davis claimed that the "Commonwealth of Kentucky, acting through Governor Beshear, deprived [her] of her religious conscience rights guaranteed by the United States and Kentucky Constitutions and laws, by insisting that [she] issue marriage licenses to same-sex couples contrary to her … sincerely held religious beliefs."  (Doc. # 34 at ¶ 1).  Davis further claimed that Governor Beshear was "not only liable to Davis for Plaintiffs' claims," but "also obligated to effect Kentucky marriage licensing policies that uphold Davis's rights of religious conscience."  *Id.*

On August 12, 2015, the Court granted Plaintiffs' Motion for Preliminary Injunction (Doc. # 2), and preliminarily enjoined Davis, in her official capacity as Rowan County Clerk, from applying her "no marriage licenses" policy to future marriage license requests submitted by Plaintiffs.  (Doc. # 43).  Davis appealed that ruling to the United States Court of Appeals for the Sixth Circuit.  (Docs. # 66, 82, and 83).  The Sixth Circuit denied Davis's request to stay the preliminary injunction pending appeal and held that "[i]n light of the binding holding of *Obergefell*, it cannot be defensibly argued that the holder of the Rowan County Clerk's Office … may decline to act in conformity with the United States

---

[1]      The State Defendants filed two Motions to Dismiss Davis's Third-Party Complaint.  (Docs. # 92 and 157).  Those motions were denied as moot, in accordance with the Sixth Circuit's Remand Order.  (Doc. # 182).

[2]      After the 2015 Kentucky gubernatorial election, newly elected Governor Matthew Bevin, in his official capacity as Governor of Kentucky, was substituted as Third-Party Defendant in place of former Governor Steven Beshear.  (Doc. # 155).  Similarly, Terry Manuel, in his official capacity as Commissioner of the Kentucky Department for Libraries and Archives, was substituted as Third-Party Defendant in place of Wayne Onkst.  (Doc. # 170).

Constitution as interpreted by a dispositive holding of the United States Supreme Court."
*Miller v. Davis*, No. 15-5880, 2015 WL 10692640, at *1 (6th Cir. Aug. 26, 2015) (Doc. #
28-1 therein).  Davis further appealed to the United States Supreme Court, which also
denied her application for stay.  *Davis v. Miller*, 136 S.Ct. 23 (2015).

Despite this Court's directive and her failed appeals, Davis refused to comply with
the Court's Order.  (Doc. # 67).  Therefore, the Court ordered Davis, as well as her deputy
clerks,[3] to appear for a contempt hearing.  (Doc. # 69).  On September 3, 2015, the Court
found Davis to be in contempt of the Court's Order and remanded her to the custody of
the United States Marshal pending compliance.  (Doc. # 75).  That same day, the Court
modified the preliminary injunction and clarified that Davis, in her official capacity as
Rowan County Clerk, was "preliminarily enjoined from applying her 'no marriage licenses'
policy to future marriage license requests submitted by Plaintiffs *or by other individuals
who are legally eligible to marry in Kentucky*."  (Doc. # 74) (emphasis added).[4]

Five days later, on September 8, 2015, the Plaintiffs filed a Status Report indicating
that they had obtained marriage licenses from the Rowan County Clerk's Office without
incident.  (Doc. # 84).  Accordingly, the Court lifted the contempt sanction, released Davis
from custody, and ordered her not to interfere with her deputy clerks' efforts to issue
marriage licenses to all legally eligible couples.  (Doc. # 89).  On September 14, 2015,
Davis returned to work at the Rowan County Clerk's Office.  (Doc. # 120).  However, the

---

[3]     The Court appointed CJA Attorneys to represent the deputy clerks. (Doc. # 75).

[4]     Davis also attempted to appeal those Orders, but to no avail.  (Doc. # 112) (Sixth Circuit
Order denying Davis's motion to stay the September 3, 2015 Modified Preliminary Injunction
Order for failure to comply with the Federal Rules of Appellate Procedure); (Doc. # 140) (Sixth
Circuit Order denying Davis's appeal of the September 3, 2015 Contempt Order as moot); (Doc.
# 147) (Sixth Circuit Order denying Davis's renewed motion for a stay of the September 3, 2015
Preliminary Injunction Order).

Court continued to monitor compliance with its Orders and required the deputy clerks to file Status Reports regarding their compliance and the issuance of marriage licenses. (Doc. # 89) (requiring Status Reports every fourteen days); (Doc. # 130) (limiting required Status Reports to every thirty days); (Doc. # 163) (requiring Status Reports every ninety days).

While multiple appeals were pending before the Sixth Circuit, the Kentucky General Assembly passed Senate Bill 216,[5] which removed county clerks' names from the prescribed marriage license forms.  Ky. Rev. Stat. Ann. § 402.100.[6]   Because the parties agreed that the change in the law rendered the consolidated appeals[7] moot, the Sixth Circuit granted Davis's Motion to Dismiss for Lack of Jurisdiction and dismissed the appeals.[8]  (Doc. # 179).  In its July 13, 2016 Order, the Sixth Circuit remanded the matter to this Court, "with instructions to vacate" the August 12, 2015 and September 3, 2015 Preliminary Injunction Orders.[9]   *Id.*   After the mandate issued (Doc. # 180), this Court

---

[5]     Senate Bill 216 also amended Ky. Rev. Stat. Ann. §§ 402.100 and 402.110 to require that the Department for Libraries and Archives issue one marriage license form that includes "bride," "groom," or the gender-neutral "spouse."

[6]     Ky. Rev. Stat. Ann. § 402.100 has been further amended by subsequent legislation.  HB 469, Pt. A, § 1(6); 2017 Ky. Laws Ch. 177.  However, House Bill 469 only amends "an incomplete, and therefore, incorrect" citation.  *Id.*  Therefore, the substance of the statute remains the same.

[7]     The Sixth Circuit consolidated three appeals (Nos. 15-5880; 15-5961; 15-5978) for briefing and submission at Davis's request.  Order Consolidating Appeals, *Miller v. Davis*, No. 15-5880 (6th Cir. Oct. 1, 2015), (Doc # 54-1 therein).

[8]     The Sixth Circuit also dismissed the State Defendants as parties in Davis's appeal from this Court's Order delaying consideration of her Motion for Preliminary Injunction against them. (Doc. # 171) ("The State Defendants' [Motion to Dismiss Appeal as Moot] is GRANTED, and Case No. 15-5961 is dismissed for lack of jurisdiction.  The clerk is directed to remove the State Defendants as appellees in Case Nos. 15-5880 and 5978.").

[9]     The Sixth Circuit determined that the Court's September 3, 2015 Order holding Davis in contempt of court (Doc. # 75) did not meet the requirements for vacatur under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).  (Doc. # 179).

complied with the Sixth Circuit's instructions and vacated the Preliminary Injunction Orders (Doc. # 181), denied all pending motions as moot, and dismissed and struck this matter from the Court's active docket.  (Doc. # 182).  Shortly thereafter, the Plaintiffs filed a Motion for Attorneys' Fees and Costs pursuant to 42 U.S.C. § 1988.  (Doc. # 183).

## III.   ANALYSIS

### A.   Standard of Review

Although a magistrate judge is not permitted to determine costs or fees, the district court may refer the matter to a magistrate judge for the preparation of a report and recommendation.  *McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005) (citing *Massey v. City of Ferndale*, 7 F.3d 506, 510-11 (6th Cir. 1993)); *see also* Fed. R. Civ. P. 72.  A party may file written objections to the R&R within fourteen days.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  The objections must be specific; "vague, general or conclusory objections … [are] tantamount to a complete failure to object."  *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001).  "The district court cannot simply 'concur' in the magistrate's findings."  *McCombs*, 395 F.3d at 360.  Instead, the Court must review the entire record and "conduct its own review" to determine whether the recommendation should be adopted.  *Id*.

Judge Atkins found that Plaintiffs were not entitled to attorneys' fees under § 1988 and recommended that Plaintiffs' Motion for Attorneys' Fees and Costs be denied.  (Doc. # 199).  The Plaintiffs object to Judge Atkins's R&R, claiming the recommendation misapplied the relevant law.  (Doc. # 201).  The Court will consider the Plaintiffs' objections and conduct a *de novo* review.

### B.      Attorneys' Fees under § 1988

"Our legal system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses."  *Fox v. Vice*, 563 U.S. 826, 832 (2011).  Thus, courts do not award "fees to a prevailing party absent explicit statutory authority."  *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 602 (2001) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994)).  Under 42 U.S.C. § 1988, Congress "explicitly empowered the courts to grant fees to parties who win § 1983 actions."  *Id.*  Accordingly, a "court, in its discretion, may allow the prevailing party … a reasonable attorney's fee as part of the costs."[10]  42 U.S.C. § 1988(b).

Therefore, the pending motion requires the Court to answer a critical threshold question: Did the Plaintiffs prevail?

"Prevailing party" is a "legal term of art."  *Buckhannon*, 532 U.S. at 603.  "The Supreme Court has stated that in providing for fees under § 1988, 'Congress intended to permit the … award of counsel fees only when a party has prevailed on the merits.'"  *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 620 (6th Cir. 2013) (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980)).  "Over time, 'prevailing on the merits' has been distilled to succeeding on any significant issue which achieves some of the benefit the parties sought in bringing suit, the settling of some dispute which affects the behavior of the defendant towards the plaintiff, and resolution of the dispute in a way that … alters

---

[10]      "Although § 1988 uses permissive language regarding fee awards, 'the Supreme Court has read [§ 1988] as mandatory where the plaintiff prevails and special circumstances are absent.'"  *Hescott v. City of Saginaw*, 757 F.3d 518, 523 (6th Cir. 2014) (citing *Déjà Vu v. Metro. Gov't of Nashville & Davidson Cty.*, 421 F.3d 417, 420 (6th Cir. 2005); *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 761 (1989)).

the legal relationship of the parties." *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Hewitt v. Helms*, 482 U.S. 755, 761 (1987); *Tex. State Teachers Ass'n v. Harland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989)).

However, not just *any* change in the legal relationship between the plaintiff and the defendant is sufficient to establish prevailing-party status. "The touchstone of the prevailing party inquiry … is the *material* alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Sole v. Wyner*, 551 U.S. 74, 82 (2007) (emphasis added) (internal citations and quotation marks omitted). "A material change 'directly benefits' a plaintiff by modifying the defendant's behavior toward him." *McQueary v. Conway*, 614 F.3d 591, 598 (6th Cir. 2010) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)).

Moreover, the modification in the defendant's behavior must be "judicially sanctioned." *Buckhannon*, 532 U.S. at 605. "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* Therefore, if the plaintiff is successful because the defendant voluntarily elected to change course, even if the litigation was the "catalyst" for the change, the plaintiff did not "prevail." *McQueary*, 614 F.3d at 597.

The "court-ordered change in the legal relationship" between the parties must also be "enduring and irrevocable." *Id.* Thus, "a plaintiff who achieves a transient victory at the threshold of an action can gain no award under [§ 1988's] fee-shifting provision if, at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded." *Sole*, 551 U.S. at 78.

Satisfying this standard is a tall order for preliminary-injunction winners.  In *Sole*, the Supreme Court held that a "plaintiff who secures a preliminary injunction, then loses on the merits as the case plays out and judgment is entered against her, has won a battle but lost the war," and is not entitled to attorneys' fees.  *Id.* at 86 (internal citations and quotation marks omitted).  However, the Court limited its holding to those particular facts and expressly declined to consider "whether, in the *absence* of a final decision on the merits of a claim for permanent injunctive relief, success in gaining a preliminary injunction may sometimes warrant an award of counsel fees."  *Id.* (emphasis added).

Recently, the Sixth Circuit addressed the very issue left open in *Sole*.  *McQueary*, 614 F.3d 591.  To answer that difficult question, *McQueary* considered and rejected a variety of approaches.  The first one—preliminary-injunction success *never* establishes prevailing-party status—was too harsh.  *Id.* at 599.  The "never" approach "fails to account for fact patterns in which the claimant receives everything it asked for in the lawsuit, and all that moots the case is court-ordered success and the passage of time."  *Id.*  The next one—preliminary-injunction winners are *always* eligible for fees—was too generous.  The "always" approach awards parties with successful preliminary injunctions that had "nothing to do with the merits" and "turn[ed] more on the grave risks of irreparable harm … than on the legal virtues of the parties' positions."  *Id.* at 600.  Finally, *McQueary*'s "Goldilocks"[11] analysis arrived at an approach that fit "just right": district courts are to engage in a contextual and case-specific inquiry to determine whether a preliminary-injunction winner "prevailed" within the meaning of § 1988.

---

[11]     Robert Southey, *The Story of the Three Bears in* "The Doctor" (Longman 1837).

Although the Sixth Circuit declined to say that preliminary-injunction winners always are, or never are, "prevailing parties," *McQueary* provided a cautionary tale: "the 'preliminary' nature of the relief—together with the requirement that a prevailing party victory must create a lasting change in the legal relationship between the parties and not merely 'catalyze' the defendant to voluntary action—will generally counsel against fees in the context of preliminary injunctions." *Id.* at 601.

Therefore, the Court must engage in "a contextual and case-specific inquiry" to determine if this case is one of the rare instances where preliminary-injunction winners are entitled to attorneys' fees. *Id.* However, the Court is mindful that "the idea behind § 1988 is to award fees to deserving parties, not to generate 'satellite' disputes over fees" and will conduct its analysis accordingly. *Id.* at 598 (citing *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992)).

## C.    Did Plaintiffs Prevail?

Although *McQueary* "generally counsel[s] against fees in the context of preliminary injunctions," that rule gives way when a preliminary-injunction winner receives "everything [that he or she] asked for in the lawsuit, and all that moots the case is court-ordered success and the passage of time." *McQueary*, 614 F.3d at 599. In those scenarios, the preliminary injunction *does* establish prevailing-party status.

For example, "[w]hen protesters seek an injunction to exercise their First Amendment rights at a specific time and place—say to demonstrate at a Saturday parade—a preliminary injunction will give them all the court-ordered relief they need and the end of the parade will moot the case." *Id.* Such claimants are prevailing parties. *Id.* (citing *Young v. City of Chicago*, 202 F.3d 1000 (7th Cir. 2000)). Likewise, "a government

11

employee who seeks to exclude an unconstitutionally obtained report from an administrative hearing and obtains a preliminary injunction that irrevocably excludes the report" is a "prevailing party." *Id.* (citing *Watson v. Cty. of Riverside*, 300 F.3d 1092 (9th Cir. 2002)). So too is "a plaintiff who seeks to delay enforcement of a statute until a certain event occurs—say a public referendum—and the preliminary injunction brings about that result." *Id.* (relying on *Grano v. Barry*, 783 F.2d 1104, 1108-09 (D.C. Cir. 1986)).

On the other hand, a protestor who seeks and obtains a preliminary injunction enjoining government officials from enforcing laws, which prevented him from protesting at military funerals, is not entitled to attorneys' fees if his claim becomes moot because the government-defendants voluntarily repealed the challenged laws. *McQueary v. Conway* (*McQueary Remand*), No. 06-cv-24-KKC, 2012 WL 3149344, *3 (E.D. Ky. Aug. 1, 2012), *aff'd*, *McQueary v. Conway* (*McQueary II*), 508 F. App'x 522 (6th Cir. 2012). In such a case, the plaintiff's claim for relief did not become "moot because the preliminary injunction granted him all the relief he sought and there was nothing more [the] Court could do." *Id.* at *2. Instead, his "claim for permanent injunctive relief became moot because the Defendant voluntarily repealed the challenged" laws. *Id.*

Plaintiffs liken their case to *Young*, *Watson*, and *Grano*, and claim that this case provides the rare circumstances that entitle preliminary-injunction winners to attorneys' fees under § 1988. (Doc. # 183). Defendants rely heavily on *McQueary* and argue that Plaintiffs have no path to prevailing-party status. (Docs. # 193 & 203). Specifically, Defendants argue that Plaintiffs are not entitled to attorneys' fees because Kentucky voluntarily changed its laws, because the preliminary relief Plaintiffs obtained was not "enduring" or "irrevocable," and because Plaintiffs did not receive "everything they wanted

12

from" the preliminary injunction. (Doc. # 193 at 17-20). Furthermore, Defendants claim that "conferring prevailing party status on Plaintiffs would contradict and frustrate the vacatur remedy awarded by the Sixth Circuit." *Id.* at 21-23.

In the R&R, Judge Atkins found that two factors prevented Plaintiffs from establishing prevailing-party status. First, the R&R reasons that Plaintiffs did not receive "the full and final relief they sought" because they were only granted a preliminary injunction; they did not obtain the permanent injunction, class certification, declaratory judgment, trial by jury, or damages they sought. (Doc. # 199 at 6). And second, the R&R concluded that the case became moot because of the Kentucky General Assembly's "voluntary conduct" in "changing the marriage license forms," and therefore, Plaintiffs did not "prevail." *Id.* Accordingly, Judge Atkins recommended that the Court deny Plaintiffs' Motion for Attorneys' Fees and Costs. *Id.*

In their Objections, Plaintiffs argue that the R&R's application of *McQueary*'s contextual and case-specific analysis is flawed because it "fails to adequately address the central inquiry … whether the merits-based preliminary injunction materially altered the parties' legal relationship." (Doc. # 201 at 2). Plaintiffs also claim that the R&R "adopts a construction" of *McQueary* that "would effectively preclude" preliminary-injunction winners from ever attaining prevailing-party status. (Doc. # 201 at 2). The Court agrees. The R&R misapplies *McQueary*.

### 1.   *Plaintiffs' unsuccessful claims for relief do not prevent them from "prevailing."*

In addition to a preliminary injunction, Plaintiffs also sought permanent injunctive relief, class certification, a declaratory judgment, trial by jury, and damages. (Doc. # 1 at pp. 10-14). Because Plaintiffs only obtained a preliminary injunction, the R&R reasons

13

that Plaintiffs did not "prevail." (Doc. # 199 at 5-6). This conclusion turns *McQueary* on its head. *McQueary* specifically held that a party who obtained a preliminary injunction on the merits, which materially altered the parties' legal relationship, can establish prevailing-party status without succeeding on every claim. *McQueary*, 614 F.3d at 598.

A plaintiff "crosses the threshold to 'prevailing party' status by succeeding on a single claim, even if he loses on several others and even if that limited success does not grant him the 'primary relief' he sought." *Id.* at 603 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 790-91); *see also Green Party of Tenn. v. Hargett*, 767 F.3d 533, 552 (6th Cir. 2014). "[C]ourts do not look to the number of claims on which the plaintiff succeeded, the magnitude of the relief obtained, or whether the plaintiff obtained the primary relief sought; the question is simply whether the plaintiff has won on at least one claim." *Woods v. Willis*, 631 F. App'x 359, 364 (6th Cir. 2015). "The significance of the relief obtained goes only to the amount of fees" a prevailing party may recover, not to whether the party in fact "prevailed." *McQueary*, 614 F.3d at 603 (citing *Eckerhart*, 461 U.S. at 434-35).

Although *McQueary* advises courts to "measure the plaintiff's gain based on the relief requested in his complaint" and "not based on the practical significance of the relief obtained," context clarifies that this inquiry is directed at determining whether the relief obtained materially altered the parties' legal relationship. *Id.* at 602 (citing *Farrar*, 506 U.S. at 111-12). The Sixth Circuit did not instruct courts to score plaintiffs on the total number of successful requests for relief in their complaints, which often include boilerplate language. Rather, *McQueary* prohibits courts from relying on extraneous practicalities to undermine a party's legal success. For example, courts cannot refuse to conclude that a plaintiff "prevailed" because "statutes he never challenged" would have prevented him

14

from protesting, despite his preliminary-injunction success.  *Id.*

Therefore, Plaintiffs' "unsuccessful" requests for permanent injunctive relief, class certification, a declaratory judgment, trial by jury, and damages do not prevent them from establishing prevailing-party status.[12]  Plaintiffs sought and obtained a preliminary injunction; they have cleared the threshold hurdle of succeeding on a single claim.  If the preliminary injunction effected an enduring and material change in the parties' legal relationship, Plaintiffs can establish prevailing-party status.

### 2. The vacatur of the preliminary injunctions does not prevent Plaintiffs from "prevailing."

Awarding Plaintiffs attorneys' fees does not contradict or frustrate the Sixth Circuit's Order instructing this Court to vacate the preliminary injunctions.  "When a case becomes moot, courts often vacate their earlier rulings on the theory that a ruling should not stand when the party opposing it is deprived of a chance to obtain a final ruling on the issue or to seek appellate review of it—due to events outside of the party's control." *McQueary*, 614 F.3d at 600.  Therefore, vacatur serves the interests of justice by "clear[ing] the path for future relitigation of the issues between the parties." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950).  It does not, however, prevent a preliminary-injunction winner from "prevailing" or preclude an award of attorneys' fees.

If it did, the Sixth Circuit could have said so in *McQueary*.  Instead, *McQueary* specifically addressed vacatur when discussing the "never" approach, and acknowledged that vacatur under *Munsingwear* would provide a "straightforward approach to the fees

---

[12]   The Court characterizes these requests for relief as "unsuccessful" for simplicity's sake. However, the Court notes that although the Plaintiffs' request for class certification was ultimately denied as moot (Doc. # 182), the preliminary injunction applied class-wide, to all legally eligible couples.  (Doc. # 74).

question." *McQueary*, 614 F.3d at 600. However, the Sixth Circuit explicitly rejected such an approach because it "fails to account for the instances in which a party has prevailed by every measure of victory." *Id.* Therefore, awarding attorneys' fees to the Plaintiffs does not "contradict [or] entirely frustrate the purpose of the Sixth Circuit's decision to apply the equitable doctrine of vacatur" to the preliminary injunctions, as Davis suggests. (Doc. # 193 at 23). Instead, permitting vacatur to prevent Plaintiffs from establishing prevailing-party status would be most inequitable. Accordingly, the Court must examine the context and specific facts of this case, and if Plaintiffs have "prevailed," award attorneys' fees under § 1988. *McQueary*, 614 F.3d at 600.

> ### 3. The preliminary injunction materially altered the parties' legal relationship, and that court-ordered change was enduring and irrevocable.

The contextual and case-specific inquiry required by *McQueary* is at odds with the R&R's rigid prevailing-party analysis. Although preliminary-injunction winners must fit within precise parameters to establish prevailing-party status, there are many sets of facts that can fall within those boundaries. Therefore, this case need not be exactly like another case where a court held attorneys' fees were warranted. Rather, the Court views *McQueary* and the cases awarding attorneys' fees to preliminary-injunction winners on a spectrum—with *Young*, *Watson*, and *Grano* on one side—and the *McQueary Remand* on the other. These cases provide examples, not rules. *McQueary*, 614 F.3d at 599. Any other interpretation is incompatible with *McQueary's* contextual and case-specific inquiry. Therefore, the question is: Where does this case fall on that spectrum?

The unique facts of this case fall somewhere in between *Young*, *Watson*, and *Grano*, and *McQueary*. The Plaintiffs obtained a preliminary injunction on the merits that

materially changed the relationship between the parties, and that court-ordered change gave Plaintiffs what they asked for – marriage licenses.[13]  However, like *McQueary*, the Sixth Circuit held that a subsequent legislative change mooted the case, not Plaintiffs' "court-ordered success and the passage of time." *Id.*

In the *McQueary Remand*, the district court concluded, and the Sixth Circuit agreed, that the defendants' "voluntary conduct" in repealing the statutes that the plaintiff-protester challenged prevented him from "prevailing" within the meaning of § 1988. *McQueary II*, 508 F. App'x at 524.  But not every legislative change strips a plaintiff of their prevailing-party status.  *See Hargett*, 767 F.3d at 553 (Sixth Circuit held "plaintiffs qualif[ied] as prevailing parties" despite a legislative change).  "When plaintiffs clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal, plaintiffs are still prevailing parties." *Id.* at 552.  Thus, despite the eventual legislative change that mooted this case, if Plaintiffs prevailed, they will *not* be "stripped of their prevailing party status by the legislature's decision to amend the relevant statutes … months after the district court issued its order but before the defendants' appeal was heard." *Id.* at 553.  Accordingly, the Sixth Circuit's determination that the legislative change rendered this case moot does not prevent Plaintiffs from "prevailing," nor does it extinguish the relief the preliminary injunction afforded to Plaintiffs.

---

[13]     Plaintiffs April Miller and Karen Roberts obtained their marriage license on September 4, 2015, and were married on September 10, 2015.  (Doc. # 183-2).  Plaintiffs Aaron Skaggs and Barry Spartman obtained their marriage license on September 4, 2015, and were married on September 9, 2015.  (Doc. # 183-3).

The Court recognizes that not all of the plaintiff-couples are currently married.  One of the plaintiff-couples, Shantel Burke and Stephen Napier, did not obtain a marriage license after the preliminary injunction.  Plaintiffs Jody Fernandez and Kevin Holloway obtained a marriage license on September 8, 2015, but for personal reasons, decided to let that marriage license expire and marry in 2016.  (Doc. # 183-1 at 9 n.4).  If relevant at all, these facts bear on the amount and the reasonableness of the attorneys' fees, not on whether the Plaintiffs "prevailed."

Here, the context and specific facts of this case establish that Plaintiffs "prevailed" within the meaning of § 1988.  Plaintiffs' preliminary-injunction success materially altered the legal relationship between Plaintiffs and Davis.  Plaintiffs did not achieve "only a symbolic victory."  *McQueary*, 614 F.3d at 598.  The preliminary injunction "directly benefited" Plaintiffs by modifying Davis's behavior towards them.  *Id.* at 601-02.  And the material change in the legal relationship between Plaintiffs and Davis was judicially sanctioned.  "No one [can] dispute" that Davis refused to issue marriage licenses "in the absence of an injunction."  *Id.* at 601.  The preliminary injunction enjoined Davis from applying her unconstitutional "no marriage licenses" policy and "materially changed [Davis's] behavior toward [Plaintiffs]—at least [eventually]."  *Id.* at 602.

The R&R relied exclusively on *McQueary*, and found that the Kentucky General Assembly's voluntary conduct in changing the law in 2016 prevented Plaintiffs from obtaining prevailing-party status.  (Doc. # 199).  But this case resembles *McQueary* only at a 30,000-foot view, where the lines between Plaintiffs' Motion for Preliminary Injunction, Defendant/Third Party Plaintiff Davis's unsuccessful Motion for Preliminary Injunction against the State Defendants,[14] and the eventual change in the law are blurred.  This case, through third-party pleading, combined two distinct cases into one.  To determine whether Plaintiffs "prevailed," the Court must focus exclusively on Plaintiffs' claims.

Plaintiffs asked the Court to enjoin Davis, in her official capacity, from refusing to issue marriage licenses in violation of their constitutional rights, and the Court did so.

---

[14]    Initially, the Court stayed briefing on Davis's Motion for Preliminary Injunction.  (Doc. # 58).  Later, the Court denied Davis's Emergency Motion for Preliminary Injunction against the State Defendants, concluding that she was unlikely to suffer a violation of her First Amendment free exercise or free speech rights and refusing to order the State Defendants to "remove her name and authorization from the marriage license forms" under Kentucky's Religious Freedom Restoration Act.  (Doc. # 103).

(Docs. # 2, 43, and 74).  Plaintiffs did not challenge any law, nor did they request changes to the marriage license form.[15]  It was Davis who had an issue with the law, which required her to issue marriage licenses, and Davis who sought modification of the marriage license form.  (Doc. # 39).  Therefore, it is Davis's claims, and not Plaintiffs', that resemble *McQueary*.

Davis did not voluntarily change her conduct; "[a]n immediately enforceable preliminary injunction compelled [her] to."  *McQueary*, 614 F.3d at 599.  In fact, Davis refused to change her conduct even after the Court ordered her to, and she was held in contempt and briefly jailed.  (Doc. # 75).  In her absence, the deputy clerks in the Rowan County Clerk's Office issued marriage licenses to all legally eligible couples in compliance with the preliminary injunction.  (Docs. # 84 and 89).  After her release from custody, Davis made minor changes to the license forms, but continued to issue marriage licenses.  (Doc. # 161).  There are no voluntary actions by *Davis* that would suggest the material alteration of the parties' legal relationship was anything other than court-ordered.

Even assuming the General Assembly's voluntary conduct in changing the law could be attributed to Davis,[16] the legislative change does not preclude Plaintiffs from

---

[15]    Nor would Plaintiffs need to challenge any law or seek modification of the marriage license form.  The state law that prohibited same-sex couples from marrying was held unconstitutional by the Supreme Court.  *See* Ky. Const. § 233A *held unconstitutional and preempted by Obergefell*, 135 S. Ct. at 2605 ("[T]he State laws challenged … are now held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite sex couples.").  And on the day the Supreme Court issued its opinion in *Obergefell*, then-Governor Beshear "instructed the Kentucky Department [for] Libraries and Archives to provide revised marriage license forms to [Kentucky's] county clerks for immediate use, beginning [that day]." (Doc. # 29-6).

[16]    Despite Davis's admission that the "appeals were rendered moot by the intervening and independent actions of the General Assembly, not the voluntary action of Davis," (Doc. # 193 at 22), the Court extends Davis the benefit of this further analysis because it has found her to be a state actor with respect to issuing, or refusing to issue, marriage licenses.  *See infra* pp. 23-38.

"prevailing" within the meaning of § 1988.  In *McQueary*, the defendants voluntarily repealed the laws the plaintiff had challenged, and the legislative change benefited the plaintiff.  Put another way, the preliminary injunction prohibited the Commonwealth from enforcing the challenged laws, and "merely catalyze[d] the defendant[s]" into voluntarily repealing the challenged laws.  *McQueary Remand*, 2012 WL 3149344, at *1.  In this case, the preliminary injunctions did not merely "catalyze" the Kentucky General Assembly into voluntary legislative action.  *Buckhannon*, 532 U.S. at 602.  The preliminary injunction did not require any modification, or prohibit enforcement, of the law; it compelled Davis to comply with the law.

Moreover, the legislative change did not affect or benefit Plaintiffs in any way; it simply afforded Davis an alternative (and to her, more appeasing) method of complying with the Court's order and the Constitution.  The Court recognizes that it must reject any invitation to engage in a "fact-based and speculative inquir[y] into why government bodies altered their conduct."  *Tex. State Teachers Ass'n*, 489 U.S. at 791.  However, the Court is not prevented from examining the substance and the effect of the legislative change.

The legislative change in *McQueary* simply "changed the form of [plaintiff's] relief"—a repeal of the challenged laws, as opposed to an injunction prohibiting the enforcement of the laws.  *O'Neil v. Coughlan*, 490 F. App'x 733, 737 (6th Cir. 2012).  By contrast, Plaintiffs' action sought to force Davis to comply with the law, obey the Constitution, and cease violating Plaintiffs' fundamental rights.  The preliminary injunction accomplished that goal.  The legislative change did not render Plaintiffs' legal success unnecessary; it provided Davis an accommodation,[17] mooted the case, and rendered

---

[17]     Davis herself refers to Senate Bill 216 as an "accommodation" for her.  (Doc. # 193 at 10).

*Davis's* requested relief unnecessary.  Therefore, this case is factually distinguishable from *McQueary*.  Accordingly, the legislative change does not prevent Plaintiffs from "prevailing."[18]

Further, the court-ordered change in the parties' legal relationship was enduring and irrevocable.  A "preliminary injunction … does not establish prevailing party status if it is 'reversed, dissolved, or otherwise undone by the final decision in the same case.'" *McQueary*, 614 F.3d at 597 (quoting *Sole*, 551 U.S. at 83).  Therefore, an adverse decision on the merits would dispose of Plaintiffs' attorneys' fees claim.  *See Sole*, 551 U.S. 74.  But here, Plaintiffs' preliminary success was not undermined by a later decision on the merits.  This case became moot, which prevented a final decision on the merits.  In the absence of a final decision, a preliminary injunction may establish prevailing-party status.  *McQueary*, 614 F.3d at 597.  Likewise, the vacation of the preliminary injunction due to mootness does not revoke Plaintiffs' legal relief.  *Id.* at 600.  If the Plaintiffs have "prevailed by every measure of victory," they can obtain attorneys' fees, even in the face of their vacated preliminary injunction.  *Id.*

Davis claims the relief Plaintiffs obtained is not permanent because "[r]eality counsels that a substantial number of marriages end, whether by death or divorce, despite the best of intentions."  (Doc. # 193 at 18).  Her argument is too clever by half.  Every marriage, even the most abiding, will eventually end by death or divorce.  That fact does not minimize the permanency of the relief obtained.  Under Davis's flawed logic, prevailing-party status would never be obtainable in the marriage context, even if Plaintiffs

---

[18]   The accuracy of this analysis is revealed by considering the time period between the Court's issuance of the preliminary injunction (and Davis's release from custody) and the passage of Senate Bill 216.  During that time, the Rowan County Clerk's Office issued marriage licenses.

had been granted a permanent injunction.

In this case, the Plaintiffs "prevailed by every measure of victory."  The relief Plaintiffs obtained—the ability to secure marriage licenses and marry—was "preliminary" in name only.  It is not the "fleeting" success that fails to establish prevailing-party status. After the Court obtained compliance with the Preliminary Injunction Orders, Plaintiffs received marriage licenses.[19]  And once the plaintiff-couples received their marriage licenses, their rights were not subject to revocation.  A benefit is irrevocable when it cannot be taken away.  Plaintiffs obtained marriage licenses that could not be revoked. And two of the plaintiff-couples married on those licenses.  That is enduring relief.  There is nothing more the Court could do.

Nor can it be said that Plaintiffs "won a battle but lost the war."  *Sole*, 551 U.S. at 86.  Plaintiffs won the war.  Legally eligible couples, whether same-sex or not, received marriage licenses in Rowan County after the Court enjoined Davis from continuing her "no marriage licenses" policy.  Couples continued to receive marriage licenses after the Kentucky General Assembly amended the law – albeit, on a form Davis felt more comfortable with.  Therefore, Plaintiffs' preliminary-injunction success materially altered their legal relationship with Davis, and that court-ordered change was enduring and irrevocable.  Accordingly, the Court concludes that the Plaintiffs "prevailed" within the meaning of § 1988 and are entitled to attorneys' fees.[20]

---

[19]     Again, the Court recognizes that not all of the plaintiff-couples are currently married.  *See supra* note 13.

[20]     For completeness, the Court quickly notes that "special circumstances" do not exist to justify the denial of attorneys' fees.  *Hensley*, 461 U.S. at 446.  Although the Sixth Circuit has acknowledged that the "special circumstances" doctrine exists, a non-prevailing party must make a "strong showing" to establish such special circumstances.  *Déjà Vu*, 421 F.3d at 422.  In fact, the Sixth Circuit "has never … found a 'special circumstance' justifying the denial of fees.

### D.    Who Pays?

Because the Court has concluded that Plaintiffs are entitled to attorneys' fees, another question must be answered: Who pays?  There are three possible answers: Kim Davis, Rowan County, or the Commonwealth of Kentucky.

The first of these answers—Kim Davis—can easily be rejected.  The Plaintiffs "prevailed" by obtaining a preliminary injunction against Davis in her *official* capacity. "While personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law, individuals sued in their official capacities stand in the shoes of the entity they represent."  *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (internal citations and quotation marks omitted).  Therefore, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  "As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit imposes liability on the entity that he represents."  *Alkire*, 330 F.3d at 810.  Therefore, in official-capacity actions, "a plaintiff who prevails [is] entitled to look for relief, both on the merits and for fees, to the governmental entity."  *Graham*, 473 U.S. at 171.

Accordingly, the entity Davis represents is liable for Plaintiffs' attorneys' fees.  But which government entity did Davis represent and with whom does the buck stop?  Rowan County or the Commonwealth of Kentucky?

---

*McQueary*, 614 F.3d at 604.  A prevailing party's "bad acts" during the course of litigation are not a special circumstance.  *Wikol v. Birmingham Pub. Schs. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004).  Nor is a defendant's good faith.  *Morscott, Inc. v. City of Cleveland*, 936 F.2d 271, 273 (6th Cir. 1991)).  Thus, there are no special circumstances that would render an attorneys' fee award unjust.

Defendant Rowan County claims they are not liable for attorneys' fees, regardless of whether the Plaintiffs "prevailed."  (Docs. # 192, 196 and 203).  Specifically, Rowan County claims that the County cannot be liable for Plaintiffs' attorneys' fees because Davis was acting for the Commonwealth of Kentucky when she refused to issue marriage licenses.  Davis agrees.[21]  Plaintiffs, however, challenge the County's denial of liability and argue that "Davis, in her official capacity, acted as a county official with final policymaking authority when she adopted the 'no marriage licenses' policy."  (Doc. # 194 at 4-11).  Third-Party State Defendants, the Governor of Kentucky and the Commissioner of the Kentucky Department for Libraries and Archives, elected not to participate in the briefing of Plaintiffs' Motion for Attorneys' Fees.[22]

As the Sixth Circuit has recognized, county officials "sometimes wear multiple hats, acting on behalf of the county *and* the State."  *Crabbs v. Scott*, 786 F.3d 426, 429 (6th Cir. 2015); *see also Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993) (A local "official pursues her duties as a state agent when enforcing state law or policy.").

---

[21]     In her attorneys-fee briefing, Davis offered little input on this particular issue, aside from reminding the Court that the preliminary injunction was issued against her in her official capacity, as opposed to her personal capacity.  (Doc. # 193 at 24 n.13).  However, in recently filed briefing in the two companion cases before this Court, Davis affirmatively argues that she was a state actor when she refused to issue marriage licenses.  *See Ermold v. Davis*, No. 0:15-cv-46-DLB (Doc. # 29-1 at 17 therein) ("Kentucky law leaves no doubt that, in issuing and declining to issue marriage licenses, Davis is a state official."); *see also Yates v. Davis*, No. 0:15-cv-62-DLB (Doc. # 29-1 at 17-20 therein).

[22]     The State Defendants' lack of participation in the attorney's-fee briefing does not preclude them from being liable for those fees.  "As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit imposes liability on the entity that he represents."  *Alkire*, 330 F.3d at 810.  The Commonwealth of Kentucky certainly had notice and an opportunity to respond.  The Commonwealth, via the fiction of *Ex Parte Young*, was made a party to this action because of Davis's third-party pleading.  (Docs. # 34 and 39).  Moreover, the Court's Preliminary Injunction Order further put the Commonwealth on notice of its potential liability for Davis's actions.  (Doc. # 43 at 8) ("Thus, Davis likely acts for the State of Kentucky, and not as a final policymaker for Rowan County, when issuing marriage licenses.").

"In that setting," the "question is not whether the officer acts for the State or the county in some categorical, 'all or nothing' manner." *Id.* (citing *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 (1997)).  Rather, the inquiry "hinges on whether the officer represents the State in the 'particular area' or on the 'particular issue' in question."  *Id.* (citing *McMillian*, 520 U.S. at 785 n.2).  "And that depends on how state and local law treat the officer in that setting."  *Id.*  "Relevant factors include: (1) the State's potential liability for a judgment; (2) how state statutes and courts refer to the officer; (3) who appoints the officer; (4) who pays the officer; (5) the degree of state control over the officer; and (6) whether the functions involved fall within the traditional purview of state or local government."  *Id.* (citing *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (en banc)).

In the August 12, 2015 Preliminary Injunction Order, the Court found that Davis likely represented the Commonwealth of Kentucky, and not Rowan County, when issuing marriage licenses.  (Doc. # 43 at 8).  Nothing in the record has altered that preliminary decision.  Consideration of the six factors compels the Court to conclude that Davis acted as a state official and represented the Commonwealth when she refused to issue marriage licenses.[23]

### 1.    The Commonwealth has "potential legal liability."

"The state's potential legal liability for a judgment against the defendant 'is the foremost factor' to consider" in this analysis.  *Lowe v. Hamilton Cty. Dep't of Job & Family*

---

[23]    Another case in this district also concluded that a county clerk, with an unconstitutional marriage-license policy, was a state official.  *See Jones v. Perry*, 215 F. Supp. 3d 563, 568 n.3 (E.D. Ky. 2016) (reasoning that the Shelby County Clerk was subject to suit under the doctrine of *Ex Parte Young*).  Because *Ex Parte Young*'s fiction is only necessary for state officials, the Court necessarily concluded that the County Clerk was acting as a state official, as opposed to a county official.  *See Crabbs*, 786 F.3d at 429 (If defendant is "an officer of the county, not the State … he may not invoke the *State's* sovereign immunity.").

*Servs.*, 610 F.3d 321, 325 (6th Cir. 2010) (citing *Ernst*, 427 F.3d at 359).  "In analyzing this factor, we focus our inquiry on 'the state treasury's *potential* legal liability for the judgment, not whether the state treasury will pay for the judgment in *that* case.'"  *Lowe*, 610 F.3d at 325 (quoting *Ernst*, 427 F.3d at 359) (cautioning courts to focus on the legal consequences of a judgment, not the practicalities of reimbursement or indemnification requirements).  Therefore, the Court must examine the State's sovereign immunity and evaluate whether the judgment against Davis would be enforceable against the Commonwealth.[24]  *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 (1997).

Typically, courts undertake this analysis at the beginning stages of litigation, when attempting to determine whether the government entity is shielded by sovereign immunity. *See*, *e.g.*, *Crabbs*, 786 F.3d 426 (affirming denial of summary judgment and concluding sheriff was county official); *McMillian*, 520 U.S. 781 (affirming dismissal of § 1983 claims and concluding sheriff was state official).  And often, courts are grappling with the request for money damages against a State or state official.  This case, however, is in the

---

[24]     Under this factor, courts also look to state law for statutes that expressly require the State to pay the judgment.  *See Kreipke v. Wayne State Univ.*, 807 F.3d 768, 776 (6th Cir. 2015) (relying on state statute that required "any judgment against [Wayne State University] to be paid out of the state's tax revenues."); *see also Ernst*, 427 F.3d at 360 (discussing state statute that required legislature to "annually appropriate to the retirement system the amount of money needed").  There are no similar statutes to guide the Court in this case.

Plaintiffs attempt to rely on a statute that requires county clerks to remit surplus monies to their County, and a 1993 Kentucky Attorney General Opinion that opines "the fiscal court could, and probably would have a duty to, pay" the County Clerk's Office's necessary expenses if the Office failed to generate sufficient fees, in support of the proposition that Rowan County would be obligated to pay a judgment against the Rowan County Clerk's Office.  (Doc. # 194 at 6) (citing Ky. Rev. Stat. Ann. §§ 64.152, 64.530(3); Ky. OAG 93-4, 1993 WL 443708 (Jan. 27, 1993)).  This argument is untenable.  First, "[t]he proper focus is not on the use of profits or surplus, but rather is on losses and debts."  *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994).  Moreover, neither the statute nor the Attorney General Opinion state that the County is liable for judgments rendered against the County Clerk's Office.  And similarly, there is no statute requiring the Commonwealth to pay.  Therefore, the Court's discussion of the first factor will focus exclusively on sovereign immunity.

homestretch, and Plaintiffs are not seeking monetary damages against the Commonwealth. Nevertheless, to answer the "who pays" question, the Court must circle back and determine which government entity Davis represented when she refused to issue marriage licenses.

In the present case, sovereign immunity is not an issue regardless of whether Davis represented Rowan County or the Commonwealth of Kentucky. If Rowan County is the government entity Davis represented, sovereign immunity provides no refuge. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (Sovereign immunity "does not extend to counties and similar municipal corporations," or their officers.). States and state officials, on the other hand, are protected by sovereign immunity. *Id.* ("The bar of the Eleventh Amendment … extends to States and state officials in appropriate circumstances."). This protection also extends to "arms" of the state. *Id.*; *see also Doe*, 519 U.S. 425. However, sovereign immunity fails to provide a defense for the Commonwealth in this case.

The Eleventh Amendment bars damages actions against a State in federal court. *Graham*, 473 U.S. at 169; *see also Cady v. Arenac Cty.*, 574 F.3d 334, 342 (6th Cir. 2009). "And this bar remains in effect when State officials are sued for damages in their official capacity." *Id.* However, an action "for prospective relief," like the injunctive relief Plaintiffs sought and obtained, is "not treated as [an] action[ ] against the State." *Id.* at 167 n.14 (citing *Ex parte Young*, 209 U.S. 123 (1908)). Therefore, the Commonwealth could not rely on sovereign immunity to protect itself from Plaintiffs' preliminary injunction.

Sovereign immunity also fails to shield the Commonwealth from attorneys' fee liability. Although attorneys' fees and costs may bear resemblance to monetary relief, the

Supreme Court has held that attorneys' fees and costs are "awarded without regard for the States' Eleventh Amendment immunity." *Hutto v. Finney*, 437 U.S. 678 (1978); *see also Tenn. Dep't of Human Servs. v. U.S. Dep't of Educ.*, 979 F.2d 1162, 1169 (6th Cir. 1992). "Unlike ordinary 'retroactive' relief, such as damages or restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court." *Hutto*, 437 U.S. at 695 n.24. "Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief."[25] *Id.* Accordingly, "when a State in a § 1983 action has been prevailed against for relief on the merits, either because the State was a proper party defendant or because state officials properly were sued in their official capacity, fees may … be available from the State under § 1988." *Graham*, 473 U.S. at 170.

Plaintiffs "prevailed" against Kim Davis, in her official capacity, by obtaining prospective, injunctive relief.[26] Therefore, the Commonwealth of Kentucky has potential legal liability for the attorneys' fees that Plaintiffs seek, and the first factor "weighs heavily" in this analysis and "creates a strong presumption" that Davis is a state official with respect to issuing marriage licenses.[27] *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 777

---

[25]    An "award of costs will almost invariably be incidental to an award of prospective relief, for costs are generally awarded only to prevailing parties … and only prospective relief can be successfully pursued by an individual in a suit against a State." *Hutto*, 437 U.S. at 695 n.24.

[26]    A court can award attorneys' fees against a state "only if it already has jurisdiction over some other part of the award." *Tenn. Dep't of Human Servs.*, 979 F.2d at 1170. Therefore, "attorneys' fees can be awarded against the state if the plaintiff prevailed on a request for prospective relief, but not if the defendant was immune" because plaintiff only sought money damages. *Id.*

[27]    The Court recognizes that the result in this case runs counter to the conclusion that usually follows a determination that the State has potential liability. Typically, a conclusion that an official is representing the state (or that an entity is an arm of the state) would result in the entity being protected by sovereign immunity. However, in this case, sovereign immunity does not shield the Commonwealth from liability for attorneys' fees.

28

(6th Cir. 2015).

### 2.   *Kentucky law generally classifies county clerks as "county officials."*

Whether Davis represents the Commonwealth or Rowan County is "dependent on an analysis of state law." *McMillian*, 520 U.S. at 786. The Kentucky Constitution describes county clerks as constitutional county officers. Ky. Const. § 99.[28] Kentucky courts have also generally characterized county clerks as county officials. *See St. Matthews Fire Prot. Dist. v. Aubrey*, 304 S.W.3d 56, 60 (Ky. Ct. App. 2009) (holding county clerk sued in official capacity was entitled to the immunity the county enjoyed); *see also Carroll v. Reed*, 425 S.W.3d 921, 924 (Ky. Ct. App. 2014) (finding that because county clerks "are subject to the code of ethics adopted by local government" and "are considered local officials subject to a measure of control by the fiscal court").

However, the Supreme Court has cautioned that this inquiry's focus on state law "is not to say that state law can answer the question … by, for example, simply labeling" Davis as a state or county official. *McMillian*, 520 U.S. at 786. Instead, an "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law." *Id.* Accordingly, the categorical characterization of county clerks as county officials in the Kentucky Constitution and by Kentucky courts weighs only slightly in favor of finding that Davis represented Rowan County.

---

[28]   The Constitution actually provides for the election of a "County Court Clerk." However, since the creation of a unified court system in 1975, county courts have ceased to function as judicial courts. Ky. Const. § 109. Accordingly, the office is now commonly referred to as "County Clerk."

### 3. County clerks are elected by the voters of each county.

Davis is a constitutional county officer, elected by the constituents of Rowan County.  Ky. Const. § 99.  In the case of a vacancy, the Rowan County Judge/Executive has the responsibility of filling the vacancy, until a successor is elected, as provided under Section 152 of the Kentucky Constitution. Ky. Rev. Stat. Ann. § 63.220.  Therefore, this factor weighs in favor of finding that Davis is a county official.

### 4. County clerks' salaries are not paid by either the Commonwealth or the County.

An examination of Kentucky law presents confusion, rather than clarity, regarding county clerks' funding and pay structure.  County clerks are "compensated … partly from fees and partly by salary."  Ky. Rev. Stat. Ann. § 64.530(3).  The Commonwealth sets county clerks' maximum salary.[29]  Ky. Rev. Stat. Ann. §§ 64.535, 64.5275.  The Rowan County Fiscal Court has no authority to affect or alter the Rowan County Clerk's salary.[30]

Although the Commonwealth sets Davis's salary, that does not answer the question of who pays her salary.  If a clear answer existed, the Court would simply say:

---

[29]    "The General Assembly of the Commonwealth of Kentucky" has found and determined that county clerks "are officers whose duties or jurisdictions are coextensive with that of the Commonwealth" and has set county clerks' maximum salary and annual incentives.  Ky. Rev. Stat. Ann. §§ 64.5275, 64.535; see also Ky. Const. § 246.

[30]    There is one exception to the Rowan County Fiscal Court's lack of authority regarding the Rowan County Clerk's salary.  County clerks have the option to serve as the clerk of the Fiscal Court.  Ky. Rev. Stat. Ann. § 67.120.  If she chooses to do so, the Fiscal Court must set an annual salary for that duty and pay such salary in monthly installments from the County Treasury.  Id. However, this does not permit Fiscal Courts to alter county clerks' statutory salaries.

   The Court also recognizes that Fiscal Courts have the authority to "fix annually the reasonable maximum amount, including fringe benefits, which the [county clerk] may expend for deputies and assistants;" however, only county clerks have the authority to "determine the number of [deputy clerks] to be hired and the individual compensation of each deputy."  Ky. Rev. Stat. Ann. § 64.530(3).  Therefore, not only does the Rowan County Fiscal Court lack authority to set the Rowan County Clerk's salary, it also lacks authority to set the deputy clerks' salaries.

The Commonwealth—or Rowan County—pays Davis's salary. Alas, that is not the case. Instead, county clerks pay their own salaries.[31]

In Kentucky, County Clerks' Offices are funded by the fees generated from the services the Office provides. (Doc. # 26 at 17-18; 25-27). Davis described the Rowan County Clerk's Office as "a pass-through collection agency for many [state] departments." (Doc. # 26 at 24; 58). The Rowan County Clerk's Office funds itself by collecting fees; therefore, "[e]very year, starting on January 1, [the County Clerk's Office] start[s] out with zero dollars." *Id.* at 25. The fees the Rowan County Clerk's Office can charge and collect, including the fee for issuing marriage licenses, are set by state law. Ky. Rev. Stat. Ann. §§ 64.012(19). Therefore, Davis pays her own salary and expenses, from the fees the County Clerk's Office collects. Neither the Commonwealth nor Rowan County pay Davis's salary or fund the Rowan County Clerk's Office. Accordingly, this factor is neutral.

### 5. The Commonwealth exercises substantial control over county clerks with respect to marriage licenses.

The fifth factor—control—weighs heavily in favor of finding Davis represented the Commonwealth. With respect to the issuance of marriage licenses, the Commonwealth

---

[31] To ensure a clear answer to this question did not exist, the Court attempted to follow the fees' path to the county clerks' pockets, but arrived at a dead-end. Fees collected by a County Clerk's Office chart different courses, depending on the size of the county. In counties with a population that equals or exceeds 70,000, the county clerk's salary and office expenses are paid out of the fees the County Clerk's Office collects, which are funneled through the State Treasury. Ky. Rev. Stat. Ann. § 64.350(1). At first glance, one may incorrectly conclude that the Commonwealth pays county clerks' salaries. However, a careful reading of the statute clarifies that county clerks' salaries are dependent upon and derived from the fees collected. *See* Ky. Rev. Stat. Ann. §§ 64.345(4) (discussing potential that the fees collected are insufficient to pay salaries and expenses and allowing the county clerk to make up the deficit, but prohibiting payment for salaries and expenses that exceeds 75% of the amount the county clerk has paid the Commonwealth during her term). For county clerks in counties with a population less than 70,000, like Rowan County, the fees collected appear to be retained by the County Clerk's Office, with only the required portions of fees remitted to the Commonwealth. Therefore, every county clerk's salary is paid by the fees her Office collects.

exercises a substantial degree of control over county clerks.  In the August 12, 2015 Preliminary Injunction Order, the Court relied heavily on that control and found that "Davis likely acts" as a state official, "and not as a final policymaker for Rowan County, when issuing marriage licenses."  (Doc. # 43 at 8).  For the following reasons, the Court again concludes that the Commonwealth exercises a great deal of control over county clerks in this particular area.

First, the Commonwealth completely controls marriage as an institution – defining marriage and the requirements for valid marriages, as well as the dissolution of marriage. Kentucky law vests county clerks with the ministerial duty of issuing marriage licenses,[32] recording marriage certificates after the union is solemnized,[33] and reporting marriages to the Commonwealth.[34]   Ky. Rev. Stat. Ann. § 402.080.  This duty is mandatory, not discretionary, and state statutes dictate every procedure for county clerks to follow when carrying out those laws, right down to the form they must use in issuing marriage licenses. Ky. Rev. Stat. Ann. § 402.100 ("Each county clerk shall make available to the public the form prescribed by the Department for Libraries and Archives for the issuance of a marriage license.").   Counties, on the other hand, have no authority to regulate

---

[32]     In fact, Kentucky law only permits another county officer to issue marriage licenses in the "absence" of the county clerk.  Ky. Rev. Stat. Ann. § 402.240.  And when a county judge/executive exercises these duties, he or she is required to "return a memorandum" to the county clerk.  *Id.*

[33]     Ky. Rev. Stat. Ann. § 402.230 ("The county clerk shall keep in a record book a fair register of the parties' names, the person by whom, or the religious society by which, the marriage was solemnized, the date when the marriage was solemnized, and shall keep an index to the book in which the register is made.").

[34]     Davis testified at the preliminary-injunction hearing that she is required to report to the Kentucky Department of Vital Statistics, which gathers and publishes information about marriages state-wide.  (Doc. # 26 at 57).

marriage.[35]  Thus, county clerks are subject to state control and supervision with respect to issuing, or refusing to issue, marriage licenses.

The Commonwealth also exercises fiscal control over Davis.  In addition to setting her maximum salary, the Commonwealth exercises total control over Davis's ability to collect fees for issuing marriage licenses.  As discussed above, the Rowan County Clerk's Office is "a pass-through collection agency for many [state] departments."  (Doc. # 26 at 24; 58).  The fee that Davis can charge and collect for issuing marriage licenses is set by state law.  Ky. Rev. Stat. Ann. §§ 64.012(19).  Accordingly, the Rowan County Clerk's Office charges $35.50 for issuing marriage licenses.  (Doc. # 26 at 26).  And after collecting the license fee, Davis remits $14.33 to the Commonwealth and retains $21.17 for the Rowan County Clerk's Office.  *Id.*  The County exercises no control, fiscal or otherwise, over Davis's duty to issue marriage licenses.[36]

---

[35]    Plaintiffs acknowledge that "Kentucky law *does not* vest county clerks with discretionary authority to adopt new or additional requirements on the issuance of marriage licenses."  (Doc. # 194 at 9).  However, Plaintiffs argue that Davis's deviation from statutory mandates should be "considered an internal operating policy."  *Id.*  This argument is illogical.   Rowan County has no authority to adopt policies regarding marriage licenses, as Plaintiffs concede; therefore, Davis possessed no authority or discretion to adopt her unconstitutional "no marriage licenses" policy.  Davis's non-compliance with state law does not transform her statutorily-required duties into discretionary county policies.

[36]    In their attempt to hold Rowan County liable for attorneys' fees, Plaintiffs urge the Court to consider the Rowan County Fiscal Court's authority to approve the Rowan County Clerk's Office's budget, and Davis's obligation to remit the Rowan County Clerk's Office revenue surplus to the County.  (Doc. # 194).  Although this may support the conclusion that the Rowan County Fiscal Court exercises *some* fiscal control over the Rowan County Clerk's Office, these facts are largely irrelevant to the narrow marriage-license inquiry.  Moreover, Davis must submit her budget and remit surplus funds to Rowan County because the Commonwealth has imposed those duties on her.  *See* Ky. Rev. Stat. Ann. §§ 64.152, 64.530(3).

The Court recognizes that the Rowan County Clerk's surplus monies may be substantial.  At the time of the preliminary-injunction hearing, Davis testified that the Rowan County Clerk's Office had a surplus of $733,000.00.  (Doc. # 26 at 27).  However, the marriage-license component of the Rowan County Clerk's Office is relatively small.  In 2014, for example, Davis testified that her Office took in $4,500.00 for the 212 marriage licenses issued.  *Id.*  Therefore, even assuming Davis remitted a surplus to the Rowan County Fiscal Court, the monies derived

And lastly, the Commonwealth is the only entity with recourse against recalcitrant county clerks.  The Commonwealth appears to have three avenues for addressing county clerks' dereliction of duties.  First, the Commonwealth, through the General Assembly, can impeach and remove county clerks.  Ky. Const. § 68; *see also Lowe v. Commonwealth*, 60 Ky. 237 (Ky. 1860).[37]  Counties do not have any authority to remove county clerks from office.[38]  Therefore, county clerks "share the same impeachment procedures as" the Commonwealth's executive officials, rather than the less-demanding removal procedures for other county officers.  *McMillian*, 520 U.S. at 788.  Whether this result was intentional or not,[39] this fact is critical and fortifies the Commonwealth's control over county clerks.

---

from marriage licenses would be negligible.  More importantly, the Fiscal Court's approval of the budget and receipt of surplus monies would allow the Fiscal Court to "exert an attenuated and indirect influence" over the Rowan County Clerk's operations, at most.  *McMillian*, 520 U.S. at 792.  Therefore, the Court concludes that the County's fiscal control is insubstantial and irrelevant.

[37]    The Constitution provides for another method of removing certain county officers – indictment or presentment for misfeasance, malfeasance, and nonfeasance.  Ky. Const. § 227.  However, only county judges, justices of the peace, sheriffs, coroners, surveyors, jailers, assessors, county attorneys, and constables can be removed in that manner.  *Id.*  Therefore, this less demanding option is not available for county clerks.

It is worth noting that the Commonwealth's highest court had the authority to remove the clerks of all courts, including county clerks, for good cause until 1975.  *See* Third Const. of Ky. (1850) Art. IV, § 39 (repealed).  However, after the creation of the Kentucky Supreme Court and adoption of the unified court system in 1975, the need for a provision for removing county clerks appears to have been overlooked.  Ky. Const. § 114 (providing the process and requirements for removal for Clerks of the Supreme Court, Court of Appeals, and Circuit Courts).

[38]    For completeness, the Court notes that it did find a Kentucky Supreme Court case affirming the issuance of an "injunction preventing [the newly-elected Powell County Clerk] from acting as county clerk" and "an order declaring the office of the county clerk to be vacant."  *Bowen v. Commonwealth ex rel. Stidham*, 887 S.W.2d 350 (Ky. 1994).  However, the facts of that case support the conclusion that county governments are without authority to remove county clerks.  *Id.* at 351 ("At the instance of the Powell County Judge-Executive," the Commonwealth's Attorney "filed this action in Powell Circuit Court.").

[39]    *See supra* note 37 and accompanying text.

Second, the Commonwealth has the ability to criminally penalize county clerks. *See* Ky. Rev. Stat. Ann. §§ 522.020-030;[40] *see also* Ky. Rev. Stat. Ann. § 402.990.[41] And third, county clerks are required by statute to execute performance bonds to the Commonwealth.[42] Ky. Const. § 103; Ky. Rev. Stat. Ann. § 62.055. These performance bonds act as a "covenant to the Commonwealth of Kentucky … that the [county clerk] will faithfully discharge his duties." Ky. Rev. Stat. Ann. § 62.060. Actions may be brought on these bonds "for the discharge or performance of any public or fiducial office … in the name of the Commonwealth, for its benefit or for that of any person injured by a breach of the covenant or condition." Ky. Rev. Stat. Ann. § 62.070. Each of these avenues allow the Commonwealth to wield authority over county clerks, and their duty to issue marriage licenses. Notably missing are any analogues for Rowan County.[43] Accordingly, the Commonwealth exercises a substantial degree of control over county clerks.

---

[40]   "A public servant is guilty of official misconduct in the first degree when, with intent to obtain or confer a benefit or to injure another person or to deprive another person of a benefit, he knowingly: (a) commits an act relating to his office which constitutes an unauthorized exercise of his official functions; or (b) refrains from performing a duty imposed upon him by law or clearly inherent in the nature of his office; or (c) violates any statute or lawfully adopted rule or regulation relation to his office." Ky. Rev. Stat. Ann. § 522.020(1). "Official misconduct in the first degree is a Class A misdemeanor." Ky. Rev. Stat. Ann. § 522.020(2). Official misconduct in the second degree is a Class B misdemeanor. Ky. Rev. Stat. Ann. § 522.030.

[41]   Ky. Rev. Stat. Ann. § 402.990(6), (7), and (10) penalize a County Clerk for knowingly issuing marriage licenses in violation of state law.

[42]   County Clerk's Offices are also "liable for the acts or omissions of deputy clerks." Ky. Rev. Stat. Ann. § 62.210. However, in this situation "if a deputy clerk omits to act or acts in such a way as to render the clerk responsible, and the clerk discharges such responsibility, the deputy clerk shall be liable to the clerk for all damages and costs caused by the deputy's act or omission." Ky. Rev. Stat. Ann. § 62.210.

[43]   The Court assumes that the Rowan County Fiscal Court has complied with Ky. Rev. Stat. Ann. § 65.003 and enacted a Code of Ethics that applies to the Rowan County Clerk. However, whatever "measure of control" fiscal courts can exercise over county clerks under the Code of Ethics is insufficient to tip this analysis in favor of finding Davis acted as a county official, and irrelevant to an inquiry focused on marriage licenses. *Carroll*, 425 S.W.3d at 924 (Ky. Ct. App. 2014).

The Commonwealth's primacy over counties with respect to the issuance of marriage licenses became increasingly evident as this litigation played out.  On the day the decision in *Obergefell* was issued, then-Governor Beshear issued a "Same-Sex Marriage Mandate" to all government entities involved in the marriage process, instructing them to take all necessary steps to implement the Supreme Court's decision and permit same-sex marriage.  (Doc. # 29-6).  Thereafter, then-Governor Beshear issued several other press releases discussing county clerks, like Davis, who "refus[ed] to perform their duties" and indicated the "courts and voters" would "deal" with those county clerks "appropriately."  (Docs. # 26-9; 26-10).  Therefore, the Commonwealth, rather than the County, had authority over county clerks' issuance of marriage licenses – and ultimately, the General Assembly decided to exercise that authority and modified the marriage license form to appease Davis.

### 6. County clerks' marriage license functions fall within the traditional purview of state government.

Finally, Davis's marriage-license functions fall squarely within the traditional purview of state government.  After all, the Commonwealth has "absolute jurisdiction over the regulation of the institution of marriage."  *Pinkhasov v. Petocz*, 331 S.W.3d 285, 291 (Ky. Ct. App. 2011) (citing *Rowley v. Lampe*, 331 S.W.2d 887, 890 (Ky. 1960)).  Therefore, the Commonwealth has the "absolute legislative authority … over the establishment of legally valid marriages."  *Id.* (citing *Reynolds v. United States*, 98 U.S. 145, 164 (1878)).  Accordingly, the last factor also weighs heavily in favor of finding Davis was representing the Commonwealth.

### 7. The balance of these factors weighs in favor of finding that Davis represented the Commonwealth in this particular area.

Although Davis is elected locally by the voters of Rowan County, and Kentucky law generally classifies county clerks as "county officials," the balance of the factors weighs heavily in favor of finding Davis was a state official and represented the Commonwealth with respect to the issuance of marriage licenses.  The significant control the Commonwealth wields over county clerks with respect to their marriage license functions, which fall within the traditional purview of state government, cannot be mitigated by county elections and categorical labels.  At most, the Rowan County Fiscal Court can "exert an attenuated and indirect influence over the [Rowan County Clerk's Office] operations."  *McMillian*, 520 U.S. at 792.  None of that control, however, can be exerted in the marriage-license context.

Although some of the factors support a finding that Davis represented Rowan County, those factors focus on the generalities of the Rowan County Clerk's Office, rather than a particular function.  The bulk of the evidence weighs heavily in favor of finding that county clerks, when issuing—or refusing to issue—marriage licenses, represent the Commonwealth of Kentucky, not their counties.

This conclusion insulates Rowan County from liability for Plaintiffs' attorneys' fees and costs.  "There is no cause of action against a defendant for fees absent that defendant's liability for relief on the merits."  *Graham*, 473 U.S. at 170.  Where a local official acts as an agent of the state, her actions cannot be attributed to a local municipality.  *Pusey*, 11 F.3d at 659; *see also Williams v. Leslie*, 28 F. App'x 387, 389 (6th Cir. 2002).  As explained above, when Davis made the unilateral decision to adopt a "no marriage licenses" policy, she was acting as an agent of the Commonwealth, not

Rowan County.  Therefore, Rowan County is not liable for Davis's actions or Plaintiffs' attorneys' fees.[44]  Davis represented the Commonwealth of Kentucky when she refused to issue marriage licenses to legally eligible couples.  The buck stops there.

### E.   How Much?

Now that the Court has determined that the Plaintiffs are entitled to attorneys' fees, and the Commonwealth of Kentucky is liable for Davis's acts in her official capacity, the Court must determine a reasonable amount of attorneys' fees and costs.  Plaintiffs seek $231,050.00 in attorneys' fees and $2,008.08 in costs.  (Doc. # 183).

### 1.   Costs

"As part of an attorneys' fee award, § 1988 allows district courts to award 'those incidental and necessary expenses incurred in furnishing effective and competent representation.'"  *Ohio Right to Life Soc'y, Inc. v. Ohio Elections Comm'n*, 590 F. App'x 597, 605 (6th Cir. 2014) (quoting *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 827 (6th Cir. 2013)).  "It is the responsibility of the prevailing party to document and provide evidence regarding the reasonableness of the costs and expenses for which it is seeking an award."  *Id.*  Plaintiffs have carried their burden, and Defendants do not challenge the costs requested.  (Doc. # 183-1 at 26; Doc. # 183-5 at 10).  Accordingly, Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. # 183) is **granted in full** with respect to the costs. The Commonwealth of Kentucky is ordered to pay Plaintiffs $2,008.08 in costs.[45]

---

[44]     Plaintiffs have not alleged any Rowan County policy or custom, apart from Davis's actions, that violated their rights.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[45]     The "term 'prevailing party' in fee statutes is a 'term of art' that refers to the prevailing litigant."  *Astrue v. Ratliff*, 560 U.S. 586, 591 (2010).  Therefore, "the party, rather than the lawyer, is entitle[d] to receive the fees under § 1988(b)."  *Id.*; *see also Ohio Right to Life Soc'y, Inc.*, 590 F. App'x at 602.

### 2.      Attorneys' Fees

If a party has prevailed in a § 1983 action, the Court may award the prevailing party "a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Plaintiffs prevailed and "remed[ied] a civil rights violation," and in doing so, "serve[d] as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Fox*, 563 U.S. at 833 (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968)). "Fee-shifting in such a case … reimburses a plaintiff for what it cost him to vindicate civil rights … and holds to account a violator of federal law." *Id.* (internal citations and quotation marks omitted).

However, "a request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. "The primary concern in an attorney fee case is that the fee awarded be reasonable, that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citing *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)).

### a.      The Lodestar Amount

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. This two-step calculation, known as the lodestar amount, provides an "initial estimate of the value of a lawyer's services." *Id.* "The product of reasonable hours times a reasonable rate does not end the inquiry." *Hensley*, 461 U.S. at 434. After determining the lodestar amount, the court can adjust the fee upward or downward "to reflect relevant considerations peculiar to the subject litigation." *Adcock-*

*Ladd*, 227 F.3d at 349.  However, "trial courts need not, and should not, become green-eyeshade accountants."  *Fox*, 563 U.S. at 838.  "The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection."  *Id.*  Therefore, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  *Id.*

"The party seeking attorneys' fees bears the burden of documenting his entitlement to the award."  *Reed*, 179 F.3d at 472.  "The fee applicant 'should submit evidence supporting the hours worked and rates claimed.'"  *Id.* (quoting *Hensley*, 461 U.S. at 433).  Defendants have not challenged the reasonableness of the hourly rates that Plaintiffs seek, instead focusing on the reasonableness of the hours.  Nevertheless, the Court is required to "provide a concise but clear explanation of its reasons for" awarding a certain amount of fees.  *Hensley*, 461 U.S. at 437.  Therefore, the Court will address the reasonableness of both the hourly rates and the hours expended.

### i. Reasonable Rate

"A trial court, in calculating the 'reasonable hourly rate' component of the lodestar computation, should initially assess the 'prevailing market rate in the relevant community.'"  *Adcock-Ladd*, 227 F.3d at 350.  The "prevailing market rate" is "the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record."  *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 715 (6th Cir. 2016) (citing *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir, 2004)).  Therefore, "the appropriate rate is … the market rate in the venue sufficient to encourage competent lawyers in the relevant community to undertake legal representation."  *Id.* at 716.  "A district court may look to 'a party's submissions, awards in analogous cases, state bar

association guidelines, and its own knowledge and experience in handling similar fee requests.'" *Id.* (quoting *Van Horn v. Nationwide Prop. & Cas. Ins.*, 436 F. App'x 496, 499 (6th Cir. 2011)).  "Furthermore, while the district court may take into consideration an attorney's skill level in identifying the market rate, [the Sixth] Circuit holds that 'reasonable' fees need not be 'liberal fees.'"  *Id.*

Four local attorneys represented Plaintiffs in this action—William Sharp, Daniel Canon, Laura Landenwich, and L. Joe Dunman.  The rates sought for local counsel range from $250.00 to $350.00 per hour.  (Doc. # 183 at 25).  Considering the record and the applicable law, including awards in analogous cases and the Court's own knowledge and experience in handling similar fee requests, these hourly rates are reasonable and proper for attorneys in this geographic area possessing similar skills and experience.  Therefore, local counsels' hourly rates will be as follows: $350.00 for William Sharp, $300.00 for Daniel Canon, $300.00 for Lara Landenwich, and $250.00 for L. Joe Dunman.

Plaintiffs were also represented by four out-of-town attorneys—James Esseks, Ria Tabacco Mar, Dan Mach, and Heather Weaver.  The rates sought for out-of-town counsel range from $350.00 to $700.00 per hour.  *Id.*  Clearly, the requested hourly rates for out-of-town counsel are significantly higher than local counsel.  Typically, out-of-town counsel are not entitled to the prevailing market rates in their home venue.  When an attorney "has voluntarily agreed to represent a plaintiff in an out-of-town lawsuit … the court should deem the 'relevant community' for fee purposes to constitute the legal community within that court's territorial jurisdiction."  *Adcock-Ladd*, 227 F.3d at 350.  The "prevailing market rate" is *not* the "foreign counsel's typical charge for work performed" in the foreign venue, "at least where the lawyer's reasonable 'home' rate exceeds the reasonable 'local'

41

charge." *Id.* (quoting *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir. 1997)).

However, if the out-of-town counsel is a "specialist," a higher hourly rate may be permitted. "Where a fee applicant seeks to recover fees for an out-of-town specialist, the district court must determine '(1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation.'" *Ne. Ohio Coal. for the Homeless*, 831 F.3d at 716 (quoting *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)). "If competent counsel was readily available locally at a lower charge or rate, the district court may apply local market rates to the services provided by the out-of-town specialist." *Id.* After all, § 1988 "does not guarantee civil rights plaintiffs the best counsel in the country; it guarantees them competent counsel." *Id.* (internal citations omitted).

The rates for out-of-town counsel, although "clearly … out of step with the local market," are reasonable. *Id.* at 719. First, Defendants have not challenged these attorneys' qualifications or the need for out-of-town specialists in this case. Moreover, the Court finds that consulting and working with James Esseks and Ria Tabacco Mar—specialists in constitutional litigation concerning the rights of lesbian, gay, bisexual, and transgender people—as well as Daniel Mach and Heather Weaver—specialists in constitutional litigation pertaining to religious-freedom rights—was reasonable.

And, the rates sought by each of the out-of-town specialists are reasonable for an attorney of his or her degree of skill, experience, and reputation. In fact, Mr. Esseks and Ms. Mar have declared that two other ACLU attorneys—Steven R. Simpson and Louise Melling—who practiced on this case have decided not to seek payment for their 70 hours

of time. (Doc. # 183-7 at 6). And Mr. Mach and Ms. Weaver have sought hourly rates lower than the hourly rates received by lawyers of their skill and experience who practice in Washington, D.C. (Doc. # 183-9); *see also Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015). Accordingly, out-of-town counsels' hourly rates will be as follows: $700.00 for James Esseks, $350.00 for Ria Tabacco Mar, $675.00 for Daniel Mach, and $500.00 for Heather Weaver.[46]

### ii.    Reasonable Hours

"In calculating a fee applicant's lodestar, a district court should exclude hours that were not 'reasonably expended' by counsel." *Ohio Right to Life Soc'y, Inc.*, 590 F. App'x at 602 (quoting *Hensley*, 461 U.S. at 434). It is the burden of the party seeking attorneys' fees to adequately document "and submit evidence supporting the hours worked." *Hensley*, 461 U.S. at 433. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly.'" *Id.* Furthermore, the "documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 533 (6th Cir. 2008). "There is no precise rule or formula for making these determinations." *Hensley*, 461 U.S. at 436. "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award." *Id.* at 436-37.

---

[46]    The Western District of Kentucky awarded similar hourly rates for out-of-town specialists, and specifically awarded Mr. Esseks the same hourly rate of $700.00 in *Bourke v. Beshear*, a case that was consolidated with *Obergefell* before the Supreme Court. *Bourke v. Beshear*, No. 3:13-cv-750-CRS, 2016 WL 164626, at *5 (W.D. Ky. Jan. 13, 2016).

"Purely clerical or secretarial" tasks are not compensable.  *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  Clerical work involves tasks that do not require legal knowledge, such as filing motions, preparing or reviewing summons, and receiving and filing correspondence.  *Lay v. Astrue*, No. 5:10-cv-346-DLB, 2012 WL 5988822, at * 5 (E.D. Ky. Nov. 29, 2012) (citing *B&G Mining, Inc. v. Office of Workers' Comp. Programs*, 522 F.3d 657, 666 (6th Cir. 2008) ("receiving and filing correspondence presumably constitutes clerical work")).

Defendants claim that a portion of the fees requested by Plaintiffs are not compensable.  Specifically, Defendants claim that that "many of the entries by Sharp, Mar, and Weaver include billing for clerical tasks."  (Doc. # 192 at 9).  Defendants also accuse Plaintiffs' counsel of "block billing."  *Id.*  The Court agrees.  Examples include converting and filing papers (Doc. # 183-5 at 5 (7/2/2015 Entry)), submitting a check (Doc. # 183-5 at 5 (7/23/15 Entry)), filing notices of appearance (Doc. # 183-7 at 10 (8/21/15 Entry)), circulating motions (Doc. # 183-7 at 11 (10/19/15 Entry)), and filing motions (Doc. # 183-9 at 12 (9/18/15 and 9/21/15 Entries)).

Moreover, several of the billing entries that involve clerical tasks can be characterized as "block billing."  "Block billing involves identifying more than one task in a single billing entry."  *Gibson v. Scott*, No. 2:12-cv-1128-GCS, 2014 WL 661716, at *4 (S.D. Ohio Feb. 19, 2014).  Block billing is not *per se* improper; it 'can be sufficient' if the description of the work performed is adequate."  *Ne. Ohio Coal. for the Homeless*, 831 F.3d at 705 n.7.  However, the use of block billing in entries that contain clerical work render it impossible for the Court to determine the exact amount of non-compensable time included in the requested hours.  For illustrative example only, one billing entry by

44

Ms. Weaver describes 5.5 hours of work as follows: "Revise and edit motion to enforce/clarify; consult with team re draft; reconcile edits; file." (Doc. # 183-9 at 12 (9/21/15 Entry)). The Court is unable to decipher what percentage of the 5.5 hours was expended on filing the motion, which is a non-compensable clerical task. Accordingly, the Court has identified specific billing entries that encompass non-compensable clerical tasks and excluded those hours before calculating the lodestar amount, which is as follows:

| Attorney | Rate | Hours | Lodestar |
|---|---|---|---|
| William Sharp | $350.00 | 224.1[47] | $78,435.00 |
| Daniel Canon | $300.00 | 128.2[48] | $38,460.00 |
| Laura Landenwich | $300.00 | 38.6 | $11,580.00 |
| L. Joe Dunman | $250.00 | 30.3[49] | $7,575.00 |
| Ria Tabacco Mar | $350.00 | 65.3[50] | $22,855.00 |
| James Esseks | $700.00 | 21.1 | $14,770.00 |
| Daniel Mach | $675.00 | 26.4 | $17,820.00 |
| Heather Weaver | $500.00 | 62.4[51] | $31,200.00 |
| | | **Total:** | **$222,695.00** |

[47]   Attorney Sharp's total requested hours are reduced by 6.4 hours. The following billing entries contain non-compensable clerical tasks: 7/2/15, 7/23/15, 7/27/15, 8/6/15, 8/13/15, 8/17/15, 8/23/15, 8/24/15, 8/23/15, 8/25/15, 8/28/15, 9/1/15, 9/2/15, 9/11/15, 9/15/15, 9/21/15, 10/18/15, 10/20/15, 11/3/15, 12/16/15, 6/2/16, 6/17/16. (Doc. # 183-5 at 5-9).

[48]   Attorney Canon's total requested hours are reduced by 5.8 hours. The billing entries on 9/8/15 and 9/18/15 constitute block-billing entries which include non-compensable clerical tasks. (Doc. # 183-6 at 12-13) ("Review and file revised status update; correspond w clients and legal team; review orders from DLB, enter appearance in yet another appeal;" "Draft, finalize and file response in 5978").

[49]   Attorney Dunman's total requested hours are reduced by 0.1 hour. The billing entry on 8/20/15 is a non-compensable clerical task. (Doc. # 183-6 at 10) ("File notice of appearance in CA6").

[50]   Attorney Mar's total requested hours are reduced by 1 hour. The following billing entries contain non-compensable clerical tasks: 8/21/15, 8/21/15, 10/19/15, 1/15/15. (Doc. # 183-7 at 10-11).

[51]   Attorney Weaver's total requested hours are reduced by 8 hours. The billing entries on 9/18/15 and 9/21/15 constitute block-billing entries which include non-compensable clerical tasks. (Doc. # 183-9 at 11-12) ("Consultation with co-counsel re motion to expedite; revise motion; file;" "Revise and edit motion to enforce/clarify; consult with team re draft; reconcile edits; file").

**b.      Fee Adjustment**

"The product of reasonable hours times a reasonable rate does not end the inquiry." *Hensley*, 461 U.S. at 434.  After determining the lodestar amount, the court can adjust the fee upward or downward "to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd*, 227 F.3d at 349.  However, "a 'strong presumption' favors the prevailing lawyer's entitlement to his lodestar fee." *Id.* at 350.  Thus, "modifications to the lodestar are proper only in certain 'rare' and 'exceptional' circumstances, supported by both 'specific evidence' on the record and detailed findings." *Id.* (quoting *Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546, 565 (1986)).

Defendants claim that a reduction of Plaintiffs' attorneys' fees are warranted in this case.  First, "Davis suggests that the Court should reduce Plaintiffs' requested fee by at least half to account for the numerous claims on which Plaintiff did not recover." (Doc. # 193 at 25).  Specifically, Davis challenges the hours expended on Plaintiffs' unsuccessful Motion for Class Certification.  *Id.* at 26.  Davis further suggests that Plaintiffs' attorneys' fees should be reduced by "half again to account for the half of Plaintiffs who abstained from participating in the limited relief Plaintiffs did obtain." *Id.*  Both of these suggestions, which are unaccompanied by any legal support, are rejected.  The lodestar amount will not be reduced.

A "partially prevailing plaintiff may recover an attorney's fee for legal services on unsuccessful claims." *Hensley*, 461 U.S. at 426.  And the Sixth Circuit has "repeatedly rejected mechanical reductions in fees based on the number of issues on which a plaintiff has prevailed." *Déjà Vu*, 421 F.3d at 423.  However, the "extent of a plaintiff's success *is*

a crucial factor in determining the proper amount of an award of attorney's fees." *Hensley*, 461 U.S. at 440 (emphasis added). Especially "where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Id.* at 434.

Because Plaintiffs prevailed only on their request for a preliminary injunction, "two questions must be addressed." *Id.* "First, did the [Plaintiffs] fail to prevail on claims that were unrelated to the claims on which he succeeded?" *Id.* If a "plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Id.* at 440. But, if the "lawsuit consists of related claims, a plaintiff who was won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised." *Id.* Instead, the "result is what matters." *Id.* at 435.

Plaintiffs' "unsuccessful" claims for relief—their requests for a permanent injunction, class certification, declaratory judgment, trial by jury, and damages—were not distinct from Plaintiffs' successful request for a preliminary injunction. Each of Plaintiffs' requests for relief "involve[d] a common core of facts" and were "based on related legal theories"—that their constitutional rights were violated by the Rowan County Clerk's "no marriage license" policy. *Id.* at 435. Characterizing Plaintiffs' other "unsuccessful" requests for relief as "distinct claims," would elevate form over substance. A preliminary injunction, a permanent injunction, and a declaratory judgment asking the Court to make the same finding are *not* distinct claims. Nor is a request for class certification, damages, or a jury trial. Rather, Plaintiffs brought one successful claim in the form of seven different requests for relief. Therefore, the Court will not reduce Plaintiffs attorneys' fees because

they did not obtain the permanent injunction, declaratory judgment, class certification, jury trial, or damages they sought.

Accordingly, the Court must consider the second question: "Did the [Plaintiffs] achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"  *Id.* at 434.  "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," which will typically "encompass all hours reasonably expended on the litigation."  *Id.* at 435.  However, if the "plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."  *Id.* at 436.  In that situation, "the district court should award only that amount of fees that is reasonable in relation to the results obtained."  *Id.* at 440.  "There is no precise rule or formula for making these determinations."  *Id.* at 436.  "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."  *Id.* at 436-37.

Here, Plaintiffs obtained "excellent" results.  *Id.* at 435.  They sought to enjoin Davis from enforcing her "no marriage licenses" policy, vindicate their fundamental right to marry, and obtain marriage licenses; and they did so.  Focusing on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," the Court finds that the lodestar amount is a reasonable attorneys' fee.  *Id.* at 435.  Although two of the plaintiff-couples did not take advantage of their preliminary-injunction success by obtaining marriage licenses from the Rowan County Clerk's Office, a downward adjustment of the lodestar is not warranted.  Davis was "preliminarily enjoined from applying her 'no marriage licenses' policy" to *all* "individuals who are legally

eligible to marry in Kentucky," not just Plaintiffs.  (Doc. # 74).[52]  Thus, it is unknown how many couples obtained marriage licenses because of Plaintiffs' preliminary-injunction success.[53]  There are no "rare" or "exceptional" circumstances which support a reduction of the lodestar amount. and Plaintiffs are entitled to a fully compensatory attorneys' fee.  *Adcock-Ladd*, 227 F.3d at 350.

Considering the relief obtained by the Plaintiffs, a fully compensatory attorneys' fee award is warranted.  Accordingly, Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. # 183) is **granted in part** with respect to the attorneys' fees, and the Commonwealth of Kentucky is ordered to pay Plaintiffs $222,695.00 in attorneys' fees.[54]

## IV.    CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    The Report and Recommendation of the United States Magistrate Judge (Doc. # 199) is hereby **REJECTED** as the findings of fact and conclusions of law of the Court;

(2)    Plaintiffs' Objections (Doc. # 201) are hereby **SUSTAINED** as set forth herein;

---

[52]    The scope of the preliminary injunction serves as an additional basis for rejecting Davis's argument that the Court should exclude all hours expended on work associated with Plaintiffs' Motion for Class Certification as excessive.  (Doc. # 193 at 26).

[53]    The Court does know, however, that at least two other couples received marriage licenses because of the preliminary injunction.  David Ermold and David Moore, plaintiffs in a companion case, received a marriage license from the Rowan County Clerk's Office on September 4, 2015, and married on September 26, 2015.  *Ermold v. Davis*, No. 0:15-cv-46-DLB (Docs. # 27-2 and 27-3 therein).  James Yates and Will Smith, plaintiffs in another companion case, also received a marriage license on September 4, 2015.  *Yates v. Davis*, No. 0:15-cv-62-DLB (Doc. # 17-1 at 4 therein).

[54]    *See supra* note 45 and accompanying text.

(3)     Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. # 183) is hereby **GRANTED** as follows:

(a)     Plaintiffs are **awarded $222,695.00 in attorneys' fees**; and

(b)     Plaintiffs are **awarded $2,008.08 in costs**; and

(4)     This matter is hereby **STRICKEN** from the Court's active docket.

This 21st day of July, 2017.



Signed By:

*David L. Bunning*

United States District Judge

K:\DATA\ORDERS\Ashland Civil\2015\15-44 1988 Attys Fees Order.docx